FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

2009 APR -9 P 1: 02

CLERK US DISTRICT COURT
ALEXANDRIA. VIRGINIA

| | |
|---|---|
| BANK OF AMERICA, N.A.<br>101 North Tryon Street<br>Charlotte, North Carolina 28255<br><br>                   Plaintiff,<br><br>   v.<br><br>AC TECHNOLOGY, INC.<br>22695 Commerce Center Court<br>Dulles, Virginia 20166<br><br>and<br><br>EARLE D. MUNNS, JR.<br>11660 Great Falls Way<br>Great Falls, Virginia 22066<br><br>and<br><br>MICHAEL ANDREW BYRD<br>2201 Darnell Court<br>Bowie, Maryland 20721<br><br>                   Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>Civil Action No.: 1:09 CV 391<br>GBL/TCB |

## VERIFIED COMPLAINT
## FOR BREACH OF CONTRACT, FRAUD AND CONVERSION

Plaintiff Bank of America, N.A. ("Bank of America") files this Complaint against Defendants AC Technology, Inc. ("AC Tech"), Earle D. Munns, Jr., and Michael Andrew Byrd and in support thereof states as follows:

## I.
## Parties, Jurisdiction and Venue

1.      Bank of America is a national banking association with its principal place of business at 100 North Tryon Street, Charlotte, North Carolina 28255.  As such, Bank of America is a citizen of the State of North Carolina.

2.      Defendant AC Tech is a corporation organized under the laws of the Commonwealth of Virginia whose principal place of business is 22695 Commerce Center Court, Dulles, Virginia 20166.

3.      Defendant Earle D. Munns, Jr. is an individual who (i) lives and resides at 11660 Great Falls Way, Great Falls, Virginia 22066 and (ii) regularly conducts business in Dulles, Virginia as the Chief Executive Officer of AC Tech.  Based upon information provided to Bank of America, Earle D. Munns, Jr. owns 52.5% of the shares of AC Tech.

4.      Defendant Michael Andrew Byrd is an individual who (i) lives and resides at 2201 Darnell Court, Bowie, Maryland 20721 and (ii) regularly conducts business in Dulles, Virginia as the Executive Vice President of AC Tech.  Based upon information provided to Bank of America, Michael Andrew Byrd owns 42.5% of the shares of AC Tech.

5.      The amount in controversy in this proceeding, exclusive of interest and costs, exceeds the sum of $75,000.

6.      Jurisdiction and venue are proper in this Court pursuant to the terms of 28 U.S.C. § 1332(a) and 28 U.S.C. § 1391.

## II.
## Factual Background and General Allegations

7.      AC Tech purports to be a "Service-Disabled Veteran Owned Small Business technology and services provider" to the federal government and privately owned companies.

8.      Among other things, AC Tech contracts with governmental agencies (or with contractors working under a government contract) and private entities to deliver technology related products such as software and licenses to that agency or entity.

9.      AC Tech acts as a "reseller" of technology related products, procuring products as required by the particular contract, then generating an invoice payable from the contracting party to AC Tech.  In generating such an invoice, AC Tech creates an "Account," as that term is defined in Section 9-102(a)(2) of the Uniform Commercial Code (UCC).

10.     Bank of America is AC Tech's primary secured lender, having made available to AC Tech a revolving line of credit (the "Line of Credit") in the maximum amount available at any one time of Fifteen Million Dollars ($15,000,000).

11.     The Line of Credit was made available pursuant to the terms and conditions of a Credit and Security Agreement (the "Credit Agreement") dated as of June 30, 2008 between Bank of America, AC Tech, and MB Security, Inc.    A true and accurate copy of the Credit Agreement is attached hereto as Exhibit A and is incorporated by reference herein.

12.     The Line of Credit is evidenced by a Revolving Loan Note (the "Note") dated June 30, 2008 from AC Tech and made payable to the order of Bank of America in the face amount of $15,000,000. A true and accurate copy of the Note is attached hereto as Exhibit B and is incorporated by reference herein.

13.     Collateral security for the repayment of the amounts owed pursuant to the Note is provided by the security interests granted to Bank of America pursuant to the Credit Agreement,

covering all personal property of AC Tech, including AC Tech's accounts receivable (the "Accounts") and all of the proceeds and products thereof.

14.    Bank of America has properly perfected the security interests granted to it pursuant to the Credit Agreement by filing a UCC-1 Financing statement with the Virginia State Corporation Commission, a true and accurate copy of which is attached hereto as Exhibit C and is incorporated by reference herein.

15.    Pursuant to the Credit Agreement and all written agreements, instruments and documents executed in connection therewith (collectively, the "Financing Documents"), Bank of America has a first priority perfected security interest in and to all property and assets of AC Tech.

16.    AC Tech's ability to request advances under the Line of Credit is at all times governed by a feature of the Credit Agreement known as the "Borrowing Base." The Borrowing Base is a formula set forth in the Credit Agreement, and it is designed to ensure that Bank of America would not intentionally lend to AC Tech more money than was adequately secured by "eligible" collateral.

17.    AC Tech's Borrowing Base was defined in the Credit Agreement as:

an amount equal to the sum of (a) ninety percent (90%) of Eligible Government Accounts, plus (b) eighty percent (80%) of Eligible Commercial Accounts, plus (c) fifty percent (50%) of Eligible Unbilled Accounts, minus (d) such reserves as Lender may from time to time establish in good faith on the basis of its Field Exams and otherwise.

A key feature of the Borrowing Base is whether a certain Account of AC Tech was "eligible," based upon historical eligibility criteria standard to the custom and trade of commercial lending.

18.    In order to be eligible, a particular Account must "represent a legal, valid and binding payment obligation of the Account Debtor enforceable in accordance with its terms and arising from an enforceable contract." See Exhibit A, definition of "Eligible Account." In

4

addition, in order to be eligible, AC Tech must "have good and indefeasible title to such Account and the Lender holds a perfected first priority Lien on such Account pursuant to the Financing Documents."

19.    In addition, the Credit Agreement contains the representation by AC Tech that each Account meets certain very specific requirements, most salient in this case the representation that with respect to each Account, "there are no setoffs, claims, or disputes existing or asserted with respect thereto." See Exhibit A, Section 3.17.

20.    Compliance with the Borrowing Base is periodically reported to the Lender pursuant to a "Borrowing Base Certificate," signed by an authorized officer of AC Tech and delivered to the Lender. Each Borrowing Base Certificate contains the following certification:

> I certify the above to be true and correct to the best of my knowledge and belief. We understand that you are relying upon this Report and supporting documents in granting credit to us and we warrant that no Event of Default exists or is imminent under any agreements between us. The undersigned further certifies that all inventory is owned by us free and clear of any liens or encumbrances other than to Bank of America, that the same is under the control and in the possession of the undersigned and otherwise, complies with all provisions of agreements between us.

21.    Under the terms of the Credit Agreement, AC Tech was required to submit a Borrowing Base to Bank of America 25 days after the last day of each calendar quarter. This requirement was revised to require AC Tech to deliver Borrowing Base Certificates to Bank of America on a weekly basis, which AC Tech began to do in January, 2009.

22.    As a material inducement for Bank of America to make the Line of Credit available to AC Tech, Defendant Earle D. Munns, Jr. guaranteed the prompt, punctual and full repayment of all amounts owed by AC Tech to Bank of America pursuant to the terms of that certain Continuing and Unconditional Guaranty dated June 30, 2008 (the "Munns Guaranty"). A

true and accurate copy of the Munns Guaranty is attached hereto as <u>Exhibit D</u> and is incorporated by reference herein.

23.    Similarly, as a material inducement for Bank of America to make the Line of Credit available to AC Tech, Defendant Michael Andrew Byrd guaranteed the prompt, punctual and full repayment of all amounts owed by AC Tech to Bank of America pursuant to the terms of that certain Continuing and Unconditional Guaranty dated June 30, 2008 (the "Byrd Guaranty"). A true and accurate copy of the Byrd Guaranty is attached hereto as <u>Exhibit E</u> and is incorporated by reference herein.

24.    On December 4, 2008, Bank of America received a "Compliance Certificate" required by the Credit Agreement in respect to the calendar quarter ended September 30, 2008 (the "<u>Compliance Certificate</u>").    The Compliance Certificate reported that the Borrower's Funded Debt to EBITDA ratio was, as of the end of such quarter, 20.42:1, which greatly exceeded the covenant requirement of 2.75:1 established by the Financing Documents (the "Covenant Default").

25.    By letter dated December 17, 2008 (the "Default Letter"), a true and accurate copy of which is attached hereto as <u>Exhibit F</u> and is incorporated by reference herewith, Bank of America notified AC Tech that AC Tech defaulted under the Financing Documents by, among other things, (i) suffering the Covenant Default <u>and</u> (ii) providing incorrect and materially misleading information to the Bank in regard to the Borrowers' financial condition as of the June 30, 2008 closing date.    In the Default Letter, Bank of America specifically reserved all of its rights and remedies against AC Tech, Earle D. Munns, Jr. and Michael Andrew Byrd (collectively, the "Obligors").

26.    Following the delivery of the Default Letter, Bank of America and the Obligors commenced discussions regarding the Line of Credit in order to determine whether the Obligors' obligations under the Financing Documents could be restructured, a process known colloquially as a "workout."

27.    In reliance upon Borrowing Base Certificates provided to the Bank by AC Tech, among other things, and the promises of AC Tech's management that AC Tech was actively seeking additional investors in its business (colloquially referred to as "raising equity"), Bank of America agreed to forbear from exercising its remedies against the Obligors pursuant to that certain Loan Modification Agreement dated as of February 18, 2009, a true and accurate copy of which is attached hereto as Exhibit G and incorporated by reference herein.

28.    Following AC Tech's failure to meet the obligations set forth in the Loan Modification Agreement, including AC Tech's failure to repay the Borrowing Base Deficiency as agreed (which was intended to be repaid from the proceeds of new equity raises), Bank of America delivered a letter to AC Tech dated as of March 30, 2009 notifying AC Tech that Bank of America was commencing the enforcement of its rights and remedies under the Financing Documents effective immediately.    A true and copy of the March 30, 2009 letter is attached hereto as Exhibit H and incorporated by reference herein.

29.    Under the terms of the Financing Documents and applicable law, Bank of America has the right immediately to seek legal relief against each of the Obligors for the full amount due and owing under the Financing Documents.

30.    As of April 3, 2009, AC Tech is indebted to Bank of America, pursuant to the terms and conditions of the Financing Documents, in the total principal and interest amount as follows:

| | |
|---|---|
| Principal: | $5,128,093.31 |
| Interest (As of 4/7/2009): | 3,981.50 |
| **TOTAL:** | **$5,132,074.81** |

31.     Interest continues to accrue on the unpaid principal balance due and owing under the Financing Documents at a variable rate which is currently $783.01 per day after April 7, 2009.  Pursuant to the terms and conditions of the Financing Documents, AC Tech is also obligated to repay certain late charges as well as all of Bank of America's attorneys' fees, costs and expenses in connection with this matter.

32.     In order to obtain the initial Advance under the Credit Agreement, Defendant Earle D. Munns, Jr. delivered its initial Borrowing Base Certificate to Bank of America on Sunday, June 29, 2008 by electronic mail, a true and accurate copy of which is attached hereto as Exhibit I and is incorporated by reference herein. As seen on the certificate attached to the electronic mail message, Defendant Michael Andrew Byrd, on behalf of and as an authorized officer of AC Tech, represented to the Bank that its gross accounts receivable were, as of the date of the Certificate, $9,788,299.19 (See Exhibit I, Line 7).

33.     According to AC Tech's official books and records, AC Tech had gross accounts receivable of only $3,525,650.98 as of the date of the initial Borrowing Base Certificate, or $6,262,648.21 less than that which was certified by AC Tech's Michael Andrew Byrd pursuant to the initial Borrowing Base Certificate.

34.     In reliance upon the schedule of "existing indebtedness" attached to the Credit Agreement, the initial Borrowing Base Certificate and other representations of AC Tech and its management, Bank of America advanced AC Tech $5,500,000 at the closing of the Loan.

8

35.     Upon its execution of the Credit Agreement on June 20, 2008, AC Tech became obligated to abide by certain affirmative covenants under the Credit Agreement, including the obligation to regularly report its financial results in accordance with the reporting regime set forth in Section 4.2 of the Credit Agreement.

36.     According to AC Tech's schedule of "existing indebtedness" attached as Schedule 5.3 to the Credit Agreement and delivered to the Lender prior to closing, Arrow Electronics, Inc. (the "Distributor") was listed as an "account payable" of AC Tech in the total amount of Seven Hundred Thirty Five Dollars ($735.00).

37.     On or about August 18, 2008, less than two months after the Initial Advance, the Distributor delivered to Bank of America a certified letter, a true and accurate copy of which is attached hereto as Exhibit J and incorporated by reference herein, stating that the Distributor intended to take a purchase money security interest in certain of AC Technology's inventory.

38.     The next day, August 19, 2009, counsel to Bank of America delivered an electronic mail message to J. Stephen Britt, counsel for AC Tech, a true and accurate copy of which is attached hereto as Exhibit K and incorporated by reference herein, which stated, in pertinent part:

> The credit agreement permits the $735 existing debt to Arrow Electronics existing as of the date of closing, and if this is all that the attached refers to, please confirm for me and we will be done.
>
> If the attached contemplates more or different indebtedness, or the imposition of a lien against the Bank's collateral (which the text of the letter seems to suggest), then the Borrowers are prohibited from incurring it without the prior written consent of the Lender, which would undoubtedly be conditioned upon Arrow's execution of a comprehensive subordination agreement.

39.    On September 19, 2008 (more than one month later), J. Stephen Britt replied with an electronic mail message, a true and accurate copy of which is attached hereto as <u>Exhibit L</u> and incorporated by reference herein, which stated in pertinent part:

> As we discussed, the recent MOCA letter was the result of a mistaken execution of a document by AC Technology. We expect to have the underlying purchase order paid off in the next couple of weeks and have taken steps to ensure it doesn't happen again. It resulted from an over-zealous effort to capture some new A/R.

40.    Contrary to the written and verbal representations of AC Tech's attorney (and 5% owner) J. Stephen Britt, and in direct contravention of the negative covenants set forth in the Credit Agreement, AC Tech intended to and had incurred significant *secured* indebtedness to the Distributor.

41.    In particular, the Distributor had obtained from AC Tech an executed Security Agreement dated as of July 30, 2008, an executed Limited Power of Attorney of even date that, among other things, purported to authorize the Distributor to endorse checks payable to AC Tech and deposit them in the Distributor's bank account, and the Distributor had filed a UCC-1 Financing Statement with the Virginia Secretary of State, a true and accurate copies of all of which are attached hereto collectively as <u>Exhibit M</u> and incorporated by reference herein.

42.    At all times following the closing date of the Loan on June 30, 2008, and the concurrent Borrowing Base Certificate submitted on that day, AC Tech and its senior management continued to assert, in writing, that all of AC Tech's "Eligible Government Accounts" were free of the liens, pledges and interests of the Distributor and indeed any other third party.

43.    Specifically, on August 31, 2008, Defendant Earle D. Munns, Jr. executed and delivered to Bank of America Borrowing Base Certificate (erroneously dated as July 31, 2008), a true and accurate copy of which is attached hereto as <u>Exhibit N</u> and incorporated by reference

herein, which listed AC Tech's total trade accounts receivable as $5,973,724.98. Contrary to the written representation of Mr. Munns, a substantial portion, if not all, of those trade accounts receivable were the subject of the liens, pledges and interests of the Distributor purportedly granted to the Distributor by AC Tech.

44.    According to AC Tech's official books and records, and contrary to the written representation of Mr. Munns, AC Tech had *gross* accounts receivable of only $1,006,054.34 as of August 31, 2008, or $4,967,670.64 less than the total accounts receivable certified by Mr. Munns on that date.

45.    Subsequently, on two subsequent occasions in 2008, and on January 25, 2009, February 6, 2009, February 20, 2009, February 27, 2009, March 13, 2009, March 20, 2009 and March 27, 2009, authorized officers of AC Tech executed and delivered to Bank of America additional Borrowing Base Certificates, each of which contained the same certification as those attached hereto as Exhibits J and N.

46.    At all times between the delivery of the July 31, 2008 Borrowing Base Certificate signed by Defendant Earle D. Munns, Jr., AC Tech and all of its senior management knew that all of AC Tech's so-called Eligible Government Accounts were secretly required to be remitted to a post office box in New Jersey.

47.    Upon information and belief, the post office box, despite being labeled in the name of AC Tech, was a bank "lockbox" exclusively controlled by the Distributor.

48.    AC Tech and the other Defendants knew that all of AC Tech's so-called Eligible Government Accounts had been pledged to the Distributor, in direct contravention of the negative covenants set forth in the Credit Agreement, and intentionally mislead Bank of America in this regard.

49.    At all times between the delivery of the Initial Borrowing Base Certificate, the Compliance Certificate, and each of the Borrowing Base Certificates, Bank of America reasonably relied on the written and verbal representations of AC Tech and the other Defendants.

50.    As a result of its reliance on such representations, Bank of America has suffered damage, including without limitation the loss of its collateral security for the repayment of the Loan.

51.    Since the June 30, 2008 closing of the Line of Credit transaction, AC Tech has repeatedly failed to honor its affirmative covenants, including its covenant to repay the Borrowing Base Deficiency, and has repeatedly failed to refrain from conduct prohibited by its negative covenants, to the demonstrable injury of Bank of America.

52.    In addition, Bank of America has tentatively identified numerous transfers and payments by AC Tech and its management in direct contravention of the negative covenants set forth in the Credit Agreement.

## Count I
### (Breach of Contract – Action on Note vs. AC Technology, Inc.)

53.    Bank of America incorporates by reference herein all of the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

54.    Following its default under the Note, the sum of $5,132,074.81 is immediately due and payable from AC Tech to Bank of America, together with interest that accrues after April 7, 2009 at the daily rate of $783.01, late charges, attorneys' fees, costs and expenses.

55.    AC Tech has refused and continues to refuse to pay such sums.

WHEREFORE, Plaintiff Bank of America, N.A. hereby demands the entry of an order entering judgment in favor of Bank of America, N.A. and against the Defendant, AC Technology, Inc. in the amount of $5,132,074.81, plus interest after April 7, 2009 until judgment

at the daily rate of $783.01, post-judgment interest, costs and attorneys' fees, and for such other and further relief as this Court deems just and equitable.

**Count II**
**(Breach of Contract – Action on Guaranty vs. Defendant Earle D. Munns, Jr.)**

56.    Bank of America incorporates by reference herein all of the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

57.    Pursuant to the Financing Documents, and following the defaults referenced above, all amounts owed thereunder from AC Tech to Bank of America are immediately due and payable. Pursuant to the Munns Guaranty, all the sums due and owing to Bank of America from AC Tech pursuant to the Note are immediately due and payable from Defendant Earle D. Munns, Jr. to Bank of America.

58.    Earle D. Munns, Jr. has refused and continues to refuse to pay the amounts owed to Bank of America pursuant to the Munns Guaranty.

59.    The Munns Guaranty has continuously been in full force and effect since it was executed and delivered to Bank of America, has never been terminated, and is in full force and effect at the present time.

WHEREFORE, Plaintiff Bank of America, N.A. hereby demands the entry of an order entering judgment in favor of Bank of America, N.A. and against the Defendant, Earle D. Munns, Jr., in the amount of $5,132,074.81, plus interest after April 7, 2009 until judgment at the daily rate of $783.01, post-judgment interest, costs and attorneys' fees, and for such other and further relief as this Court deems just and equitable.

**Count III**
**(Breach of Contract – Action on Guaranty vs. Defendant Michael Andrew Byrd)**

60.    Bank of America incorporates by reference herein all of the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

13

61.    Pursuant to the Financing Documents, and following the defaults referenced above, all amounts owed thereunder from AC Tech to Bank of America are immediately due and payable.

62.    Pursuant to the Byrd Guaranty, all the sums due and owing to Bank of America from AC Tech pursuant to the Note are immediately due and payable from Defendant Michael Andrew Byrd to Bank of America.

63.    Michael Andrew Byrd has refused and continues to refuse to pay the amounts owed to Bank of America pursuant to the Byrd Guaranty.

64.    The Byrd Guaranty has continuously been in full force and effect since it was executed and delivered to Bank of America, has never been terminated, and is in full force and effect at the present time.

WHEREFORE, Plaintiff Bank of America, N.A. hereby demands the entry of an order entering judgment in favor of Bank of America, N.A. and against the Defendant, Michael Andrew Byrd, in the amount of $5,132,074.81, plus interest after April 7, 2009 until judgment at the daily rate of $783.01, post-judgment interest, costs and attorneys' fees, and for such other and further relief as this Court deems just and equitable.

## Count IV
### (Fraudulent Misrepresentation against
### Defendants Earle D. Munns, Jr. and Michael Andrew Byrd)

65.    Bank of America incorporates by reference herein all of the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

66.    Defendants Earle D. Munns, Jr. and Michael Andrew Byrd have repeatedly made false representations to Bank of America in connection with AC Tech's Line of Credit.

14

67.     The false representations made by Defendants Earle D. Munns, Jr. and Michael Andrew Byrd involved facts material to the application, establishment, and administration of the Line of Credit, as well as the collateral security for the Line of Credit.

68.     The false representations made by Defendants Earle D. Munns, Jr. and Michael Andrew Byrd to Bank of America were at all times made intentionally and knowingly.

69.     The false representations made by Defendants Earle D. Munns, Jr. and Michael Andrew Byrd were intended to mislead Bank of America.

70.     Bank of America at all times reasonably relied upon the false representations made by Defendants Earle D. Munns, Jr. and Michael Andrew Byrd to Bank of America.

71.     As a result of the false representations made by Defendants Earle D. Munns, Jr. and Michael Andrew Byrd to Bank of America, Bank of America has suffered damages.

WHEREFORE, Plaintiff Bank of America, N.A. hereby demands the entry of an order entering judgment in favor of Bank of America, N.A. and against the Defendants, Earle D. Munns, Jr. Michael Andrew Byrd, jointly and severally, in the amount of $5,132,074.81, plus interest after April 7, 2009 until judgment at the daily rate of $783.01, post-judgment interest, costs and attorneys' fees, punitive damages, and for such other and further relief as this Court deems just and equitable.

## Count V
### (Constructive Fraud against Defendants
### Earle D. Munns, Jr. and Michael Andrew Byrd)

72.     Bank of America incorporates by reference herein all of the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

73.     Defendants Earle D. Munns, Jr. and Michael Andrew Byrd have repeatedly made false representations to Bank of America in connection with AC Tech's Line of Credit.

74.    The representations made by Defendants Earle D. Munns, Jr. and Michael Andrew Byrd involved facts material to the application, establishment, and administration of the Line of Credit, as well as the collateral security for the Line of Credit.

75.    In the event Earl D. Munns, Jr. and Michael Andrew Byrd did not intentionally mislead Bank of America, then their verbal and written representations to Bank of America were made with reckless abandon and disregard for truth.

76.    The false representations made by Defendants Earle D. Munns, Jr. and Michael Andrew Byrd were intended to mislead Bank of America.

77.    Bank of America at all times reasonably relied upon the false representations made by Defendants Earle D. Munns, Jr. and Michael Andrew Byrd to Bank of America.

78.    As a result of the false representations made by Defendants Earle D. Munns, Jr. and Michael Andrew Byrd to Bank of America, Bank of America has suffered damages.

WHEREFORE, Plaintiff Bank of America, N.A. hereby demands the entry of an order entering judgment in favor of Bank of America, N.A. and against the Defendants, Earle D. Munns, Jr. Michael Andrew Byrd, jointly and severally, in the amount of $5,132,074.81, plus interest after April 7, 2009 until judgment at the daily rate of $783.01, post-judgment interest, costs and attorneys' fees, punitive damages, and for such other and further relief as this Court deems just and equitable.

### Count VI
### (Conversion by Defendants
### Earle D. Munns, Jr. and Michael Andrew Byrd)

79.    Bank of America incorporates by reference herein all of the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

80.    The Line of Credit was extended to AC Tech to provide, among other things, a base of working capital and to ensure the existence of sufficient funds and collateral for Bank of America.

81.    Defendants Earle D. Munns, Jr. and Michael Andrew Byrd, without authorization, and to the detriment of Bank of America, directed proceeds from the Line of Credit to their personal accounts.

WHEREFORE, Plaintiff Bank of America, N.A. hereby demands the entry of an order entering judgment in favor of Bank of America, N.A. and against the Defendants, Earle D. Munns, Jr. and Michael Andrew Byrd jointly and severally, in the amount of $5,132,074.81, plus interest after April 7, 2009 until judgment at the daily rate of $783.01, post-judgment interest, costs and attorneys' fees, punitive damages, and for such other and further relief as this Court deems just and equitable.

Respectfully submitted,

Nikolaus F. Schandlbauer
(Admission pending *pro hac vice*)
E. John Steren
(Admission pending *pro hac vice*)
Paul M. Vincent (Virginia Bar No. 08324)
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W., Suite 500
Washington, D.C. 20005-3324
(202) 408-8400
(202) 408-0640 Facsimile

**Attorneys for Plaintiff,**
**Bank of America, N.A.**

## VERIFICATION PURSUANT TO 28 U.S.C. § 1746

I declare under the penalty of perjury that the foregoing factual allegations are true and correct.

Dated: April 8, 2009

_Robert S. Cashion_
Robert S. Cashion
Senior Vice President
Bank of America, N.A.

18