# CREDIT AND SECURITY AGREEMENT

THIS CREDIT AND SECURITY AGREEMENT (this "Agreement") is made as of June 30, 2008 by and between MB SECURITY CORPORATION, a Delaware corporation ("MB Security") and AC TECHNOLOGY, INC., a Virginia corporation (collectively with MB Security, the "Borrowers")and BANK OF AMERICA, N.A., a national banking association (the "Lender").

## R E C I T A L S

The Borrowers have requested that the Lender make available to the Borrowers (a) a revolving credit facility pursuant to which the Lender will make advances to the Borrowers from time to time in an aggregate principal amount not to exceed Ten Million Dollars ($10,000,000) at any one time outstanding, and (b) an uncommitted guidance line facility pursuant to which the Lender may from time to time make guidance line advances (to increase the revolving credit facility) in an aggregate principal amount not to exceed Fifteen Million Dollars ($15,000,000). The Lender has agreed to make these credit facilities available to the Borrowers, subject to and upon the terms and conditions hereinafter set forth.

## AGREEMENTS

SECTION 1.  The Credit Facilities.

1.1.    Definitions.  All capitalized terms used herein and not otherwise defined shall have the following meanings:

"Account Debtor" means any Person who may become obligated to the Borrowers under, with respect to, or on account of, an Account, Chattel Paper or General Intangibles (including a Payment Intangible).

"Accounts" has the meaning given to such term in the UCC.

"Additional Financing Documents" has the meaning given to such term in Section 1.4(e) hereof.

"Advances" means advances made by the Lender to the Borrowers under the Revolving Credit Facility.

"Applicable Margin" shall mean the margin added to the LIBOR Rate to obtain the interest rate for the outstanding Advances under the Revolving Credit Facilities set forth in the Table attached hereto as Attachment I. The Applicable Margin during any calendar quarter shall be set based upon the Borrowers' ratio of Total Funded Debt to EBITDA as of the last day of the immediately prior calendar quarter, and the Applicable Margin shall be determined and adjusted quarterly on the first day of the first month after the date by which the annual and quarterly



EXHIBIT
A

compliance certificates and related financial statements and information are required in accordance with the provisions of this Agreement.

"AutoBorrow Service Agreement" means an AutoBorrow Service Agreement in effect from time to time between the Borrowers and the Lender.

"Board" means the Board of Governors of the Federal Reserve System of the United States.

"Borrowers" shall mean as set forth in the recitals.

"Borrowing Base" means an amount equal to the sum of (a) ninety percent (90%) of Eligible Government Accounts, plus (b) eighty percent (80%) of Eligible Commercial Accounts, plus (c) fifty percent (50%) of Eligible Unbilled Accounts, minus (d) such reserves as Lender may from time to time establish in good faith on the basis of its Field Exams and otherwise.

"Borrowing Base Certificate" means a borrowing base certificate in the form attached hereto as Exhibit A.

"Borrowing Base Deficiency" has the meaning set forth in Section 1.2(g) of this Agreement.

"Breakage Fees" means an amount equal to any net loss or out-of-pocket expenses which the Lender may sustain or incur (including, without limitation, any net loss or expense incurred by reason of the liquidation or re-employment of deposits or other funds acquired by the Lender to fund or maintain the Advances, or any swap breakage incurred in connection with any Hedge Agreement), as reasonably determined by the Lender, as a result of any prepayment of any the Advances.

"Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in the Commonwealth of Virginia are authorized to close.

"Capital Lease" means any lease that has been or should be capitalized on the books of the Borrowers in accordance with GAAP.

"Cash Flow" shall mean (a) net income, after income tax, (b) plus interest expense on all obligations, (c) plus depreciation and amortization, (d) plus lease and/or rent expense, (e) minus dividends, withdrawals and other distributions and (f) minus any unfinanced capital expenditures.

"Chattel Paper" has the meaning given to such term in the UCC.

"Claim" has the meaning given to such term in Section 7.9(a).

"Closing Date" means the date on which all conditions to closing as set forth in Section 2.1 of this Agreement are satisfied.

"Collateral" means all of the Borrowers' personal property, both now owned and hereafter acquired, including, insofar as any of the following are applicable, but not limited to:

(a)     Accounts, including, without limitation, all collateral security of any kind given to any Account Debtor or other Person with respect to any Account;

(b)     As-extracted collateral;

(c)     Chattel Paper;

(d)     Commodity Accounts;

(e)     Commodity Contracts;

(f)     Deposit Accounts;

(g)     Documents;

(h)     Equipment;

(i)     Farm Products;

(j)     Fixtures;

(k)     General Intangibles, including, but not limited to, (i) all patents, and all unpatented or unpatentable inventions; (ii) all trademarks, service marks, and trade names; (iii) all copyrights and literary rights; (iv) all computer software programs; (v) all mask works of semiconductor chip products; (vi) all trade secrets, proprietary information, customer lists, manufacturing, engineering and production plans, drawings, specifications, processes and systems;

(l)     Goods, and all accessions thereto and goods with which the Goods are commingled;

(m)     Health Care Insurance Receivables;

(n)     Instruments;

(o)     Inventory;

(p)     Investment Property;

(q)     Letter-of-Credit Rights;

(r)     Payment Intangibles;

(s)     Promissory Notes;

(t)     Software;

(u)     The commercial tort claims specifically described on Schedule 1.1, if any.

(v)     Letters patent, applications for letters patent, trademarks, applications for trademarks, service marks, trade names, and copyrights, whether registered or unregistered, together with all royalties, fees, and other payments made or to be made with respect to any of the foregoing, and all rights, interests, claims, and demands that the Borrowers have or may have and existing and future profits and damages for past or future infringement thereof; and

(w)     all proceeds and products of any of the foregoing.

"Collateral Account" has the meaning set forth in Section 7.5 of this Agreement.

"Collection Account" means the collection account established pursuant to this Agreement.

"Commodity Accounts" has the meaning given to such term in the UCC.

"Commodity Contracts" has the meaning given to such term in the UCC.

"Credit Facilities" means the Revolving Credit Facility and any other credit facilities established subsequently hereto.

"Default" has the meaning set forth in Section 6 of this Agreement.

"Default Rate" means a floating and fluctuating per annum rate of interest calculated by adding the sum of four percent (4.0%) to the rate of interest otherwise then in effect.

"Deposit Accounts" has the meaning given to such term in the UCC.

"Documents" has the meaning given to such term in the UCC.

"EBITDA" shall mean (a) net income, after income tax, (b) less income or plus loss from discontinued operations and extraordinary items, (c) plus interest expense on all operations, (d) plus taxes, (e) plus depreciation, and (f) plus amortization, calculated on trailing twelve-month basis.

"Eligible Account" means, at any date of determination, each Account of the Borrowers which satisfies each of the following requirements or conditions:  (a) such Account complies with all applicable laws, including, without limitation, usury laws, the Federal Truth in Lending Act and Regulation Z of the Board of Governors of the Federal Reserve System; (b) such Account, at the date of issuance of its invoice, was payable not more than 90 days after the original date of issuance of the invoice therefor; (c) such Account has not been outstanding for more than 90 days past the date upon which such invoice was issued; (d) such Account was created in connection with the sale of goods or the performance of services by the Borrowers in the ordinary course of business and such goods or services have been delivered or performed, as applicable; (e) such Account represents a legal, valid and binding payment obligation of the Account Debtor enforceable in accordance with its terms and arising from an enforceable contract; (f) the Borrowers have good and indefeasible title to such Account and the Lender holds a perfected first priority Lien on such Account pursuant to the Financing Documents; (g) such Account does not arise out of a contract with, or an order from, an account debtor that, by its terms (other than terms which are invalid under applicable law), prohibits or makes void or unenforceable the grant of a security interest to the Lender in and to such Account; (h) the amount of such Account included in Eligible Accounts is not subject to any setoff, counterclaim, defense, dispute, recoupment or adjustment other than normal discounts for prompt payment; (h) the Account Debtor with respect to such Account is not insolvent or the subject of any bankruptcy or insolvency proceeding and has not made an assignment for the benefit of creditors, suspended normal business operations, dissolved, liquidated, terminated its existence, ceased to pay its debts as they become due or suffered a receiver or trustee to be appointed for any of its assets or affairs; (i) such Account is not evidenced by chattel paper or instruments unless the Lien on such chattel paper or instrument is a perfected first priority Lien on such chattel paper or instrument in favor of the Lender pursuant to the Financing Documents; (j) such Account is not owed by an affiliate of the Borrowers; (k) such Account is payable in Dollars by the Account Debtor; (l) the Account Debtor is not domiciled in or organized under the laws of

any country other than the United States of America, unless such Account is fully secured by credit insurance acceptable to the Lender, or a letter of credit issued or confirmed by a bank acceptable to the Lender and which has capital and surplus exceeding $100,000,000 and such letter of credit contains terms and conditions reasonably acceptable to the Lender; (m) the Account Debtor with respect to such Account is not located in New Jersey, Minnesota, West Virginia or any other state denying creditors access to its courts in the absence of a notice of business activities report or other similar filing, unless the Borrowers have either qualified as a foreign corporation authorized to transact business in such state or has filed a notice of business activities report or similar appropriate filing with the applicable state agency for the then current year; (n) if such Account arises pursuant to a Government Contract, such Account shall be directly assigned to the Lender in conformity with the Federal Assignment of Claims Act of 1940, as amended (unless the Lender has waived such requirement with respect to such Account); and (o) the Account meets such other criteria as the Lender shall from time to time reasonably establish in good faith; provided that any Account which is at any time an Eligible Account but which subsequently fails to meet the criteria for an Eligible Account shall immediately cease to be an Eligible Account.

"Eligible Commercial Account" means an Eligible Account that does not arise out of a Government Contract.

"Eligible Government Account" means an Eligible Account that arises out of a Government Contract.

"Eligible Unbilled Accounts" means, at any date of determination, each Account of a Borrowers that has not yet been billed to the Account Debtor but which (a) will be billed in accordance with the Borrowers' standard billing procedures within thirty (30) days, (b) is attributable solely to timing differences for work completed and costs incurred under Government Contracts, and (c) when billed, shall constitute an Eligible Government Account, and (d) is not otherwise reasonably determined in good faith to be unacceptable to the Lender.

"Enforcement Costs" means all reasonable expenses, charges, recordation or other taxes, costs and fees (including reasonable attorneys' fees and expenses) of any nature whatsoever advanced, paid or incurred by or on behalf of the Lender in connection with (a) the collection or enforcement of this Agreement or any of the other Financing Documents, (b) the creation, perfection, maintenance, preservation, defense, protection, realization upon, disposition, collection, sale or enforcement of all or any part of the Collateral, and (c) the exercise by the Lender of any rights or remedies available to it under the provisions of this Agreement, or any of the other Financing Documents.

"Environmental Laws" means all laws, statutes, rules, regulations or ordinances which relate to Hazardous Materials and/or the protection of the environment or human health.

"Equipment" means all of the Borrowers' equipment, as such term is defined by the Uniform Commercial Code, together with all additions, parts, fittings, accessories, special tools, attachments, and accessions now and hereafter affixed thereto and/or used in connection therewith, and all replacements thereof and substitutions therefor.

"ERISA" means the Employee Retirement Income Security Act of 1974 ("ERISA").

"Event of Default" has the meaning set forth in Section 6 of this Agreement.

"Farm Products" has the meaning given to such term in the UCC.

"Field Exam" has the meaning set forth in Section 4.9 of this Agreement.

"Financing Documents" means, collectively, this Agreement, the Note, any Hedge Agreement, any Letter of Credit Agreement, any Additional Financing Documents, and any other instrument, document or agreement now or hereafter executed, delivered or furnished by the Borrowers or any other person evidencing, guaranteeing, securing or in connection with this Agreement or all or any part of the Credit Facilities.

"Fixed Charge Coverage Ratio" means the ratio of (a) Cash Flow to (b) Fixed Charges.

"Fixed Charges" means the sum of scheduled principal payments made on long-term debt and capitalized lease obligations, plus interest expense, plus lease and/or rent expense.

"Fixtures" has the meaning given to such term in the UCC.

"GAAP" means generally accepted accounting principles in the United States of America.

"General Intangibles" means all of the Borrowers' general intangibles, as such meaning is defined by the Uniform Commercial Code, together with all of the Borrowers' letters patent, applications for letters patent, trademarks, applications for trademarks, service marks, trade names and copyrights, whether registered or unregistered, together with all goodwill of the business of the Borrowers relating thereto, any and all reissues, extensions, divisions or continuations thereof, all royalties, fees and other payments made or to be made to the Borrowers with respect thereto, and all rights, interests, claims and demands that the Borrowers have or may have in existing and future profits and damages for past and future infringements thereof.

"Goods" has the meaning given to such term in the UCC.

"Government Contract" means (i) any contract entered into by the Borrowers with the United States government or any state or local government or any division, department, or instrumentality thereof and (ii) any contract entered into between the Borrowers and any "prime" contractor providing goods and services to the United States government or any state or local government or any division, department, or instrumentality thereof.

"Guaranties" means, collectively, the Continuing and Unconditional Guaranties of Payment executed in favor of the Lender by the Guarantors.

"Guarantors" means, collectively, Earle D. Munns, Jr. and Michael A. Byrd.

"Guidance Line Advance" shall have the meaning set forth in Section 1.3 hereof.

"Guidance Line Facility" shall mean the uncommitted credit facility established pursuant to Section 1.3 hereof, in the amount of not more than Fifteen Million Dollars ($15,000,000).

"Hazardous Materials" shall mean hazardous wastes, hazardous substances, toxic chemicals and substances, oil and petroleum products and their by-products, radon, asbestos, pollutants or contaminants.

"Hedge Agreement" means any agreement between the Borrowers and the Lender or any affiliate of the Lender now existing or hereafter entered into, which provides for an interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross-currency rate swap, currency option, or any similar transaction or any combination of, or option with respect to, these or similar transactions, for the purpose of hedging the Borrowers' exposure to fluctuations in interest or exchange rates, loan, credit, exchange, security or currency valuations or commodity prices.

"Health Care Insurance Receivables" shall have the meaning given to such term in the UCC.

"Instruments" has the meaning given to such term in the UCC.

"Interest Payment Date" has the meaning set forth in Section 1.2(d) of this Agreement.

"Interest Rate Change Date" shall mean the first day of each one-month period; provided, however, that if any such day is not a Business Day, at Lender's option, the Interest Rate Change Date shall be the next succeeding Business Day.

"Inventory" means all of the Borrowers' now owned and hereafter acquired inventory as such term is defined by the Uniform Commercial Code, wherever located and however constituted, including, without limitation, raw materials, work and goods in process, finished goods, goods or inventory returned or repossessed or stopped in transit, supplies, packaging, shipping and other materials, all other goods, merchandise and personal property used or consumed in the business of the Borrowers, and all documents and documents of title relating to any of the foregoing.

"Investment Property" has the meaning given to such term in the UCC.

"Letter of Credit" means any letter of credit issued by the Lender for the account of the Borrowers under the Revolving Credit Facility.

"Letter of Credit Account" has the meaning set forth in Section 1.2(m) of this Agreement.

"Letter of Credit Agreement" means an Application and Agreement for Letter of Credit on the Lender's standard form, as such form may be revised by the Lender in its discretion at any time and from time to time hereafter.

"Letter of Credit Exposure" means at any time the sum of (x) the undrawn amount of all Letters of Credit outstanding at such time, and (y) all Letter of Credit Obligations outstanding at such time.

"Letter of Credit Fee" has the meaning set forth in Section 1.2(l) of this Agreement.

"Letter of Credit Obligations" means, collectively, (i) the amount of each draft drawn under or purporting to be drawn under a Letter of Credit, (ii) the amount of any and all charges, reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) which the Lender may charge, pay or incur for drawings under a Letter of Credit, transfers of a Letter of Credit, amendments to and extensions of a Letter of Credit and for the prosecution or defense of any action arising out of or in connection with any Letter of Credit, including, without limitation, any action to enjoin full or partial payment of any draft drawn under or purporting to be drawn under any Letter of Credit, including, but not limited to, Letter of Credit Fees, (iii) interest on all amounts payable under (i) and (ii) above from the date due until paid in full at a per annum rate of interest equal at all times to the Default Rate.

"Letter of Credit Rights" has the meaning given to such term in the UCC.

"Lender" shall mean Bank of America, N.A., a national banking association.

"LIBOR-Based Rate" means a per annum rate of interest equal at all times to the sum of the LIBOR Rate plus the Applicable Margin. The LIBOR-Based Rate shall change immediately and contemporaneously with each change in the LIBOR Rate.

"LIBOR Rate" means, at any time, the rate of interest equal to the rate per annum (rounded upwards to the nearest 1/100 of one percent) equal to the British Bankers Association LIBOR Rate ("BBA LIBOR"), as published by Reuters (or other commercially available source providing quotations of BBA LIBOR as selected by the Lender from time to time) as determined for each Interest Rate Change Date at approximately 11:00 a.m. London time two (2) London Banking Days prior to the Interest Rate Change Date, for U.S. Dollar deposits (for delivery on the first day of such interest period) with a term of one month, as adjusted from time to time in the Lender's sole discretion for Reserve Requirements, deposit insurance assessment rates and other regulatory costs. If such rate is not available at such time for any reason, then the rate for that interest period will be determined by such alternate method as reasonably selected by the Lender.

"London Banking Day" means a day on which the Lender's London Banking Center is open for business and dealing in offshore dollars.

"Note" means the Revolving Credit Note of even date herewith from the Borrowers made payable to the order of the Lender.

"Obligations" shall mean all present and future indebtedness, liabilities and obligations of any kind and nature whatsoever of the Borrowers to the Lender both now existing and hereafter arising under, as a result of, on account of, or in connection with, this Agreement and any and all amendments, restatements, supplements and modifications hereof made at any time and from time to time hereafter, the Note, any and all extensions, renewals or replacements thereof,

amendments thereto and restatements or modifications thereof made at any time or from time to time hereafter, the Letter of Credit Agreements, or the other Financing Documents, including, without limitation, future advances, principal, interest, indemnities, fees, late charges, Letter of Credit Exposure, Enforcement Costs and other costs and expenses whether direct, contingent, joint, several, matured or unmatured, and the indebtedness owed under any Hedge Agreement.

"Payment Intangibles" has the meaning given to such term in the UCC.

"PBGC" means the Pension Benefit Guaranty Corporation or its successor entity.

"Permitted Liens" means liens permitted pursuant to Section 5.4 of this Agreement.

"Person" means any natural person, individual, company, corporation, partnership, joint venture, unincorporated association, government or political subdivision or agency thereof, or any other entity of whatever nature.

"Plan" means any pension, employee benefit, multi-employer, profit sharing, savings, stock bonus or other deferred compensation plan.

"Prime-Based Rate" means a floating and fluctuating per annum rate of interest equal at all times to the sum of the Prime Rate plus one percent (1%).

"Prime Rate" shall mean the floating and fluctuating per annum rate of interest of the Lender at any time and from time to time established and declared by the Lender in its sole and absolute discretion as its prime rate, and does not necessarily represent the lowest rate of interest charged by the Lender to borrowers.

"Promissory Notes" has the meaning given to such term in the UCC.

"Reserve Requirements" means the maximum rate (expressed as a decimal) at which reserves (including any marginal, supplemental, emergency or other reserves) are required to be maintained under Regulation D of the Federal Reserve Board or otherwise by any statute or regulation applicable to the class of commercial banks which includes the Lender.

"Revolving Credit Account" means the loan account maintained by the Lender with respect to advances, repayments and prepayments of Advances, the accrual and payment of interest on Advances and all other amounts and charges owing to the Lender in connection with Advances.

"Revolving Credit Amount" means the amount of Ten Million Dollars ($10,000,000), as the same may from time to time be increased in accordance with the provisions of Section 1.3 of this Agreement.

"Revolving Credit Expiration Date" means June 30, 2011, or such later date as to which the Lender shall, in its discretion, agree to extend the Revolving Credit Expiration Date.

"Revolving Credit Exposure" means, at any time, the sum of the aggregate principal amount of outstanding Advances plus the Letter of Credit Exposure.

"Revolving Credit Facility" shall mean the revolving credit facility established pursuant to Sections 1.2 and 1.3 hereof, as applicable, in a maximum principal amount at any one time outstanding equal to the Revolving Credit Amount, made available to the Borrowers pursuant to this Agreement.

"Software" has the meaning given to such term in the UCC.

"Subordinated Debt" means debt of the Borrowers, the payment of which subordinated to the repayment of the Advances on terms satisfactory to the Lender in its sole discretion.

"Subsidiary" means an entity of which the Borrowers directly or indirectly owns or controls securities or other ownership interests representing more than 50% of the ordinary voting power thereof.

"Subsidiary Guaranty" means each guaranty agreement executed and delivered by each Subsidiary of the Borrowers to the Lender, in form and substance reasonably satisfactory to the Lender.

"Subsidiary Security Agreement" means each security agreement executed and delivered by each Subsidiary of the Borrowers to the Lender, in form and substance reasonably satisfactory to the Lender.

"Total Funded Debt" shall mean all outstanding liabilities for borrowed money and other interest-bearing liabilities, including current and long-term debt, Capital Leases and Subordinated Debt.

"Unused Commitment Fee" shall mean the fee paid by the Borrowers to the Lender pursuant to Section 1.2(e).

"Unused Commitment Fee Percentage" shall mean the percentage upon which the Unused Commitment Fee shall be calculated, as determined in accordance with Attachment I hereto. The Unused Commitment Fee Percentage earned during any calendar quarter shall be determined based upon the Borrowers' ratio of Total Funded Debt to EBITDA as of the last day of the immediately prior calendar quarter. The Unused Commitment Fee Percentage shall be determined and adjusted quarterly on the first day of the first month after the date by which the annual and quarterly compliance certificates and related financial statements and information are required in accordance with the provisions of this Agreement.

1.2.    Revolving Credit Facility.

(a)    Advances and Letters of Credit. Subject to and upon the provisions of this Agreement and relying upon the representations and warranties herein set forth, the Lender agrees at any time and from time to time to make Advances to the Borrowers and issue Letters of Credit for the account of the Borrowers from the date hereof until the earlier of the Revolving Credit Expiration Date or the date on which this Revolving Credit Facility is terminated pursuant to Section 7 hereof, in an aggregate principal amount at any time outstanding not to exceed the lesser of (i) the Revolving Credit Amount or (ii) the Borrowing Base; provided however, that in no event shall the total Letter of Credit Exposure exceed $5,000,000 at any one time.

In no event shall the Lender be obligated to make an Advance or issue a Letter of Credit hereunder if a Default shall have occurred and be continuing. Unless sooner terminated pursuant to other provisions of this Agreement, this Revolving Credit Facility and the obligation of the Lender to make Advances and issue Letters of Credit hereunder shall automatically terminate on the Revolving Credit Expiration Date without further action by, or notice of any kind from, the Lender. Within the limitations set forth herein and subject to the provisions of this Agreement, the Borrowers may borrow, repay and reborrow under this Revolving Credit Facility. The fact that there may be no Advances or Letters of Credit outstanding at any particular time shall not affect the continuing validity of this Agreement.

(b)    Use of Proceeds of Advances. Each Advance shall be advanced by the Lender not later than the Business Day following the day (which shall be a Business Day) of the Borrowers' request therefor. The proceeds of each Advance may be deposited by the Lender in the Borrowers' demand deposit account with the Lender. The proceeds of the Advances shall be used solely for working capital, for the issuance of Letters of Credit, and for other lawful purposes.

(c)    Liability of Lender. Lender shall in no event be responsible or liable to any person other than Borrowers for the disbursement of or failure to disburse Advances or any part thereof, and no other party shall have any right or claim against Lender under this Agreement or the other Financing Documents.

(d)    Interest on Advances; Repayment of Advances. Except for any period during which an Event of Default shall have occurred and be continuing, the Borrowers shall pay interest (calculated on a daily basis) on the unpaid principal balance of the Advances until maturity (whether by acceleration, extension or otherwise) at a per annum rate of interest equal at all times to the LIBOR-Based Rate in effect from time to time.

After maturity, or during any period in which an Event of Default exists and remains continuing, the unpaid principal balance of the Advances shall bear interest at a rate equal to the Default Rate.

Notwithstanding any other provision of this Agreement, if the Lender determines in good faith (which determination shall be conclusive) (i) that any applicable law, rule, or regulation, or any change in the interpretation of any such law, rule, or regulation shall make it unlawful or impossible for the Lender to charge or collect interest at the LIBOR-Based Rate, or (ii) that quotations of interest rates for the relevant deposits referred to in the definition of the LIBOR-Based Rate are not being provided in the relevant amounts or for the relevant maturities, then upon notice from the Lender to the Borrowers, the entire outstanding principal balance of the Revolving Credit Facility shall bear interest at the Prime-Based Rate.

Until the maturity of the Revolving Credit Facility, all accrued and unpaid interest on all Advances shall be paid monthly on the first day of each month (each, an "Interest Payment Date").

If not sooner paid, the entire outstanding principal balance of the Advances, together with all accrued and unpaid interest thereon, shall be due and payable on the Revolving Credit Expiration Date.

(e)    Unused Commitment Fee. During the period from the date hereof until the earlier of the Revolving Credit Expiration Date or the date on which the Revolving Credit Facility is terminated pursuant to the provisions hereof, the Borrowers shall pay to the Lender an availability fee in a per annum amount equal to the Unused Commitment Fee Percentage times the average daily unused portion of the Revolving Credit Amount. Such availability fee shall commence to accrue on the date hereof and shall be due and payable by the Borrowers quarterly, in arrears, commencing on September 30, 2008, and, on the last Business Day of each third month thereafter, and on the earlier of the Revolving Credit Expiration Date or on the date on which the Revolving Credit Facility is terminated pursuant to Section 7 hereof.

(f)    Note; Revolving Credit Account. The Borrowers' obligation to pay the Advances with interest shall be evidenced by the Note. The Lender will maintain the Revolving Credit Account with respect to advances, repayments and prepayments of Advances, the accrual and payment of interest on Advances and all other amounts and charges owing to the Lender in connection with Advances. Except for demonstrable error, the Revolving Credit Account shall be conclusive as to all amounts owing by the Borrowers to the Lender in connection with and on account of Advances.

(g)    Required Prepayments of Advances. On any date on which the Revolving Credit Exposure exceeds the then current Borrowing Base (such excess being hereinafter called a "Borrowing Base Deficiency"), the Borrowers shall pay to the Lender on each such date an amount equal to the Borrowing Base Deficiency.

(h)    Notwithstanding anything contained herein to the contrary, so long as the Borrowers opts to use the Lender's "AutoBorrow" program and has executed and delivered to the Lender an AutoBorrow Service Agreement (which AutoBorrow Service Agreement remains in full force and effect), all Advances to be made hereunder shall be made in accordance with, and all interest accrued on such Advances and all repayments of such Advances shall be payable at the times and in the manner provided for in, the AutoBorrow Service Agreement. To the extent that any of the provisions of Section 1.2(a) through 1.2(g) hereof are inconsistent with provisions of the AutoBorrow Service Agreement, the provisions of the AutoBorrow Service Agreement shall govern. Any Advances made to the Borrowers under the AutoBorrow Service Agreement shall nonetheless be deemed to be an Advance hereunder, subject to all other terms hereof.

(i)    Voluntary Prepayments; Voluntary Termination. Within the limitations set forth herein and subject to the provisions of this Agreement, the Borrowers may prepay any Advance in whole or in part, from time to time without premium or penalty, except that the Borrowers shall pay applicable Breakage Costs, if any. Any permitted prepayment need not be accompanied by payment of interest on the amount prepaid except that any prepayment of Advances which constitutes a final payment of all Advances shall be accompanied by payment of all interest thereon accrued through the date of prepayment.

(j)    <u>Terms of Letters of Credit</u>. Each Letter of Credit shall (i) be a commercial Letter of Credit or a standby Letter of Credit, (ii) be opened pursuant to a Letter of Credit Agreement duly executed and delivered to the Lender by the Borrower prior to the issuance of such Letter of Credit, (iii) <u>either</u> expire on the Revolving Credit Expiration Date <u>or</u> at that does not extend more than one hundred twenty (120) days beyond the Revolving Credit Expiration Date provided that the Borrower Cash Collateralizes such Letters of Credit that do so extend beyond the Revolving Credit Expiration Date as contemplated below, (iv) be in an amount not less than $10,000, (v) be issued in the ordinary course of the Borrower's business, and (vi) be issued in accordance with the Lender's then current practices relating to the issuance of letters of credit. All powers, right, remedies and provisions set forth in any Letter of Credit Agreement shall be in addition to those set forth herein. In the event of any conflict between the provisions of this Agreement and the provisions of any Letter of Credit Agreement, the provisions of this Agreement shall prevail and control unless expressly provided otherwise herein or in the Letter of Credit Agreement. If, as of the Revolving Credit Expiration Date, any Letter of Credit may for any reason remain outstanding and partially or wholly undrawn, the Borrower shall immediately Cash Collateralize the then outstanding amount of all such obligations, in an amount equal thereto determined as of the Revolving Credit Expiration Date, as the case may be. For purposes hereof, "<u>Cash Collateralize</u>" means to pledge and deposit with or deliver to the Lender, cash or deposit account balances pursuant to documentation in form and substance reasonably satisfactory to the Lender.

(k)    <u>Procedures for Letters of Credit</u>. The Borrowers shall give the Lender written notice of their request for a Letter of Credit at least three (3) Business Days prior to the date on which the Letter of Credit is to be opened by delivering to the Lender a duly executed Letter of Credit Agreement in form and content acceptable to the Lender setting forth (i) the face amount of the Letter of Credit, (ii) the name and address of the beneficiary of the Letter of Credit, (iii) whether the Letter of Credit is irrevocable or revocable, (iv) whether the Letter of Credit requested is a standby or commercial Letter of Credit, (v) the date the Letter of Credit is to be opened and the date the Letter of Credit is to expire, (vi) the purpose of the Letter of Credit, (vii) the terms and conditions for any draws under the Letter of Credit, and (viii) such other information as the Lender may reasonably deem to be necessary or desirable.

(l)    <u>Letter of Credit Fees</u>. With respect to each Letter of Credit issued hereunder, the Borrowers shall pay to the Lender a letter of credit fee (the "<u>Letter of Credit Fee</u>") in an amount per annum set forth in the table attached hereto as <u>Attachment I</u>, payable quarterly in advance, <u>plus</u> the Lender's then standard fee for the issuance, negotiation, processing and administration of letters of credit of the same type as the Letter of Credit. The amount of the Letter of Credit Fee payable per annum with respect to any Letter of Credit shall be a percentage of the face amount of such Letter of Credit, calculated on the basis of the table included as <u>Attachment I</u> hereto, based upon the Borrowers' ratio of Funded Debt to EBITDA as of the end of the calendar quarter immediately preceding the date of calculation.

(m)    <u>Agreement to Pay Letter of Credit Obligations</u>. The Borrowers shall pay to the Lender the Letter of Credit Obligations when due; <u>provided</u>, <u>however</u>, that (a) so long as the Borrowers have availability under the Revolving Credit Facility, the Lender may, and is

hereby authorized to, make Advances to itself to pay when due any or all Letter of Credit Obligations incurred in connection with Letters of Credit. The Lender may maintain on its books a letter of credit account (the "Letter of Credit Account") with respect to the Letter of Credit Obligations paid and payable from time to time hereunder. Except for demonstrable error, the Letter of Credit Account shall be conclusive as to all amounts owing by the Borrowers to the Lender in connection with and on account of the Letter of Credit Obligations. From the date due until paid in full, all Letter of Credit Obligations shall bear interest at the Default Rate.

(n)    Agreement to Pay Absolute.  The obligation of the Borrowers to pay Letter of Credit Obligations set forth above shall be absolute and unconditional and irrespective of (i) any lack of validity or enforceability of any Letter of Credit, (ii) the existence of any claim, setoff, defense or other right which the Borrowers may at any time have against the beneficiary under any Letter of Credit or the Lender, (iii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue provided that payment by the Lender under such Letter of Credit against presentation of such draft shall not have constituted gross negligence or willful misconduct, and (v) any other events or circumstances whatsoever, whether or not similar to any of the foregoing provided that the payment by the Lender under the Letter of Credit shall not have constituted gross negligence or willful misconduct of the Lender.

(o)    Upfront Fee.  In consideration for the agreements of the Lender as set forth herein, Borrowers agree to pay to the Lender at closing an upfront fee equal to 50 basis points of the Revolving Credit Amount, or $50,000, which fee shall be deemed earned upon its receipt by the Lender.   On each date on which the Revolving Credit Amount is increased in accordance with the provisions of Section 1.3 hereof, the Borrowers shall pay to the Lender a commitment fee equal to fifty (50) basis points times the amount of such increase.

1.3    Guidance Line Facility.  Subject to the terms and conditions of this Agreement (including, without limitation, all of the conditions precedent to the making of Advances set forth herein), from the date hereof until the earlier of the Revolving Credit Expiration Date or the date on which this facility is otherwise terminated pursuant to the provisions of Section 7, the Lender may, in its sole and absolute discretion, from time to time make Advances to the Borrowers in an amount greater than the difference between the then-current Revolving Credit Amount and the then-current Revolving Credit Exposure (each such Advance being hereinafter called a "Guidance Line Advance"); provided, however, that (a) the aggregate principal amount of all Guidance Line Advances shall not exceed $15,000,000, and (b) in no event shall the Lender make a new Guidance Line Advance hereunder if an Event of Default shall have occurred and be continuing. Once a Guidance Line Advance has been made hereunder, it shall be considered an Advance for all purposes under this Agreement (including, without limitation the calculation of the Revolving Credit Exposure) and shall be repaid in accordance with the terms and conditions hereof. Each time the Lender makes a Guidance Line Advance, the Revolving Credit Amount shall automatically increased to an amount equal to the Revolving Credit Exposure (after giving effect to such Guidance Line Advance).

1.4.    Additional Provisions.

(a)    Interest Calculation.  All interest and fees payable under the provisions of this Agreement or the Note shall be computed on the basis of actual number of days elapsed over a year of 360 days.

(b)    Late Charges.  If the Borrowers fails to make any payment of principal, interest, prepayments, fees or any other amount becoming due pursuant to the provisions of this Agreement, the Note or any other Financing Document within fifteen (15) days after the date due and payable, the Borrowers shall pay to the Lender a late charge equal to five percent (5%) of the amount of such payment.  Such 15-day period shall not be construed in any way to extend the due date of any such payment.  Late charges are imposed for the purpose of defraying the Lender's expenses incident to the handling of delinquent payments, and are in addition to, and not in lieu of, the exercise by the Lender of any rights and remedies hereunder or under applicable laws and any fees and expenses of any agents or attorneys which the Lender may employ upon the occurrence of an Event of Default.

(c)    Payments.  Whenever any payment to be made by the Borrowers under the provisions of this Agreement, the Note, the Letter of Credit Agreements or any other Financing Document is due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, in the case of any payment which bears interest, such extension of time shall be included in computing interest on such payment.  All payments of principal, interest, fees or other amounts to be made by the Borrowers under the provisions of this Agreement or the Note shall be paid without set-off or counterclaim to the Lender at the Lender's office at 8300 Greensboro Drive, Mezzanine Level, McLean, Virginia 22102, or to such other place as the Lender shall direct in writing, in lawful money of the United States of America in immediately available funds.

(d)    Interest On Overdue Amounts.  If the principal of or interest on, the Note or any other amount required to be paid to the Lender hereunder or under the Note or any of the other Financing Documents is not paid within fifteen (15) days after the date when the same becomes due and payable, whether by acceleration or otherwise, the Borrowers shall on demand from time to time pay to the Lender interest on such principal, interest or other amount from the date due until the date of payment (after as well as before any judgment) at a rate per annum equal to the Default Rate.

(e)    Collateral and Subsidiary Guarantees.  (1) In order to secure the full and punctual payment of the Obligations in accordance with the terms thereof, and to secure the performance of this Agreement and the other Financing Documents, the Borrowers hereby pledges and assigns to the Lender, and grants to the Lender a continuing lien and security interest in and to the Collateral, both now owned and existing and hereafter created, acquired and arising and regardless of where located.

(2)    Promptly, following the acquisition or creation thereof and in any event within thirty (30) days after a request with respect thereto, the Borrowers shall cause each of the Borrowers' Subsidiaries to become party to, and to execute and deliver, a Subsidiary Guaranty Agreement, guarantying to the Lender the prompt payment, when and as due, of all Obligations

of the Borrowers under the Financing Documents, including all obligations under any Hedge Agreements.

(3)    Promptly, following the acquisition or creation thereof and in any event within thirty (30) days after a request with respect thereto, the Borrowers shall cause such Subsidiary to grant to the Lender a first priority lien on all property (tangible and intangible) of such Subsidiary, including, without limitation, all of the capital stock of any of its subsidiaries upon terms similar to those set forth in the Financing Documents and otherwise satisfactory in form and substance to the Lender. The Borrowers shall cause such Subsidiary, at its own expense, to become a party to a Subsidiary Security Agreement and any other Financing Document and to execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record in any appropriate governmental office, any document or instrument reasonably deemed by the Lender to be necessary or desirable for the creation and perfection of the foregoing liens (including legal opinion, consents, corporate documents and any additional or substitute security agreements or mortgages). The Borrowers will cause such Subsidiary to take all actions requested by the Lender (including, without limitation, the filing of UCC-1's) in connection with the granting of such security interests.

(4)    The security interests required to be granted pursuant to this Section shall be granted pursuant to such security documentation as is reasonably satisfactory in form and substance to Lender (the "Additional Financing Documents") and shall constitute valid and enforceable perfected security interests prior to the rights of all third Persons and subject to no other Liens except Liens permitted hereunder. The Additional Financing Documents and other instruments related thereto shall be duly recorded or filed in such manner and in such places and at such times as are required by law to establish, perfect, preserve and protect the Liens, in favor of the Lender, granted pursuant to the Additional Financing Documents and, all taxes, fees and other charges payable in connection therewith shall be paid in full by the Borrowers. At the time of the execution and delivery of Additional Financing Documents, the Borrowers shall cause to be delivered to Lender such agreements, opinions of counsel, and other related documents as may be reasonably requested by the Lender to assure it that this Section has been complied with.

(5)    Automatic Debit. To ensure timely payment of all interest and other sums due hereunder, the Borrowers hereby authorizes and instructs the Lender to either (i) debit, on the due date thereof, a demand deposit account established and maintained at the Lender for the amount then due, or (ii) at the Lender's option, cause an Advance to be made sufficient to pay the amount then due. This authorization shall not affect the obligation of the Borrowers to pay such sums when due, without notice, if there are insufficient funds available to make any payment in full on the due date thereof, or if the automatic debit feature is at any time terminated by the Lender in its discretion.

(f)    Calculation of Applicable Margin. If, as a result of any restatement of or other adjustment to the financial statements of Borrower or for any other reason, Borrower or the Lender determine that (i) the ratio of Total Funded Debt to EBITDA as calculated by Borrower as of any applicable date was inaccurate and (ii) a proper calculation of such financial covenant would have resulted in higher pricing for such period, Borrower shall immediately and retroactively be obligated to pay to the Lender, promptly on demand by Lender (or, after the

occurrence of an actual or deemed entry of an order for relief with respect to Borrower under the United States Bankruptcy Code, automatically and without further action by the Lender), an amount equal to the excess of the amount of interest and fees that should have been paid for such period over the amount of interest and fees actually paid for such period. Borrower's obligations under this paragraph shall survive the repayment of all other Obligations hereunder.

1.5.    The Borrowers' Representative. Each of the Borrowers hereby represents and warrants to the Lender that each of them will derive benefits, directly and indirectly, from the proceeds of each Advance and Letter of Credit, both in its separate capacity and as a member of the integrated business to which each of the Borrowers belong. For administrative convenience, MB Security is hereby irrevocably appointed by each of the Borrowers as agent for each of the Borrowers for the purpose of requesting Advances and Letters of Credit hereunder from the Lender, receiving the proceeds of Advances and disbursing the proceeds of Advances among the Borrowers. In its capacity as such agent, MB Security shall have the power and authority through its authorized officer or officers to (i) endorse any check for the proceeds of any Advance for and on behalf of each of the Borrowers and in the name of each of the Borrowers, and (ii) instruct the Lender to credit the proceeds of any Advance directly to a banking account of any of the Borrowers. By reason of the foregoing, the Lender is hereby irrevocably authorized by each of the Borrowers to make Advances to the Borrowers and issue Letters of Credit for the account of the Borrowers pursuant to this Agreement upon the request of any one of the persons who is authorized to do so under the provisions of any applicable corporate resolutions of MB Security. The Lender assumes no responsibility or liability for any errors, mistakes and/or discrepancies in any oral, telephonic, written or other transmissions of any instructions, orders, requests and confirmations between the Lender and any one or more of the Borrowers in connection with any Advance, Letter of Credit or other transaction pursuant to the provisions of this Agreement, except for acts of gross negligence and/or willful misconduct.

SECTION 2.  Conditions Precedent.

2.1.    Initial Advance or Letter of Credit. The Lender shall not be required to make the initial Advance, or issue the initial Letter of Credit hereunder, whichever occurs first, unless the following conditions precedent have been satisfied in a manner reasonably acceptable to the Lender and its counsel:

(a)    Borrowers' Organizational Documents. The Lender shall have received with respect to the Borrowers: (i) a copy, certified as of a recent date by the Virginia Secretary of State, of the Borrowers' Articles of Incorporation or Organization as well as a copy of the Borrowers' operating agreement, bylaws and all amendments thereto, as applicable (ii) a Certificate of Good Standing for the Borrowers are issued by the Virginia Secretary of State, and (iii) a copy, certified to the Lender as true and correct as of the date hereof by the Borrowers, of the resolutions of the Borrowers' board of directors or consents of managing members, as applicable, authorizing the execution and delivery of this Agreement and the other Financing Documents to which the Borrowers are a party and designating by name and title the officer(s) of the Borrowers who are authorized to sign this Agreement and such other Financing Documents for and on behalf of the Borrowers and to make the borrowings hereunder.

(b)    Lists of Locations, Etc.  The Borrowers shall have delivered to the Lender a list showing the street address, city or county and state of the Borrowers' chief executive office and of any other location where the Borrowers conducts or has a place of business or where any of the Collateral is or may be located, which list shall include the names of all landlords (and mortgagees) and be accompanied by true and complete copies of all leases, together with all amendments thereto;

(c)    Insurance.  The Borrowers shall have delivered to the Lender a property and casualty insurance policy from a well-rated and responsible insurance company insuring the Collateral in amounts satisfactory to the Lender against loss or damage resulting from fire and other risks insured against by extended coverage, together with a standard non-contributing and non-reporting loss payee endorsement in favor of the Lender in form satisfactory to the Lender, and such other insurance policies as the Lender shall reasonably require;

(d)    Searches.  The Lender shall have received the results of a search by an attorney or company reasonably satisfactory to the Lender of the Uniform Commercial Code filings with respect to the Borrowers in their jurisdictions of organization and in which the Borrowers conduct or have a place of business or in which any of the Collateral is or will be located, accompanied by copies of such filings, if any, and evidence satisfactory to the Lender that any security interest or other lien indicated in any such filing has or will be released or is permitted by the Lender so that the Lender's security interest in the Collateral will be a perfected first security interest and lien on the Collateral subject only to Permitted Liens and such other matters as the Lender may approve;

(e)    Opinions.  The Lender shall have received the written opinion of counsel of the Borrowers dated on or around the date of this Agreement, reasonably satisfactory in form and content to the Lender, opining, among other things, that the Borrowers are duly organized, validly existing, and in good standing, that the Financing Documents executed and delivered by the Borrowers have been duly authorized by all requisite corporate action, and that the Financing Documents executed and delivered by the Borrowers constitute the legal, valid, binding, and enforceable obligations of the Borrowers, enforceable against the Borrowers, as applicable, in accordance with the terms thereof, subject to customary exceptions and limitations reasonably acceptable to the Lender.

(f)    Financing Documents.  The Lender shall have received each of the Financing Documents required by the Lender to be executed and delivered prior to the making of the initial Advance.

(g)    Due Diligence.  The Lender shall have received and reviewed such financial information and other due diligence reports as the Lender shall reasonably require including, without limitation, copies of the Borrowers' audited 2007 financial statement, including a recent backlog report for each acquisition target.

(h)    Operating Account; Etc.  The Borrowers shall have established an operating account into which Advances shall be paid, and the Borrowers shall maintain their primary accounts with the Lender.

(i)    Borrowing Base Certificate.  The Borrowers shall have delivered to the Lender the initial Borrowing Base Certificate in the form set forth herein as Exhibit A.

(l)    Executed Subordination Agreements.   The Lender shall have received a fully executed subordination agreement or agreements reasonably satisfactory to the Lender in all respects with respect to any Subordinated Debt of the Borrowers.

(m)    Guaranties/Related Security Agreements. The Guarantors shall each have executed and delivered to the Lender the Guaranties in favor of the Lender.

(n)    Executed Landlord's Waivers.  The Lender shall have received a fully executed landlord's waiver in connection with the headquarters lease of real property by each Borrower satisfactory to the Lender in all respects, or otherwise satisfy the Lender that such landlord's waivers are diligently being sought from each landlord.

(o)    Additional Documents.  The Borrowers shall have furnished in form and content reasonably acceptable to the Lender any additional documents, agreements, certifications, record searches, insurance policies or opinions which the Lender may reasonably deem necessary or desirable.

2.2.    All Advances and Letters of Credit.  The Lender shall not be required to make any Advances, including the initial Advance, or issue any Letter of Credit, until compliance to the satisfaction of the Lender with all of the following conditions at the time of and with respect to each Advance or Letter of Credit:

(a)    Representations and Warranties.  No representation or warranty made in or in connection with this Agreement and the other Financing Documents shall be untrue, incorrect or incomplete in any material respect on and as of the date of any Advance or Letter of Credit as if made on such date, except for changes in facts or circumstances arising in the ordinary course of business and which do not constitute a breach of any covenant set forth herein; and

(b)    Event of Default or Default.  No Event of Default or Default shall have occurred and be continuing.

SECTION 3.  Representations and Warranties.  The Borrowers represents and warrants to the Lender that, except as specifically set forth on Schedule 3 attached hereto, the following statements are true, correct and complete in all material respects as of the date hereof and as of each date any Advance is to be made or any Letter of Credit is to be issued hereunder, except for changes in facts or circumstances arising in the ordinary course of business and which do not constitute a breach of any covenant set forth herein:

3.1.    Authority, Etc.  MB Security is duly organized and in good standing under the laws of Delaware under organizational identification number 4562418.  AC Technology, Inc. is duly organized and in good standing under the laws of Virginia under organizational

identification number 0382020. The Borrowers are qualified to do business in all states where the Borrowers do business, except where the failure to be so qualified would not materially adversely affect the business, operations or financial condition of the Borrower. The Borrowers have the full power and authority to execute, deliver and perform this Agreement and the other Financing Documents to which the Borrowers are a party. Neither such execution, delivery and performance, nor compliance by the Borrowers with the provisions of this Agreement and of the other Financing Documents to which the Borrowers are a party will conflict with or result in a breach or violation of the Borrowers' articles of incorporation or bylaws, or any judgment, order, regulation, ruling or law to which the Borrowers are subject or any contract or agreement to which the Borrowers are a party or to which the Borrowers' assets and properties is subject, or constitute a default thereunder. The execution, delivery and performance of this Agreement and all other Financing Documents to which the Borrowers are a party have been duly authorized and approved by all necessary action by the Borrowers and constitute the legal, valid and binding obligations of the Borrowers, enforceable in accordance with their terms except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally.

     3.2.   Litigation. There is no litigation or proceeding pending or, to the knowledge of any representative of the Borrowers signing this Agreement on behalf of the Borrowers, threatened against or affecting the Borrowers which might materially adversely affect the business, financial condition or operations of the Borrowers or the ability of the Borrowers to perform and comply with this Agreement or the other Financing Documents to which the Borrowers are a party.

     3.3.   Subsidiaries. The Borrowers do not currently have any Subsidiaries.

     3.4.   Financial Condition. The Borrowers have heretofore furnished to the Lender certain financial statements. Such financial statements and all other financial statements and information furnished or to be furnished to the Lender hereunder have been and will be prepared in accordance with generally accepted accounting principles (subject to year-end adjustments and the omission of footnote information) and fairly present in all material respects the financial condition of the Borrowers as of the dates thereof and the results of the operations of the Borrowers for the periods covered thereby. No material adverse change in the business, financial condition, prospects or operations of the Borrowers have occurred since the date of such financial statements. The Borrowers do not have any indebtedness or liabilities that are required to be accrued on financial statements prepared in accordance with GAAP other than that reflected on such financial statements or expressly permitted by the provisions of this Agreement, and accounts payable incurred in the ordinary course of business since the date of such financial statements. The Borrowers are not in default under any obligation for borrowed money.

     3.5.   Taxes. The Borrowers have filed all federal, state and local income, excise, property and other tax returns which are required to be filed and has paid all taxes as shown on such returns or assessments received (including, without limitation, all F.I.C.A. payments and withholding taxes, if appropriate), except for such taxes, if any, as are being contested in good

faith and as to which adequate reserves have been provided. No tax liens have been filed and no claims are being asserted with respect to such taxes or assessments.

3.6.    Title to Properties and Collateral.  The Borrowers have good and marketable title to all of the Borrowers' assets and properties, including, without limitation, the Collateral, and such assets and properties are subject to no liens, security interests or other encumbrances except for those of the Lender or other Permitted Liens.

3.7.    Borrowers' Name, Business Locations, etc.  The correct legal names of the Borrowers are those specified on Schedule 3.7. Except as provided on Schedule 3.7, the Borrowers have conducted business under their legal names since their formation. The Borrowers do not do business under any trade or fictitious names. The chief executive office of the Borrowers and the place where records concerning Accounts and other Collateral are kept are as set forth on Schedule 3.7 hereto, and each other location at which the Borrowers conduct business or keeps any of the Collateral is listed on Schedule 3.7 attached hereto. All Equipment is personalty and is not and will not be affixed to real estate in such a manner as to become a fixture and a part of such real estate except for the Equipment described in Schedule 3.7 attached hereto, if any, which is or will be attached to the real estate described in Schedule 3.7 attached hereto. Such real estate, if any, is owned of record by the person or persons specified in Schedule 3.7 attached hereto.

3.8.    Compliance with Laws.  (a) To the knowledge of the Borrowers, the Borrowers are not in violation of any applicable federal, state or local law, statute, rule, regulation or ordinance and has not received any notice of, and is not the subject of, any pending investigation or complaint alleging that the Borrowers or the Collateral (or any part thereof) or any other property owned, leased, operated or used by the Borrowers are in violation of any such law, statute, rule, regulation or ordinance, including, without limitation, Environmental Laws other than violations that will not have a material adverse effect on the business, operations or financial condition of the Borrowers.

(b)    To the knowledge of the Borrowers, no Hazardous Materials have been used, located, installed, spilled, treated, released or stored on, under or from any property in or on which the Borrowers conduct their operations except for those which have been handled in a manner not prohibited by applicable Environmental Laws or which will not have a material adverse effect on the business, operations or financial condition of the Borrowers.

3.9.    Federal Reserve Board Regulations.  The Borrowers are not engaged in the business of extending credit for the purpose of purchasing or carrying "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System of the United States (the "Board") and no part of the proceeds of the Advances will be used for any purpose which entails a violation of Regulations U or X of the Board.

3.10.    ERISA.  No Plan maintained by the Borrowers or any trade or business group with which the Borrowers are affiliated subject to the requirements of ERISA has been terminated, no lien exists against the Borrowers in favor of the PBGC, and no "reportable event" (as such term is defined in ERISA) has occurred with respect to any such Plan. The Borrowers

have not incurred any "accumulated funding deficiency" within the meaning of ERISA or any liability to the PBGC in connection with any Plan. Borrowers do not have any withdrawal or other liability (absolute, contingent or otherwise) with respect to any multi-employer plan as defined by Section 3(37) of ERISA. The Borrowers have complied with in all material respects all provisions of ERISA and with all provisions of any Plan sponsored, maintained by, or contributed to, by the Borrowers.

3.11. Licenses, etc. The Borrowers have obtained and now hold all licenses, permits, franchises, patents, trademarks, copyrights and trade names which are necessary to the conduct of the business of the Borrowers as now conducted free, to the knowledge of the Borrowers, of any conflict with the rights of any other person.

3.12. Labor Matters. Except as disclosed in writing to the Lender, the Borrowers are not subject to any collective bargaining agreements or any agreements, contracts, decrees or orders requiring the Borrowers to recognize, deal with or employ any persons organized as a collective bargaining unit or other form of organized labor. There are no strikes or other material labor disputes pending or, to the knowledge of the Borrowers, threatened against the Borrowers. The Borrowers have complied in all material respects with the Fair Labor Standards Act.

3.13. Accuracy of Information. To the knowledge of the Borrowers, no information, exhibit, report, statement, certificate or document furnished by the Borrowers to the Lender in connection with this Agreement or the other Financing Documents or the negotiation thereof contains any material misstatement of fact or omitted to state a material fact or any fact necessary to make the statements contained herein or therein not misleading.

3.14. No Debarment or Suspension. The Borrowers are not subject to any pending or threatened debarment or suspension proceedings.

3.15 Intellectual Property. Schedule 3.15 to this Agreement is a complete list of all patents, trademark and service mark registrations, copyright registrations, mask work registrations, and all applications therefor, in which the Borrowers have any right, title, or interest, throughout the world. The Borrowers will promptly notify the Lender of any acquisition (by adoption and use, purchase, license or otherwise) of any patent, trademark or service mark registration, copyright registration, mask work registration, and applications therefor, and unregistered trademarks and service marks and copyrights, throughout the world, which are granted or filed or acquired after the date hereof or which are not listed on Schedule 3.15. The Borrowers authorizes the Lender, without notice to the Borrowers, to modify this Agreement by amending the Schedule to include any such Collateral.

3.16. Assignment of Government Payments. Borrowers have the right to assign to the Lender all payments due or to become due under all of Borrowers' U.S. Government Contracts and there exists no uncanceled assignment of payment rights under any such Government Contract.

3.17. Accounts. With respect to each Account: (i) reflected as an Eligible Account in the computations included in any Borrowing Base Certificate, except as specifically disclosed on

the applicable Borrowing Base Certificate, (A) such Account represents a bona fide sale of Inventory or rendering of services to the applicable Account Debtor in the ordinary course of the Borrowers' business and is not evidenced by a judgment, Instrument or Chattel Paper, (B) (1) to the Borrowers' knowledge, there are no setoffs, claims or disputes existing or asserted with respect thereto, and (2) the Borrowers have not made any agreement with the Account Debtor with respect thereto for any extension of time for the payment thereof, any compromise or settlement for less than the full amount thereof, any release of such Account Debtor from liability therefor, or any deduction therefrom except a discount or allowance allowed by the Borrowers in the ordinary course of business for prompt payment, (C) to Borrowers' knowledge, there are no facts, events or occurrences that in any way impair the validity or enforceability thereof or could reasonably be expected to reduce the amount payable thereunder as shown on Borrowers' books and records, (D) the Borrowers have not received any notice of proceedings or actions that are threatened or pending against the Account Debtor with respect thereto that could reasonably be expected to result in any material adverse change in such Account Debtor's financial condition, (E) Borrowers have no knowledge that the applicable Account Debtor is unable generally to pay its debts as they become due or is on a "credit watch" list of Dun & Bradstreet, TRW or any other nationally-recognized trade credit association unless Borrowers have determined in their reasonable credit judgment that such Account Debtor is still creditworthy; (F) the amounts reflected on all records, invoices, statements and collateral reports that may be delivered to Lender with respect thereto are actually and absolutely owing as indicated thereon and are not in any way contingent, and to Borrower's knowledge, each Account Debtor that is a party thereto has the capacity to contract; and (G) each Eligible Account reflected in the computations included in any Borrowing Base Certificate satisfies the criteria established therefor in this Agreement.

3.18.    Government Regulation.  The Borrowers are not an "investment company" or an "affiliated person" of or "provider" or "principal underwriter" for an "investment company" as all such terms are defined in the Investment Company Act of 1940, as amended. The Borrowers are not subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, or any other federal or state statute that restricts or limits its ability to incur Indebtedness or to perform its obligation hereunder.

SECTION 4.  Affirmative Covenants. The Borrowers covenant and agree with the Lender that so long as any of the Obligations (or commitments therefor) shall be outstanding:

4.1.    Payment of Obligations.  The Borrowers shall punctually pay the principal of and interest on the Credit Facilities and the other Obligations, at the times and places, in the manner and in accordance with the terms of this Agreement, the Note, and the other Financing Documents.

4.2.    Financial Statements and Other Reports.  The Borrowers shall maintain at all times a system of accounting established and administered in accordance with sound business practices, and will deliver, or cause to be delivered, to the Lender, in form and substance satisfactory to the Lender in all respects:

(a)    <u>Annual Financial Statements</u>.  Within one hundred twenty (120) days  of the end of each fiscal year of the Borrowers, the annual consolidated  (if applicable) financial statements of the Borrowers, (including statements  of financial condition, income, profits and loss, cash flows and changes  in shareholder's equity)  audited by independent certified public accountants satisfactory to the Lender;

(b)    <u>Quarterly Financial Statements</u>.  Within forty-five (45) days after the  end of each calendar quarter, the consolidated balance sheets and income statements of the Borrowers prepared by an authorized financial officer  of the Borrowers and showing the financial condition of the Borrowers as  of the end of such quarter and the results of operations of the Borrowers from the beginning of the current calendar year of the Borrowers to the end  of such quarter;

(c)    <u>Projected Financial Statements</u>.  As soon as available, and in any event  no later than sixty (60) days after the end of each fiscal year of  the Borrowers, projected financial statements for the Borrowers for the next calendar year, to include income statement, balance sheet, and cash flow projections prepared on a quarterly basis;

(d)    <u>Borrowing Base Certificates</u>.  Within twenty-five  (25) days after the  end of each calendar quarter (and at any other time upon the reasonable request of the Lender),  a fully-completed Borrowing Base Certificate, accompanied by accounts receivable agings reports and accounts payable agings reports;

(e)    <u>Compliance Certificates</u>.  Concurrent with the delivery of the financial statements described in Sections (a) and (b) above, a written certification, signed by an authorized financial officer of the Borrowers, to the effect that such officer has no knowledge of the existence of any Defaults under the Financing Documents or if such officer has knowledge of the existence of an Event of Default, a statement as to the nature thereof and the action which the Borrowers proposes to take with respect thereto.  Such written certification shall include the calculations made by the Borrowers  to determine compliance by the Borrowers with each of the financial covenants set forth herein as of the date of the financial statements delivered therewith;

(f)    <u>Contract Backlog Report</u>.  Within forty-five (45) days after the end  of each quarter, a contract backlog report;

(g)    <u>ERISA Reports</u>. Promptly after filing, a copy of each annual report filed in respect of any Plan subject to ERISA;

(h)     <u>Financial Information regarding Guarantors</u>.  Within one hundred twenty (120) days of the end of each calendar year, the Borrower shall deliver to the Lender signed personal financial statements of each of the Guarantors, in form and content satisfactory to the Lender in the Lender's discretion; and

(i)     <u>Other Information</u>.  Promptly upon request of the Lender such other information, reports or documents respecting the business, properties, operation or financial condition of the Borrowers as the Lender may at any time and from time to time reasonably request.

4.3.    <u>Conduct of Business and Maintenance of Existence</u>.  The Borrowers shall continue to engage in business of the same general type as now being conducted by the Borrowers and do and cause to be done all things necessary to maintain and keep in full force and effect their corporate existence in good standing in each jurisdiction in which they conduct business.

4.4.Com    pliance with Laws.

(a)     The Borrowers shall comply in all material respects with all laws, statutes, ordinances, orders, rules or regulations applicable to the Borrowers or the Collateral (or any part thereof) or to any other property owned, leased, operated or used by the Borrowers, including, without limitation, Environmental Laws.

(b)     The Borrowers will not use, locate, install, spill, treat, release or store Hazardous Materials on, under or from any property owned, leased, operated or used by the Borrowers unless such Hazardous Materials are handled in a manner not prohibited by applicable Environmental Laws and are handled in a manner and in such quantities that would not constitute a hazard to the environment or human health and safety or subject the Borrowers to any prosecution or material liability in connection therewith.  The Borrowers will dispose of all Hazardous Materials only at facilities and/or with carriers that maintain governmental permits under applicable Environmental Laws.  The Borrowers shall promptly, at the cost and expense of the Borrowers, take all action necessary or required by Environmental Laws to remedy or correct any violation of Environmental Laws by the Borrowers, the Collateral (or any part thereof) or by any other property owned, leased, used or operated by the Borrowers.

(c)     If the Lender shall have, in the exercise of good faith, reason to believe at any time or from time to time there are or may be Hazardous Materials affecting the Collateral (or any part thereof) or any other property owned, leased, operated or used by the Borrowers in violation of applicable Environmental Laws, the Borrowers, upon the request of the Lender and at the cost and expense of the Borrowers, shall furnish to the Lender an environmental assessment of the Collateral and such other property in such detail and content and by an environmental consultant or engineer acceptable to the Lender.  The Borrowers shall provide evidence to the Lender within ten (10) business days of the Lender's request, that such an assessment will be promptly undertaken and completed.

(d)    The Borrowers hereby agree to indemnify and hold the Lender and its employees and agents harmless from and against any and all liability, loss, damage, costs and expenses suffered or incurred by the Lender during or after the term of this Agreement arising out of or resulting from a violation of any Environmental Laws by the Borrowers, the Collateral (or any part thereof) and any other property owned, leased, used or operated by the Borrowers provided, however, that the Borrowers shall not be required to indemnify any party for liability, loss, damage, costs, or expenses arising from such party's own gross negligence or willful misconduct. The obligations and liabilities of the Borrowers under the foregoing indemnity, together with interest thereon commencing ten (10) days after the date written demand is received by the Borrowers until paid in full at the Default Rate, shall be paid by the Borrowers to the Lender upon written demand and shall be a part of the Obligations hereunder. The foregoing indemnity shall survive the payment of all other Obligations and the release of the Collateral.

4.5.    Payment of Liabilities and Taxes. The Borrowers shall pay, when due, all of their indebtedness and liabilities, and pay and discharge promptly all taxes, assessments and governmental charges and levies (including, without limitation, F.I.C.A. payments and withholding taxes) upon the Borrowers or upon the Borrowers' income, profits or property (including, without limitation, the Collateral), except to the extent the amount or validity thereof is contested in good faith by appropriate proceedings so long as adequate reserves have been set aside therefore.

4.6.    Contractual Obligations. The Borrowers shall comply with any agreement or undertaking to which the Borrowers is a party and maintain in full force and effect all contracts and leases to which the Borrowers are or become a party, in each case unless the failure to do so would not have a material adverse effect on the business, operation, properties or financial condition of the Borrowers.

4.7.    Maintenance of Properties; Collateral. The Borrowers shall do all things necessary to maintain, preserve, protect and keep their properties, including the Collateral, in good repair, working order and condition, and make all necessary and proper repairs, renewals and replacements so that the Borrowers' businesses may be properly conducted at all times,, in each case unless the failure to do so would not have a material adverse effect on the business, operation or financial condition of the Borrowers. The Borrowers shall promptly notify the Lender of any event causing deterioration, loss or depreciation in value of any substantial portion of the Collateral and the amount of such loss or depreciation. The Borrowers shall perform, observe, and comply with all of the terms and provisions to be performed, observed or complied with by them under each contract, agreement or obligation relating to the Collateral. The Lender shall have no duty to, and the Borrowers hereby releases the Lender from all claims for loss or damage caused by the failure of the Lender to, collect, protect, preserve or enforce any of the Collateral or preserve rights against account debtors and prior parties to the Collateral.

4.8.    Insurance. The Borrowers shall maintain, with financially sound, well rated and reputable insurance companies insurance in such amounts and covering such risks as is consistent with sound business practice, and in any event as is ordinarily and customarily carried by (and, as implied, economically available to) companies similarly situated and in the same or similar businesses as the Borrowers. The Borrowers will pay, when due, all premiums on such

insurance and will furnish to the Lender, upon request, evidence of payment of such premiums and other information as to the insurance carried by the Borrowers. Such insurance shall include, as applicable and without limitation, (a) comprehensive fire and extended coverage insurance on the physical assets and properties of the Borrowers (including, without limitation, the Collateral) against such risks, with such loss deductible amounts and in such amounts conforming to prudent business practices and in such minimum amounts that the Borrowers will not be deemed a co-insurer under applicable insurance laws, regulations, policies and practices, and (b) public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by the Borrowers, and (c) worker's compensation insurance (as applicable). Each policy of such insurance covering the Collateral shall contain a provision or endorsement reasonably satisfactory to the Lender naming the Lender as loss payee or mortgagee and providing that (a) such policy may not be canceled or altered and the Lender may not be removed as loss payee or mortgagee without at least thirty days prior written notice to the Lender, and (b) no act or default of the Borrowers or any other person shall affect the right of the Lender to recover under such policy. The Borrowers hereby irrevocably (x) assign and grant to the Lender a security interest in any and all proceeds of each such insurance policy covering the Collateral, and , during the continuation of an Event of Default, (y) direct each insurance company to pay all such proceeds directly to the Lender, and (z) constitute and appoint the Lender (and all officers, employees or agents designated by the Lender) as the Borrowers' true and lawful attorney-in-fact (coupled with an interest) with authority and power on behalf of the Borrowers to make, adjust, settle or compromise all claims under each such insurance policy, to collect and receive all proceeds payable under each such insurance policy and to endorse any check, draft or instrument for such proceeds. Any proceeds of such insurance received by the Lender (less the amount of any reasonable costs and settlement of such losses) shall be held and applied, at the option of the Lender, to the Obligations (whether matured or unmatured) in such manner and at such times as the Lender may determine in its sole discretion or to the restoration or replacement of the damaged or destroyed Collateral upon terms and conditions reasonably satisfactory in all material respects to the Lender.

4.9.   Inspection. The Borrowers shall permit the Lender, by its representatives and agents, to inspect any of the properties, books and financial records of the Borrowers, to examine and make copies of the books of accounts and other financial records of the Borrowers, and to discuss the affairs, finances and accounts of the Borrowers with, and to be advised as to the same by, the Borrowers (or their representatives) at such reasonable times and intervals as the Lender may designate. In connection with the foregoing, the Lender and its representatives and agents shall have the right, upon reasonable notice and during regular working hours, to (a) enter any business premises of the Borrowers or any other premises where the Collateral and the records relating thereto may be located and to audit, appraise, examine and inspect the Collateral and all records related thereto and to make extracts therefrom and copies thereof, and (b) verify under reasonable procedures the validity, amount, quality, quantity, value and condition of, and any other matter relating to, the Collateral, including contacting account debtors or any person possessing any of the Collateral. Without limiting the foregoing, the Borrowers specifically agrees that the Borrowers will permit the Lender to conduct, at the expense of the Borrowers, (a) prior to closing and at least annually thereafter, an audit to be performed by the Lender or an authorized agent of the Lender (each, a "Field Exam"), and (b) upon the occurrence of a Default

or Event of Default, such additional inspections or audits at the Lender shall deem necessary or advisable. Based upon the results of the Field Exams, the Lender reserves the right to make adjustments to the Borrowing Base requirements, including, without limitation, eligibility requirements, advance rates and reserve requirements, type and frequency of reporting, and frequency of Field Exams. The Borrower shall not be responsible for the expense of more than one (1) Field Exam in any twelve-month period (and the Lender agrees not to request more than one (1) Field Exam at the Borrower's expense in any twelve-month period) unless (i) an Event of Default has occurred and is continuing; (ii) any Borrower consummates a merger or acquisition permitted by Section 5.7 hereof; or (iii) any Borrower suffers a material adverse change in its financial condition, as determined in good faith by the Lender. To the extent that the Lender receives any confidential information from or with respect to the Borrowers, as a result of Field Exams or otherwise, (a) the Lender will not reproduce or distribute any such information, or any notes, interpretations or other documents based in whole or in part upon such information, to non-affiliated parties, other than financial or legal advisors also bound by an obligation of confidentiality, and (b) the Lender will keep permanently confidential all such information, except to the extent that (i) such information ceases to be confidential by reason of its being in the public domain, other than as a result of a disclosure by the Lender or its representatives, or (ii) such information was within the Lender's possession or becomes available to the Lender on a non-confidential basis from a source other than the Borrowers, or any representative of the Borrowers, or (iii) the Lender is legally required to disclose such information to any tribunal or governmental authority.

4.10. <u>Collection of Accounts</u>. The Borrowers shall, subject to the provisions of Section 4.14 hereof, collect their Accounts only in the ordinary course of business, and shall not except in the ordinary course of their business, without the Lender's prior written consent, compromise or adjust the amount of any Account or extend the time for payment of any Account.

4.11. <u>Sale of Inventory, etc.</u> The Borrowers shall sell their Inventory only in the ordinary course of business, and will not, without the prior written consent of the Lender, consign or otherwise dispose of their Inventory.

4.12. <u>Further Assurances</u>. The Borrowers shall defend the security interest and lien of the Lender on the Collateral against all persons and against all security interests and liens on the Collateral adverse to those of the Lender. The Borrowers will, from time to time, at the expense of the Borrowers, execute, deliver, acknowledge and cause to be duly filed, recorded or registered any statement, assignment, instrument, paper, agreement or other document and take any other action that from time to time may be necessary or desirable, or that the Lender may reasonably request, in order to create, preserve, continue, perfect, confirm or validate the security interest and lien of the Lender on the Collateral or to enable the Lender to obtain the full benefits of this Agreement or to exercise and enforce any of its rights, powers and remedies hereunder or under applicable laws. The Borrowers shall pay all costs of, and incidental to, the filing, recording or registration of any such document as well as any recordation, transfer or other tax required to be paid in connection with any such filing, recordation or registration. The Borrowers hereby covenant to save harmless and indemnify the Lender from and against any liability resulting from the failure to pay any required documentary stamps, recordation and transfer taxes and recording costs incurred by the Lender in connection with this Agreement or

the Collateral which covenant shall survive the termination of this Agreement and the payment of all other Obligations. The Borrowers agree that a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing statement signed by the Borrowers in connection with this Agreement shall be sufficient as a financing statement. If, in the reasonable opinion of the Lender, any Equipment is or may become a part of any real estate owned or leased by the Borrowers, the Borrowers will, upon the request of the Lender, furnish to the Lender in form and content satisfactory to the Lender, a landlord's waiver by the record owner of such real estate and a mortgagee's waiver by any person who has a security interest or lien on such real estate which is or may be superior to the security interest and lien of the Lender on such Equipment. If any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading, the Borrowers shall immediately deliver such document to the Lender, together with any necessary endorsement.

4.13. <u>Notice</u>. The Borrowers shall promptly give written notice to the Lender of (a) the occurrence of any Default or Event of Default or any event, development or circumstance specific to any Borrower which might materially adversely effect the business, operations, properties or financial condition of the Borrowers, (b) any litigation instituted or threatened against the Borrowers or any judgment against the Borrowers where claims against the Borrowers exceed $100,000 and are not covered in full by insurance (subject to any deductible), (c) any notice of a claim against, or investigation of, the Borrowers, the Collateral or any other property owned, leased, operated or used by the Borrowers alleging a violation of Environmental Laws or the discovery, use, location, installation, spill, treatment, release or storage of any Hazardous Materials by the Borrowers or on, under or from the Collateral (or any part thereof) or any other property owned, leased, used or operated by the Borrowers which could result in a breach of the provisions of Section 4.4 hereof, (d) the occurrence of any "reportable event" within the meaning of ERISA or any assertion of liability of the Borrowers by the PBGC, and (e) notice of any suspension or debarment by any governmental authority, or any termination of any Governmental Contract for default.

4.14. <u>Collections</u>.

(a)    The Borrowers shall notify and direct all account debtors promptly following written request by the Lender to make all payments on or in respect of Accounts and/or the sale or lease of Inventory (other than electronic funds transfers) directly to an account in the name of the Borrowers to be maintained at the Lender (the "<u>Collection Account</u>"). So long as no Event of Default has occurred, the Borrowers may continue to permit electronic payments to be made to the Borrowers' operating accounts (collectively, the "<u>Operating Accounts</u>"), provided, however, that at the end of each Business Day, amounts remaining in the Operating Accounts will be swept into the Collection Account. The Borrowers hereby authorizes the Lender to receive, endorse and/or deposit into the Collection Account in the name of the Lender or in the name of the Borrowers any and all cash, checks, drafts and other remittances received by the Lender on or in respect of Accounts and/or the sale or lease of Inventory and the Borrowers hereby waive notice of presentment, protest and non-payment of any such checks, drafts or other remittances. In the event that the Borrowers directly receives any cash, checks, drafts or other remittances on or in respect of Accounts and/or the sale or lease of Inventory, the Borrowers

shall promptly deliver the same to the Lender for deposit to the Collection Account. Pending such deposit, the Borrowers will not commingle any such cash, checks, drafts or other remittances with other funds and property but will hold them separate and apart in trust for the Lender subject to the security interests hereunder. Until such authority is terminated by the Lender pursuant to subsection (b) below, the Borrowers shall have the authority to withdraw funds from the Collection Account and use the same for the Borrowers' general business purposes so long as such use is not inconsistent with the provisions of this Agreement. Until an Event of Default exists or occurs, the Lender, on each Business Day, or if an AutoBorrow Service Agreement is then in effect, on each Business Day, will apply all finally collected funds on deposit to the Collection Account to the unpaid principal amount of Advances then outstanding.

(b)     At any time while an Event of Default shall be continuing, the Lender may (1) terminate the authority of the Borrowers to receive electronic payments into the Operating Accounts, whereupon all account debtors shall be directed to remit all payments directly to the Collection Account, and (2) terminate the authority of the Borrowers to withdraw funds from the Collection Account whereupon (i) the Collection Account will automatically convert into an account over which the Lender has exclusive dominion, control and power of access and withdrawal, and, for that purpose, the Lender is hereby authorized to take all appropriate actions to block the Borrowers' access to the Collection Account, including without limiting the generality of the foregoing, denying electronic access and returning unpaid any checks, drafts or other instruments theretofore or thereafter issued by the Borrowers and drawn upon the Collection Account, all without any liability whatsoever on the part of the Lender to the Borrowers or to any other person for having done so, (ii) any cash, checks, drafts or other remittances on or in respect of Accounts and/or the sale or lease of Inventory received by the Borrowers and held in trust for the Lender as above provided shall be immediately delivered to the Lender for deposit to the Collection Account in precisely the form received, except for the addition thereto of the endorsement of the Borrowers where required for collection of any such checks, drafts or other remittances which endorsement the Borrowers agree to make and with respect to such checks, drafts and other remittances the Borrowers waives notice of presentment, protest and non-payment and (iii) the Lender shall have the right at any time and from time to time to apply funds held by it in the Collection Account to the payment of all or any part of the Obligations, whether matured or unmatured, in such order and manner as the Lender may determine in its sole discretion.

4.15. <u>Assignment of Payments Under Certain Government Contracts and Government Accounts</u>. On the date hereof and thereafter upon the creation of any Government Contract, Borrowers shall execute and deliver to the Lender specific assignments of payments due or to become due with respect to any Government Contracts. The Lender may, in its sole and absolute discretion, from time to time exclude from this requirement contracts that (a) provide for payments to Borrowers of less than $500,000, or (b) are less than six (6) months in duration; <u>provided, however</u> that any such exclusion, if granted, shall not release the Borrowers from the obligation to provide such assignments in the future, at the Lender's discretion. Borrowers shall execute and deliver any and all documents and take any and all steps necessary to provide the Lender with an assignment. The separate assignment to the Lender of a right to payment under specific Government Contracts, as contemplated under this Section, shall not be deemed to limit

the Lender's security interest to payments under those particular Government Contracts, but rather the Lender's security interest, as stated above, shall extend to payments under any and all Government Contracts and proceeds thereof, now or hereafter owned or acquired by Borrowers. Borrowers acknowledge that the Lender will be irreparably harmed if Borrowers fails to assign payments due or to become due under any Government Contract when required by this Agreement, and that the Lender shall have no adequate remedy at law. Therefore, the Borrowers agree that the Lender shall be entitled, in addition to all other remedies allowed by law or under this Agreement, to injunctive or other equitable relief to compel Borrowers' compliance with the provisions of this Agreement requiring the Borrowers to assign payments due or to become due under any Government Contract.

4.16. <u>Intellectual Property</u>. The Borrowers will, at their expense, diligently prosecute all patent, trademark or service mark or copyright applications pending on or after the date hereof, if any, will maintain in effect all issued patents and will renew all trademark and service mark registrations, if any, including payment of any and all maintenance and renewal fees relating thereto. The Borrowers will at their expense protect and defend all rights in such Collateral against any claims and demands of all persons other than the Lender and will, at their expense, enforce all rights in such Collateral against any and all infringers of the Collateral.

4.17. <u>Primary Operating Accounts</u>. The Borrowers shall at all times maintain their primary deposit and operating accounts, cash management operations and collection/lockbox services with the Lender. The Borrowers recognizes and agrees that the pricing for the Revolving Credit Facility set forth herein is based on the assumption that the Borrowers will maintain their primary operating accounts with the Lender, and that, in the event that the Borrowers fail to do so, the Lender may, among other things, adjust the applicable interest rate or fees in order to maintain its required rate of return.

SECTION 5. <u>Financial and Negative Covenants</u>. The Borrowers covenant and agree with the Lender that so long as any of the Obligations (or commitments therefor) shall be outstanding:

5.1. <u>Total Funded Debt to EBITDA Ratio</u>. The Borrowers shall not permit their consolidated ratio of Total Funded Debt to EBITDA, as measured on a rolling 4-quarter basis, to be greater than 2.75 to 1.0.

5.2 <u>Fixed Charge Coverage Ratio</u>. The Borrowers shall not permit their consolidated Fixed Charge Coverage Ratio, as measured quarterly on a rolling four-quarter basis, to be less than 1.25 to 1.0.

5.3 <u>Indebtedness</u>. The Borrowers shall not create, incur, assume or permit to exist any indebtedness (including Capital Leases) except (a) indebtedness to the Lender, (b) other indebtedness existing on the date hereof (a comprehensive list of which is itemized on <u>Schedule 5.3</u>) or expressly permitted by the provisions hereof (c) indebtedness incurred by the endorsement of negotiable instruments for deposit or collection in the ordinary course of business, and (d) indebtedness incurred in the ordinary course of business which is unsecured and consists of open accounts extended by suppliers on normal trade terms in connection with the purchase of goods and services.

5.4.   Liens.  The Borrowers shall not create, incur, assume or permit to exist any lien, security interest or encumbrance of any nature whatsoever on the Borrowers' property or assets, both now owned and hereafter acquired and including, without limitation, the Collateral, except for (a) any lien or security interest now or hereafter securing all or any part of the Obligations, (b) any lien, security interest or encumbrance existing on the date hereof which was immediately prior hereto disclosed to, and approved by, the Lender in writing, (including those created to secure the Subordinated Debt), (c) any lien, security interest or other encumbrance subsequently approved by the Lender in writing after the date hereof, (d) liens for taxes not delinquent or for taxes being diligently contested by Borrowers in good faith and for which adequate reserves are maintained, (e) mechanic's, artisan's, materialmen's, vendor's or other similar liens arising in the ordinary course of business, and (f) any deposit of funds made in the ordinary course of business to secure obligations of the Borrowers under workers compensation, social security or similar laws or to secure public or statutory obligations or the performance of bids, tenders, contracts, leases, subleases, surety and appeals bonds and the like, (g) zoning or other similar and customary land use restrictions, and (h) duly perfected liens securing purchase money indebtedness not prohibited by this Agreement, including duly perfected liens obtained in favor of lessors of tangible personal property arising under operating leases to the extent such leases are recharacterized as sales.  Any lien, security interest or encumbrance permitted by this subsection is called a "Permitted Lien."

5.5.   Loans and Investments.  The Borrowers shall not make or permit to remain outstanding any loan or advance to, provide any guaranty for, or make or own any investment in, any person except (a) reasonable advances for business expenses of the Borrowers' employees that would be reimbursable under the Borrowers' existing expense reimbursement policy, (b) investments in existing subsidiaries and new subsidiaries purchased in accordance with the terms hereof, (c) investments in obligations of, or guaranteed by, the United States government or any agency thereof, and (d) investments in commercial paper rated in the highest grade.

5.6.   Dividends.  The Borrowers shall not without the prior written consent of the Lender, declare or pay any dividend or other distribution on or with respect to any shares of any class of their capital stock now or hereafter outstanding or redeem, purchase or otherwise acquire any shares of any class of their capital stock now or hereafter outstanding or any warrants or rights to purchase any such stock, except for dividends payable solely in shares of capital stock, and for cash distributions to the shareholders of the Borrowers for the purpose of funding the tax liability of each shareholder arising from the S-corporation status of any Borrower.

5.7.   Mergers, Acquisitions, Etc. The Borrowers shall not enter into any merger or consolidation or acquire or purchase all or substantially all of the assets, properties or stock of any other Person without the prior written consent of the Lender.

5.8.   Sale of Assets and Liquidation.  The Borrowers shall not sell, lease or otherwise dispose of, in one transaction or a series of transactions, all or any substantial part of their business, assets or properties, including, without limitation, the Collateral, outside of the ordinary course of business or take any action to liquidate, dissolve or wind up any Borrower or its business.

5.9.  Change of Business.  The Borrowers shall not enter into any business other than their business as of the date of closing, and related enterprises.

5.10.  Change of Name, Location, Etc.  The Borrowers shall not (a) change their legal name, identity or structure, (b) change the location of their chief executive office or their chief place of business, or jurisdiction of incorporation, (c) change the location where they keep their records concerning the Collateral, or (d) open a new place of business, unless the Borrowers shall have given the Lender prior written notice thereof and shall at their cost and expense have executed, delivered, acknowledged, filed, recorded or registered all financing statements and other documents as may be required by the Lender in order to create, perfect, continue, preserve, confirm or validate the security interest and lien of the Lender on the Collateral and their priority; provided, that the Borrowers shall not in any event change the location of any Collateral if such change would cause the security interest and lien of the Lender on the Collateral (or the perfection thereof) to lapse, or if required to be perfected prior to such change, to cease to be perfected.

5.11.  Fiscal year.  The Borrowers shall not change their fiscal year.

5.12.  Affiliates.  The Borrowers shall not enter into or participate in any transaction with an affiliate except on terms and at rates no more favorable than those which would have prevailed in an arm's length transaction between unrelated third parties.

5.13.  ERISA.  The Borrowers shall not engage in any "prohibited transaction" (as such term is defined by ERISA), incur any "accumulated funding deficiency" (as such term is defined by ERISA) whether or not waived, or terminate any Plan in a manner which could result in the imposition of a lien on any property of the Borrowers pursuant to the provisions of ERISA.

5.14.  Sale and Leaseback.  The Borrowers shall not enter into any arrangement whereby Borrowers sell or transfer all or a substantial part of their fixed assets then owned by them and thereupon, or within one (1) year thereafter, rents or leases the assets so sold or transferred from the purchaser or transferee (or their respective successors and assigns).

5.15.  Financing Statements.  The Borrowers shall not file or cause to be filed any amendments, correction statements, or termination statements concerning the Collateral without the prior written consent of the Lender.

SECTION 6.  Events of Default.  The occurrence of any one or more of the following events shall constitute a default under the provisions of this Agreement, and the term "Event of Default" shall mean, whenever it is used in this Agreement, any one or more of the following events (and the term "Default" as used herein means one or more of the following events, whether or not any requirement for the giving of notice, the lapse of time, or both has been satisfied):

6.1.  Payment of Obligations.  The failure of the Borrowers to pay any of the Obligations as and when  the same becomes due and payable in accordance with the provisions

of this Agreement, the Note, and/or any of the other Financing Documents, whether at the due date thereof, at a date fixed for prepayment thereof or by acceleration thereof;

6.2.  Certain Provisions of this Agreement. The failure of the Borrowers to perform any of their obligations under Sections 4.2, 4.5, 4.14, 4.17 or Section 5 of this Agreement;

6.3.  Perform, etc. Provisions of This Agreement.  The failure of the Borrowers to perform, observe or comply with any of the provisions of this Agreement other than those covered by Section 6.1 or Section 6.2, and such failure is not cured within a period of thirty (30) days after the delivery of written notice thereof by the Lender to the Borrowers;

6.4.  Representations and Warranties.  If any representation and warranty contained herein or any statement or representation made in any certificate or any other written information at any time given by or on behalf of the Borrowers or any Guarantor or furnished by the Borrowers or any Guarantor in connection with this Agreement or any of the other Financing Documents shall prove to be false, incorrect or misleading in any material respect on the date as of which made;

6.5.  Default under Other Financing Documents.  The occurrence of a default (as defined and described therein) by the Borrowers, any Guarantor, or any other party or parties under the provisions of the Note or any of the other Financing Documents which is not cured within applicable cure periods, if any;

6.6.  Liquidation, Termination, Dissolution, etc.  If any Borrower shall liquidate, dissolve or terminate its existence;

6.7.  Default under Other Indebtedness.  If any Borrower or any Guarantor shall default in any payment of (a) any other indebtedness owing to the Lender, or (b) an indebtedness in excess of $100,000 owing to any other party beyond the period of grace, if any, provided in the instrument or agreement under which such indebtedness was created, or default in the observance or performance of any other agreement or condition relating to any such indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur, in each case, the effect of which default or other event is to cause or to permit the holder or holders of such indebtedness or beneficiary or beneficiaries of such indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice, if required, such indebtedness to become due prior to its stated maturity;

6.8.  Attachment.  The issuance of any attachment or garnishment against property or credits of any Borrower serving as Collateral, or the issuance of any attachment or garnishment against any other property or credits of any Borrowers or any Guarantor for an amount in excess, singly or in the aggregate, of $100,000, which shall not have been vacated, discharged, stayed or bonded pending appeal within 30 days after the issuance thereof;

6.9.  Judgments.  One or more judgments or decrees shall be entered against any Borrowers or any Guarantor involving in the aggregate a liability in excess of $100,000, and all

such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 30 days after the entry thereof;

6.10. Inability to Pay Debts, etc. If any Borrower shall admit its inability to pay its debts as they mature or shall make any assignment for the benefit of any of its creditors;

6.11. Bankruptcy. If proceedings in bankruptcy, or for reorganization of any Borrower or Guarantor under the United States Bankruptcy Code (as amended) or any part thereof, or under any other applicable laws, whether state or federal, for the relief of debtors, now or hereafter existing, shall be commenced against or by any Borrowers or any Guarantor and, except with respect to any such proceedings instituted by a Borrower or any Guarantor, shall not be discharged within sixty (60) days of their commencement;

6.12. Receiver, etc. A receiver or trustee shall be appointed for any Borrower or for any substantial part of the Borrowers' assets, or any proceedings shall be instituted for the dissolution or the full or partial liquidation of any Borrower and, except with respect to any such appointments requested or instituted by the Borrowers, such receiver or trustee shall not be discharged within sixty (60) days of his or her appointment, and, except with respect to any such proceedings instituted by any Borrower, such proceedings shall not be discharged within sixty (60) days of their commencement;

6.13. Change in Ownership or Control, or Key Management. The majority ownership or voting control of any Borrower is directly or indirectly sold, assigned, transferred, encumbered or otherwise conveyed without the prior written consent of the Lender, which consent shall not be unreasonably withheld;

6.14. Financial Condition. The occurrence of any change in the financial condition of any Borrowers or any Guarantor which in the good faith judgment of the Lender is materially adverse, and any such change is not cured to the reasonable satisfaction of the Lender within thirty (30) days after the date of written notice thereof by the Lender to the Borrowers;

6.15. Financing Documents Unenforceable. Any Financing Document shall cease to be enforceable for any reason or any Borrower or any Guarantor shall assert in writing that any Financing Document is unenforceable, or any lien purported to be created by any Financing Document and required hereunder or thereunder to be perfected shall (except as otherwise expressly permitted in this Agreement or the other Financing Documents) cease to be a valid first lien and prior perfected security interest in the securities, assets or properties covered thereby, or the Borrowers or any Guarantor shall assert in writing that any security interest purported to be created by any Financing Document and required hereunder or thereunder to be perfected is not (except as otherwise expressly permitted in this Agreement or the other Financing Documents) a valid first lien and prior perfected security interest in the securities, assets or properties purported to be covered thereby.

SECTION 7. Rights and Remedies.

7.1. Rights and Remedies. If any Event of Default shall occur and be continuing, the Lender may (i) declare the Credit Facilities hereunder and any obligation or commitment of the

Lender hereunder to make Advances to or issue Letters of Credit for the account of the Borrowers to be terminated, whereupon the same shall forthwith terminate, and (ii) declare the unpaid principal amount of the Note, together with accrued and unpaid interest thereon, and all other Obligations then outstanding to be immediately due and payable, whereupon the same shall become and be forthwith due and payable by the Borrowers to the Lender, without presentment, demand, protest or notice of any kind, all of which are expressly waived by the Borrowers; provided that in the case of any Event of Default referred to in Sections 6.11 or 6.12 above, the Credit Facilities hereunder and any obligation or commitment of the Lender hereunder to make Advances to, or issue Letters of Credit for the account of, the Borrowers shall immediately and automatically terminate and the unpaid principal amount of the Note, together with accrued and unpaid interest thereon, and all other Obligations then outstanding shall be automatically and immediately due and payable by the Borrowers to the Lender without notice, presentment, demand, protest or other action of any kind, all of which are expressly waived by the Borrowers. Upon the occurrence and during the continuation of any Event of Default, then in each and every case, the Lender shall be entitled to exercise in any jurisdiction in which enforcement thereof is sought, the following rights and remedies, in addition to the rights and remedies available to the Lender under the other provisions of this Agreement and the other Financing Documents, the rights and remedies of a secured party under the Uniform Commercial Code and all other rights and remedies available to the Lender under applicable law, all such rights and remedies being cumulative and enforceable alternatively, successively or concurrently:

(a)  The Lender shall have the right to take possession of the Collateral, and for that purpose, so far as the Borrowers may give authority therefor or to the extent permitted under applicable laws, to enter upon any premises on which the Collateral or any part thereof may be situated and remove therefrom all or any of the Collateral without any liability for suit, action or other proceeding. THE BORROWERS HEREBY WAIVE ANY AND ALL RIGHTS TO PRIOR NOTICE AND TO JUDICIAL HEARING WITH RESPECT TO REPOSSESSION OF COLLATERAL, and require the Borrowers, at the Borrowers' expense, to assemble and deliver all or any of the Collateral to such place or places as the Lender may designate.

(b)  The Lender shall have the right to operate, manage and control all or any of the Collateral (including use of the Collateral and any other property or assets of the Borrowers in order to continue or complete performance of the Borrowers' obligations under any contracts of Borrowers), or permit the Collateral or any portion thereof to remain idle or store the same, and collect all rents and revenues therefrom and sell, lease or otherwise dispose of any or all of the Collateral upon such terms and under such conditions as the Lender, in its sole discretion, may determine, and purchase or acquire any of the Collateral at any such sale or other disposition, all to the extent permitted by applicable law. Any purchaser or lessee of any of the Collateral so sold or leased shall hold the property so sold or leased free from any claim or right of the Borrowers and the Borrowers hereby waives (to the extent permitted by law) all rights of redemption, stay or appraisal with respect thereto. The Lender and the Borrowers agree that commercial reasonableness and good faith require the Lender to give to the Borrowers no more than five (5) days prior written notice of any public sale or other disposition of the Collateral or of the time after which any private sale or other disposition of the Collateral is to be made.

(c)    The Lender shall have the right, and the Borrowers hereby irrevocably designate and appoint the Lender and its designees as the attorney-in-fact of the Borrowers, with power of substitution and with power and authority in the Borrowers' name, the Lender's name or otherwise and for the use and benefit of the Lender (i) to notify persons obligated to make payments or other remittances on or with respect to the Collateral to make such payments and other remittances directly to the Lender, (ii) to demand, collect, sue for, take control of, compromise, settle, change the terms of, release, exchange, substitute, extend, renew or otherwise deal with, the Collateral or any person obligated on or under the Collateral in any manner as the Lender may deem advisable, (iii) to remove from any place of business of the Borrowers copies of (or, if deemed by the Lender to be reasonably necessary, originals of) all records in respect of the Collateral and, at the cost and expense of the Borrowers, to make use of any place of business of the Borrowers as may be necessary or desirable to administer, control, collect, sell or otherwise dispose of the Collateral, (iv) to receive and endorse the Borrowers' name on any checks, drafts, money orders or other instruments of payment relating to any of the Collateral, (v) to sign any proofs of claim or loss, (vi) to commence, prosecute or defend any action, suit or proceeding relating to the Collateral or the collection, enforcement or realization upon the Collateral, (vii) to adjust and compromise any claims under insurance policies, and (viii) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with any or all of the Collateral and to do all other acts and things necessary to carry out this Agreement as though the Lender were absolute owner of the Collateral. This power of attorney, being coupled with an interest, is irrevocable and all acts by the Lender and its designees pursuant thereto are hereby ratified and confirmed by the Borrowers. Neither the Lender nor any of its designees shall be liable for any acts of commission or omission, nor for any error of judgment or mistake of fact or law other than acts of actual fraud, willful misconduct or gross negligence.    The provisions of this subsection shall not (x) be construed as requiring or obligating the Lender or any designee to take any action authorized hereunder and any action taken or any action not taken hereunder shall not give rise to any liability on the part of the Lender or its designees or to any defense, claim, counterclaim or offset in favor of the Borrowers, (y) be construed to mean the Lender has assumed any of the obligations of the Borrowers under any instrument or agreement as the Lender shall not be responsible in any way for the performance of the Borrowers of any of the provisions thereof, and (z) relieve the Borrowers of any of its obligations hereunder or in any way limit the exercise by the Lender of any other or further rights it may have hereunder, under the other Financing Documents, by law or otherwise.

7.2.    Default Rate. Notwithstanding the entry of any decree, order, judgment or other judicial action, upon the occurrence of an Event of Default hereunder, the unpaid principal amount of the Note and all other monetary Obligations outstanding or becoming outstanding while such Event of Default exists shall bear interest from the date of such Event of Default until such Event of Default has been cured, at a floating and fluctuating per annum rate of interest equal at all times to the Default Rate, irrespective of whether or not as a result thereof, the Note or any of the Obligations has been declared due and payable or the maturity thereof accelerated. The Borrowers shall on demand from time to time pay such interest to the Lender and the same shall be a part of the Obligations hereunder.

7.3.  Liens, Set-Off.  As security for the payment of the Obligations and the performance of the Financing Documents, the Borrowers hereby grant to the Lender a continuing security interest and lien on, in and upon all indebtedness owing to, and all deposits (general or special), credits, balances, monies, securities and other property of, the Borrowers and all proceeds thereof, both now and hereafter held or received by, in transit to, or due by, the Lender. In addition to, and without limitation of, any rights of the Lender under applicable laws, if any Event of Default occurs and is continuing, the Lender may at any time and from time to time thereafter during the continuance of such Event of Default, without notice to the Borrowers, set-off, hold, segregate, appropriate and apply at any time and from time to time thereafter all such indebtedness, deposits, credits, balances (whether provisional or final and whether or not collected or available), monies, securities and other property toward the payment of all or any part of the Obligations in such order and manner as the Lender in its sole discretion may determine and whether or not the Obligations or any part thereof shall then be due or demand for payment thereof made by the Lender.

7.4.  Enforcement Costs.  The Borrowers agree to pay to the Lender on demand (a) all Enforcement Costs paid, incurred or advanced by or on behalf of the Lender including, without limitation, reasonable attorneys' fees, costs and expenses, and (b) interest on such Enforcement Costs from the date payment for the same is demanded until paid in full at a per annum rate of interest equal at all times to the Default Rate.  All Enforcement Costs, with interest as above provided, shall be a part of the Obligations hereunder.

7.5  Collateral Account.  If any Event of Default shall occur and be continuing, and the Lender shall elect to terminate the Revolving Credit Facility, the Borrowers at any time and from time to time during the continuance of such Event of Default shall upon demand of the Lender deliver to the Lender cash or U.S. Treasury Bills with maturities of not more than thirty (30) days in an amount equal to the amount of issued or pending Letters of Credit as of such time.  The Lender may also deposit to the Collateral Account (defined below) any cash, monies or funds received by the Lender from the collection of the Obligations or the sale or other disposition of the Collateral which the Lender, in its discretion, designates as being held against issued or pending Letters of Credit as of such time.  Such cash, monies, funds or U.S. Treasury Bills shall be held by the Lender in an account (the "Collateral Account") and invested or reinvested (as the case may be) in U.S. Treasury Bills with maturities of no more than thirty (30) days from the date of investment.  The Lender shall have the sole power of access and withdrawal from the Collateral Account.  As collateral and security for the payment of the Obligations, the Borrowers hereby assign and pledge to the Lender, and grants to the Lender a security interest in and to, all cash, monies, funds, U.S. Treasury Bills and other securities and instruments at any time and from time to time held by the Lender in the Collateral Account and any interest, income, earnings and proceeds thereof, all of which shall be a part of the Collateral hereunder.  If any Event of Default shall occur and be continuing, the Lender is irrevocably authorized to make such withdrawals from the Collateral Account at any time and from time to time and apply the same to any of the Obligations (including, without limitation, Letter of Credit Obligations) in such order and manner as the Lender in its sole discretion may determine.  After all Obligations have been indefeasibly paid in full and there are no Letters of Credit outstanding or any commitment on the part of the Lender to open and issue Letters of Credit, any cash, monies, funds, U.S. Treasury Bills or other securities and instruments held by the Lender in the

Collateral Account will be turned over to the Borrowers or to such other person who may be entitled to the same under applicable laws.

7.6.    Application of Proceeds.  During the continuance of any Event of Default, any proceeds of the collection of the Obligations and/or the sale or other disposition of the Collateral will be applied by the Lender to the payment of Enforcement Costs, and any balance of such proceeds (if any) will be applied by the Lender to the payment of the remaining Obligations (whether then due or not), at such time or times and in such order and manner of application as the Lender may from time to time in its sole discretion determine.  If the sale or other disposition of the Collateral fails to satisfy all of such Obligations, the Borrowers shall remain liable to the Lender for any deficiency.

7.7.    Remedies, etc. Cumulative.  Each right, power and remedy of the Lender as provided for in this Agreement or in the other Financing Documents or now or hereafter existing under applicable laws or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power or remedy provided for in this Agreement or in the other Financing Documents or now or hereafter existing under applicable laws or otherwise, and the exercise or beginning of the exercise by the Lender of any one or more of such rights, powers or remedies shall not preclude the simultaneous or later exercise by the Lender of any or all such other rights, powers or remedies.

7.8.    No Waiver, Etc.  No failure or delay by the Lender to insist upon the strict performance of any term, condition, covenant or agreement of this Agreement or of the other Financing Documents, or to exercise any right, power or remedy consequent upon a breach thereof, shall constitute a waiver of any such term, condition, covenant or agreement or of any such breach, or preclude the Lender from exercising any such right, power or remedy at any later time or times.  By accepting payment after the due date of any amount payable under this Agreement or under any of the other Financing Documents, the Lender shall not be deemed to waive the right either to require prompt payment when due of all other amounts payable under this Agreement or under any of the other Financing Documents, or to declare an Event of Default for failure to effect such prompt payment of any such other amount.  The payment by the Borrowers or any other person and the acceptance by the Lender of any amount due and payable under the provisions of this Agreement or the other Financing Documents at any time during which an Event of Default exists shall not in any way or manner be construed as a waiver of such Event of Default by the Lender or preclude the Lender from exercising any right of power or remedy consequent upon such Event of Default.

7.9    Arbitration.

(a)    This paragraph concerns the resolution of any controversies or claims between the parties, whether arising in contract, tort or by statute, including but not limited to controversies or claims that arise out of or relate to: (i) this Agreement (including any renewals, extensions or modifications); or (ii) any document related to this Agreement (collectively a "Claim").  For the purposes of this arbitration provision only, the term "parties" shall include any parent corporation, subsidiary or affiliate of the Lender involved in the servicing, management or administration of any obligation described or evidenced by this Agreement.

(b)    At the request of any party to this Agreement, any Claim shall be resolved by binding arbitration in accordance with the Federal Arbitration Act (Title 9, U.S. Code) (the "Act"). The Act will apply even though this Agreement provides that it is governed by the law of a specified state. The arbitration will take place on an individual basis without resort to any form of class action.

(c)    Arbitration proceedings will be determined in accordance with the Act, the then-current rules and procedures for the arbitration of financial services disputes of the American Arbitration Association or any successor thereof ("AAA"), and the terms of this paragraph. In the event of any inconsistency, the terms of this paragraph shall control. If AAA is unwilling or unable to (i) serve as the provider of arbitration or (ii) enforce any provision of this arbitration clause, any party to this agreement may substitute another arbitration organization with similar procedures to serve as the provider of arbitration.

(d)    The arbitration shall be administered by AAA and conducted in Washington, D.C. All Claims shall be determined by one arbitrator; however, if Claims exceed Five Million Dollars ($5,000,000), upon the request of any party, the Claims shall be decided by three arbitrators. All arbitration hearings shall commence within ninety (90) days of the demand for arbitration and close within ninety (90) days of commencement and the award of the arbitrator(s) shall be issued within thirty (30) days of the close of the hearing. However, the arbitrator(s), upon a showing of good cause, may extend the commencement of the hearing for up to an additional sixty (60) days. The arbitrator(s) shall provide a concise written statement of reasons for the award. The arbitration award may be submitted to any court having jurisdiction to be confirmed, judgment entered and enforced.

(e)    The arbitrator(s) will give effect to statutes of limitation in determining any Claim and may dismiss the arbitration on the basis that the Claim is barred. For purposes of the application of the statute of limitations, the service on AAA under applicable AAA rules of a notice of Claim is the equivalent of the filing of a lawsuit. Any dispute concerning this arbitration provision or whether a Claim is arbitrable shall be determined by the arbitrator(s). The arbitrator(s) shall have the power to award reasonable legal fees pursuant to the terms of this Agreement.

(f)    This paragraph does not limit the right of any party to: (i) exercise self-help remedies, such as but not limited to, setoff; (ii) initiate judicial or non-judicial foreclosure against any real or personal property collateral; (iii) exercise any judicial or power of sale rights, or (iv) act in a court of law to obtain an interim remedy, such as but not limited to, injunctive relief, writ of possession or appointment of a receiver, or additional or supplementary remedies.

(g)    The filing of a court action is not intended to constitute a waiver of the right of any party, including the suing party, thereafter to require submittal of the Claim to arbitration.

(h)    By agreeing to binding arbitration, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of any Claim. Furthermore, without intending in any way to limit this agreement to arbitrate, to the extent any Claim is not arbitrated, the parties

irrevocably and voluntarily waive any right they may have to a trial by jury in respect of such Claim. This provision is a material inducement for the parties entering into this Agreement.

SECTION 8. Miscellaneous.

8.1. Course of Dealing; Amendment. No course of dealing between the Lender and the Borrowers shall be effective to amend, modify or change any provision of this Agreement or the other Financing Documents. The Lender shall have the right at all times to enforce the provisions of this Agreement and the other Financing Documents in strict accordance with the provisions hereof and thereof, notwithstanding any conduct or custom on the part of the Lender in refraining from so doing at any time or times. The failure of the Lender at any time or times to enforce its rights under such provisions, strictly in accordance with the same, shall not be construed as having created a custom in any way or manner contrary to specific provisions of this Agreement or the other Financing Documents or as having in any way or manner modified or waived the same. This Agreement and the other Financing Documents to which the Borrowers are a party may not be amended, modified, or changed in any respect except by an agreement in writing signed by the Lender and the Borrowers.

8.2. Waiver of Default. The Lender may, at any time and from time to time, execute and deliver to the Borrowers a written instrument waiving, on such terms and conditions as the Lender may specify in such written instrument, any of the requirements of this Agreement or of the other Financing Documents or any Event of Default or Default and its consequences, provided, that any such waiver shall be for such period and subject to such conditions as shall be specified in any such instrument. In the case of any such waiver, the Borrowers and the Lender shall be restored to their former positions prior to such Event of Default or Default and shall have the same rights as they had hereunder. No such waiver shall extend to any subsequent or other Event of Default or Default, or impair any right consequent thereto and shall be effective only in the specific instance and for the specific purpose for which given.

8.3. Notices. All notices, requests and demands to or upon the parties to this Agreement shall be deemed to have been given or made when delivered by hand, or when received after being deposited in the mail, postage prepaid by registered or certified mail, return receipt requested, one day after being sent by reputable overnight delivery service, or, in the case of notice by telegraph, telex or facsimile transmission, when properly transmitted, addressed as follows or to such other address as may be hereafter designated in writing by one party to the other:

If to any Borrower:

MB SECURITY INC.

With a copy to:
J. Stephen Britt
Leach Travell Britt plc
8270 Greensboro Drive

Suite 1050
McLean, Virginia 22102
703.584.8904


Lender:    Bank of America, N.A.
8300 Greensboro Drive, Mezzanine Level
McLean, Virginia 22102
Attention:  Jessica L. Tencza, Senior Vice President
Facsimile No.: (703) 761-8118

With a copy to:

Ober, Kaler Grimes & Shriver,
A Professional Corporation
1401 H Street, N.W.
Washington, D.C. 20005
Attention: Nikolaus F. Schandlbauer, Esquire
Telecopy No.: 202-408-0640

except in cases where it is expressly herein provided that such notice, request or demand is not effective until received by the party to whom it is addressed.

    8.4.  <u>Right to Perform</u>.  For so long as an Event of Default has occurred and is continuing, then and in each such case, the Lender may (but shall be under no obligation whatsoever to) upon concurrent notice to or demand upon the Borrowers remedy any such failure by advancing funds or taking such action as it deems appropriate for the account and at the expense of the Borrowers. The advance of any such funds or the taking of any such action by the Lender shall not be deemed or construed to cure an Event of Default or waive performance by the Borrowers of any provisions of this Agreement. The Borrowers shall pay to the Lender on demand, together with interest thereon from the date of such demand until paid in full at a per annum rate of interest equal at all times to the Default Rate, any such funds so advanced by the Lender and any costs and expenses advanced or incurred by or on behalf of the Lender in taking any such action, all of which shall be a part of the Obligations hereunder.

    8.5.  <u>Indemnification</u>.  The Borrowers agree hereby to indemnify and hold the Lender harmless from any loss, liability, damages, judgments, and costs of any kind brought by third parties relating to or arising directly or indirectly out of (a) this Agreement or any document required hereunder, (b) any credit extended or committed by the Lender to the Borrowers hereunder, and (c) any litigation or proceeding related to or arising out of this Agreement, any such document, or any such credit. This indemnity includes but is not limited to attorneys' fees. This indemnity extends to the Lender, its parent, subsidiaries and all of its directors, officers, employees, agents, successors, attorneys, and assigns. This indemnity will survive repayment of the Borrowers' obligations to the Lender. All sums due to the Lender hereunder shall become Obligations of the Borrowers, due and payable immediately without demand.

8.6. Costs and Expenses. The Borrowers agree to promptly pay to the Lender on demand, all such fees, recordation and other taxes, costs and expenses of whatever kind and nature, including reasonable attorney's fees and disbursements, which the Lender may incur or which are payable in connection with the closing and the administration of the Credit Facilities, including, without limitation, the preparation of this Agreement and the other Financing Documents, the recording or filing of any and all of the Financing Documents and obtaining lien searches. All such fees, costs, recordation and other taxes shall be a part of the Obligations hereunder.

8.7. Consent to Jurisdiction. The Borrowers irrevocably (a) consent and submit to the jurisdiction and venue of any state or federal court sitting in the Commonwealth of Virginia over any suit, action or proceeding arising out of or relating to this Agreement or any of the other Financing Documents, (b) waives, to the fullest extent permitted by law, any objection that the Borrowers may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum, and (c) consents to the service of process in any such suit, action or proceeding in any such court by the mailing of copies of such process to the Borrowers by certified or registered mail at the Borrowers' address set forth herein for the purpose of giving notice.

**8.8. WAIVER OF JURY TRIAL. THE BORROWERS AND THE LENDER HEREBY VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THE CREDIT FACILITIES, THIS AGREEMENT OR ANY OF THE OTHER FINANCING DOCUMENTS.**

8.9. Certain Definitional Provisions. All terms defined in this Agreement shall have such defined meanings when used in any of the other Financing Documents. Accounting terms used in this Agreement shall have the respective meanings given to them under generally accepted accounting principles in effect from time to time in the United States of America. The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. As used herein, the singular number shall include the plural, the plural, the singular and the use of the masculine, feminine or neuter gender shall include all genders, as the context may require. Unless otherwise defined herein, all terms used herein which are defined by the Uniform Commercial Code shall have the same meanings as assigned to them by the Uniform Commercial Code unless and to the extent varied by this Agreement.

8.10. Severability. The invalidity, illegality or unenforceability of any provision of this Agreement shall not affect the validity, legality or enforceability of any of the other provisions of this Agreement which shall remain effective.

8.11. Survival. All representations, warranties and covenants contained among the provisions of this Agreement shall survive the execution and delivery of this Agreement and all other Financing Documents.

8.12. <u>Binding Effect</u>.  This Agreement and all other Financing Documents shall be binding upon and inure to the benefit of the Borrowers and the Lender and their respective personal representatives, successors and assigns, except that the Borrowers shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of the Lender.

8.13. <u>Applicable Law and Time of Essence</u>.  This Agreement and the rights and obligations of the parties hereunder shall be construed and interpreted in accordance with the laws of the Commonwealth of Virginia, both in interpretation and performance.  Time is of the essence in connection with all obligations of the Borrowers hereunder and under any of the other Financing Documents.

8.14. <u>Duplicate Originals and Counterparts</u>.  This Agreement may be executed in any number of duplicate originals or counterparts, each of such duplicate originals or counterparts shall be deemed to be an original and all taken together shall constitute but one and the same instrument.

8.15. <u>Headings</u>.  Section and subsection headings in this Agreement are included herein for convenience of reference only, shall not constitute a part of this Agreement for any other purpose and shall not be deemed to affect the meaning or construction of any of the provisions hereof.

8.16 <u>Public Use of Borrowers' Name</u>.  With the Borrowers' permission, the Lender may in its discretion use the Borrowers' corporate name in press releases, public announcements and other promotional items or literature of the Lender.  To that end, the Borrowers *hereby* consent to the creation of one or more items commemorating this transaction and use information related to the transaction in internal communications.  In addition, the Borrowers *hereby* consent to the Lender's use of the Borrowers name and information related to this transaction in connection with marketing, press releases or other transactional announcements or updates provided to investor or trade publications.

8.17 <u>Termination of Security Interest</u>.  Upon payment in full of the outstanding Obligations and the termination of the Revolving Loan Commitment, the security interest granted hereby shall terminate and all rights to the Collateral shall revert to the Borrowers.  Upon any such termination, the Lender will execute and deliver to the Borrowers such documents as the Borrowers shall reasonably request to evidence such termination.

8.18 <u>Joint and Several Liability, Etc</u>.  The Borrowers shall be jointly and severally liable for the payment and performance of the Obligations.  The Lender may, without notice to or consent of any of the Borrowers and with or without consideration, release, discharge, compromise or settle with, waive, grant indulgences to, proceed against or otherwise deal with, any of the Borrowers without in any way affecting, limiting, modifying, discharging or releasing any of the obligations and liabilities under this Agreement or any other Financing Documents of the other Borrowers.  Each of the Borrowers consents and agrees that (a) the Lender shall be under no obligation to marshall any assets in favor of such Borrower or against or in payment of any or all of the obligations and liabilities of such Borrower under this Agreement or any of the

other Financing Documents, (b) any rights such Borrower may have against the other Borrowers for contribution, exoneration from payment or otherwise, in respect of any amounts paid by such Borrower pursuant to any of the Financing Documents or which continue to be owing pursuant to any of the Financing Documents, shall be postponed until the Obligations have been indefeasibly paid in full and no commitments therefor are outstanding and (c) the Lender may enforce and collect the obligations and liabilities of such Borrower hereunder or under the other Financing Documents irrespective of any attempt, pursuit, enforcement or exhaustion of any rights and remedies the Lender may at any time have to collect the obligations and liabilities hereunder or under the other Financing Documents of the other Borrowers.

8.19  <u>No Advisory or Fiduciary Responsibility</u>.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Financing Document), each Borrower acknowledges and agrees that:  (i) (A)  the services evidenced by this Agreement provided by Lender are arm's-length commercial transactions between such Borrower and Lender, (B) each Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Borrower is capable of evaluating and understanding, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Financing Documents; (ii) (A)  Lender  is and has been acting solely as a principal and, has not been, is not, and will not be acting as an advisor, agent or fiduciary, for Borrowers or any other Person and (B) Lender does not have any obligation to Borrowers with respect to the transaction contemplated hereby except those obligations expressly set forth herein and in the other Financing Documents; and (iii) Lender may be engaged in a broad range of transactions that involve interests that differ from those of the Borrowers, and Lender has no obligation to disclose any of such interests to  the Borrowers.  To the fullest extent permitted by law, each Borrower hereby waives and releases any claims that it may have against Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

8.20  <u>USA  PATRIOT  Act Notice</u>.  The Lender hereby notifies the Borrowers that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of each Borrower and other information that will allow the Lender to identify Borrower in accordance with such Act.

[remainder of page left intentionally blank – signature pages follow]

IN WITNESS WHEREOF, each of the parties hereto have executed and delivered this Agreement under their respective seals as of the day and year first written above.

WITNESS:                                    MB SECURITY CORPORATION


_____          By:_____(SEAL)
                                                Name:
                                                Title:

WITNESS:                                    AC TECHNOLOGY, INC.


_____          By:_____(SEAL)
                                                Name:
                                                Title:

WITNESS:                                    BANK OF AMERICA, N.A.


_____          By:_____(SEAL)
                                                Jessica L. Tenoza
                                                Senior Vice President

IN WITNESS WHEREOF, each of the parties hereto have executed and delivered this Agreement under their respective seals as of the day and year first written above.

WITNESS:

MB SECURITY CORPORATION

By:_____(SEAL)
    Earle D. Munns, Jr.
    President & CEO

WITNESS:

AC TECHNOLOGY, INC.

By:_____(SEAL)
    Earle D. Munns, Jr.
    President & CEO

WITNESS:

BANK OF AMERICA, N.A.

_____

By:_____(SEAL)
    Jessica L. Tencza
    Senior Vice President

## Schedule 1.1

### *Commercial Tort Claims*

*None*

## Schedule 3

*Exceptions to Borrowers' Representations and Warranties*

**SCHEDULE 3**
**TO**
**CREDIT AND SECURITY AGREEMENT**

**This Schedule 3 is dated June 26, 2008.**

**3.15**    **Intellectual Property.**

(A)    USPTO Reg. No. 3,257,490
Registered July 3, 2007



(B)    USPTO Reg. No. 3,315,226
Registered October 23, 2007

# AC TECHNOLOGY

**3.17**    **Accounts.**

(A)    Accounts Receivable from Sun Microsystem dated January 1, 2008 in the amount of $311,929.

## Schedule 3.7

### *Borrowers' Name and Business Locations*

MB Security Corporation
11660 Great Falls Way,
Great Falls Virginia 22066

AC Technology, Inc.
22695 Commerce Center Court
Suite C
Dulles, Virginia 20166

## Schedule 3.15

***Intellectual Property***
***None***

**Schedule 4.8**

*Insurance Coverage*

*Schedule 5.3*
*(Existing Indebtedness)*

**A/R Aging Summary**
**As of June 26, 2008**

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| Arbitech | 5,060.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,060.00 |
| Arrow Electronics, Inc. | 735.22 | 0.00 | 0.00 | 0.00 | 0.00 | 735.22 |
| Carahsoft | 558.77 | 0.00 | 0.00 | 0.00 | 0.00 | 558.77 |
| David, Brody & Dondershine, LLP | 82.50 | 0.00 | 0.00 | 0.00 | 0.00 | 82.50 |
| GSSi | 1,950.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,950.00 |
| i- Tech | 4,579.20 | 0.00 | 0.00 | 0.00 | 0.00 | 4,579.20 |
| Ingram Micro, Inc. | 191.92 | 0.00 | 0.00 | 0.00 | 0.00 | 191.92 |
| Miller's Office Products | 278.25 | -69.17 | 0.00 | 0.00 | 0.00 | 209.08 |
| MOCA/Arrow | 2,634,664.78 | 79,103.23 | 84,384.65 | 0.00 | 0.00 | 2,798,152.66 |
| Pitney Bowes | 24.74 | 0.00 | 0.00 | 0.00 | 0.00 | 24.74 |
| RDSK Inc, dba Litronic | 18,520.40 | 0.00 | 0.00 | 0.00 | 0.00 | 18,520.40 |
| Reich, Adrian | 0.00 | 430.80 | 0.00 | 0.00 | 0.00 | 430.80 |
| Ritter & Company | 7,880.00 | 20,000.00 | 0.00 | 0.00 | 0.00 | 27,880.00 |
| Sky Electronics, Inc. | 3,174.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,174.00 |
| Synnex Corp. | 19,389.88 | 0.00 | 0.00 | 0.00 | 0.00 | 19,389.88 |
| Tech Data Corporation | 6,230.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6,230.00 |
| Travelers | 4,296.50 | 0.00 | 0.00 | 0.00 | 0.00 | 4,296.50 |
| Verizon | 144.86 | 0.00 | 0.00 | 0.00 | 0.00 | 144.86 |
| Whay Law Firm | 657.46 | 0.00 | 0.00 | 0.00 | 0.00 | 657.46 |
| XO Communications Services, Inc. | 26.35 | 0.00 | 0.00 | 0.00 | 0.00 | 26.35 |
| TOTAL | 2,708,444.83 | 99,464.86 | 84,384.65 | 0.00 | 0.00 | 2,892,294.34 |

*Exhibit A*

**Form of Borrowing Base Certificate**
*[to be provided in electronic form by Lender]*

## Attachment I

| Tier | Funded Debt to EBITDA | Unused Fee | Applicable Libor Margin | Letters of Credit Fee |
|------|----------------------|-----------|------------------------|----------------------|
| I | Less than or equal to 1.50 to 1.00 | 25 bps | 250 bps | 250 bps |
| II | Less than or equal to 2.25 to 1.00 but greater than 1.50 to 1.00 | 25 bps | 275 bps | 275 bps |
| III | Less than or equal to 2.75 to 1.00 but greater than 2.25 to 1.00 | 35 bps | 300 bps | 300 bps |

*bps = basis points*

# REVOLVING LOAN NOTE

$25,000,000                                                    June 30, 2008

FOR VALUE RECEIVED, the undersigned, MB SECURITY CORPORATION, a Delaware corporation and AC TECHNOLOGY, INC., a Virginia corporation (collectively, the "Borrowers") hereby jointly and severally promise to pay to the order of BANK OF AMERICA, N.A., a national banking association (the "Lender"), in lawful money of the United States of America and in immediately available funds and without deduction, set-off or other reduction, the principal amount of Twenty Five Million Dollars ($25,000,000) or such lesser amount as shall equal the aggregate of the Advances made or deemed to be made by the Lender to the Borrowers under the Revolving Credit Facility established by the Credit Agreement referred to below, on the dates and in the principal amounts provided in the Credit Agreement, and to pay interest on the unpaid principal amount of each such Advance, at such office, in like money and funds, for the period commencing on the date of advance of each such Advance until such Revolving Credit Facility be paid in full, at the rates per annum and on the dates provided in the Credit Agreement.

This Note is the "Revolving Credit Note" referred to in that certain Credit and Security Agreement of even date herewith between the Borrowers and the Lender (such Credit Agreement, as the same may be amended, modified, supplemented, renewed, extended or restated from time to time, being referred to herein as the "Credit Agreement"), and evidences Advances made or deemed to be made by the Lender thereunder. The holder of this Note shall be entitled to, without limitation, the benefits provided in the Credit Agreement as set forth therein. The Credit Agreement, among other things, contains provisions for acceleration of the maturity of this Note upon the happening of certain stated events and for prepayment of the Advances prior to the maturity of this Note upon the terms and conditions specified in the Credit Agreement. Capitalized terms used in this Note have the respective meanings assigned to them in the Credit Agreement.

**THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF VIRGINIA (WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES) AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.**

The Borrowers and each surety, guarantor, endorser and other party ever liable for payment of any sums of money payable on this Note jointly and severally waive notice, presentment, demand for payment, protest, notice of protest and non-payment or dishonor, notice of acceleration, notice of intent to accelerate, notice of intent to demand, diligence in collecting, grace and all other formalities of any kind, and consent to all extensions without notice for any period or periods of time and partial payments, before or after maturity, and any impairment of any collateral securing this Note, all without



prejudice to the holder; and (ii) the holder shall similarly have the right to deal in any way, at any time, with one or more of the foregoing parties without notice to any other party, and to grant any such party any extensions of time for payment of any of said indebtedness, or to release or substitute part or all of the collateral securing this Note, or to grant any other indulgences or forbearances whatsoever, without notice to any other party and without in any way affecting the personal liability of any party hereunder.

**THIS NOTE, TOGETHER WITH THE OTHER FINANCING DOCUMENTS, REPRESENTS THE FINAL AGREEMENT OF THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.**

IN WITNESS WHEREOF, the Borrowers have caused this Note to be executed in its name, under their seals and on their behalf by their duly authorized representative the day and year first written above.

**BORROWERS:**

WITNESS:                            MB SECURITY CORPORATION

By: _____ (SEAL)
Name:  Earle D. Munns, Jr.
Title:  President & CEO

WITNESS:                            AC TECHNOLOGY, INC.

By: _____ (SEAL)
Name:  Earle D. Munns, Jr.
Title:  President & CEO

An Affiliate of

| | |
|---|---|
| DATE FILED: | 7-1-08 |
| JURISDICTION FILED: | VA, State Corporation Commission |
| TIME FILED: | 3:02PM |
| DEBTOR NAME: | **AC TECHNOLOGY, INC.** |
| FILE NUMBER: | 08070171570 |
| LIBER / FOLIO: | N/A |

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Federal Research
1023 15th Street, NW, Suite 401
Washington, DC  20005

**080701 7157**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| AC TECHNOLOGY, INC. | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 22695 COMMERCE CENTER COUT, SUITE C | Dulles | VA | 20166 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | CORPORATION | VIRGINIA | 0382020 ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| BANK OF AMERICA, N.A. | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 8300 GREENSBORO DRIVE, MEZZANINE LEVEL ATTN: JESSICA TENCZA, SENIOR VICE PRESIDENT | McLEAN | VA | 22102 | USA |

4. This FINANCING STATEMENT covers the following collateral:

All of the Debtor's personal property, whether now owned or hereafter acquired including, without limitation, goods, accounts, deposit accounts, investment property, instruments, chattel paper, documents, letter-of-credit rights, commercial tort claims and general intangibles, as such terms are defined under the Uniform Commercial Code.

| 5. ALTERNATIVE DESIGNATION (if applicable): | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA

**FILE WITH THE STATE CORPORATION COMMISSION OF VIRGINIA**

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)
DEUCC1PNAT - 12/17/2002 C T System Online

*An Affiliate of*

DATE FILED:                    7-1-08

JURISDICTION FILED:            VA, State Corporation Commission

TIME FILED:                    3:02PM

DEBTOR NAME:                   **AC TECHNOLOGY, INC.**

FILE NUMBER:                   08070171570

LIBER / FOLIO:                 N/A



# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

**B. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Federal Research
1023 15th Street, NW, Suite 401
Washington, DC 20005

080701 7157

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| AC TECHNOLOGY, INC. | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 22695 COMMERCE CENTER COUT, SUITE C | Dulles | VA | 20166 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | CORPORATION | VIRGINIA | 0382020 | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| BANK OF AMERICA, N.A. | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 8300 GREENSBORO DRIVE, MEZZANINE LEVEL ATTN: JESSICA TENCZA, SENIOR VICE PRESIDENT | McLEAN | VA | 22102 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

All of the Debtor's personal property, whether now owned or hereafter acquired including, without limitation, goods, accounts, deposit accounts, investment property, instruments, chattel paper, documents, letter-of-credit rights, commercial tort claims and general intangibles, as such terms are defined under the Uniform Commercial Code.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |

**8. OPTIONAL FILER REFERENCE DATA**

FILE WITH THE STATE CORPORATION COMMISSION OF VIRGINIA

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)
DEUCC1FNAT - 12/17/2002 C T System Online



|  |  |
|---|---|
| BORROWERS: | MB SECURITY CORPORATION |
|  | AC TECHNOLOGY, INC. |
|  |  |
| GUARANTOR: | EARLE D. MUNNS, JR. |

## CONTINUING AND UNCONDITIONAL GUARANTY

To:    Bank of America, N.A.

1.    _The Guaranty_.    For valuable consideration, the undersigned ("Guarantor") hereby unconditionally guarantees and promises to pay promptly to Bank of America, N.A., its subsidiaries and affiliates (collectively, "Bank"), or order, in lawful money of the United States, any and all Indebtedness of MB SECURITY CORPORATION, a Delaware corporation and AC TECHNOLOGY, INC., a Virginia corporation (collectively, the "Borrowers") to Bank when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter.    The liability of Guarantor under this Guaranty is not limited as to the principal amount of the Indebtedness guaranteed and includes, without limitation, liability for all interest, fees, indemnities, and other costs and expenses relating to or arising out of the Indebtedness and for all swap, option, or forward obligations relating to or arising out of the Indebtedness now or hereafter owing from Borrowers to Bank.    The liability of Guarantor is continuing and relates to any Indebtedness, including that arising under successive transactions which shall either continue the Indebtedness or from time to time renew it after it has been satisfied.    This Guaranty is cumulative and does not supersede any other outstanding guaranties, and the liability of Guarantor under this Guaranty is exclusive of Guarantor's liability under any other guaranties signed by Guarantor.    If Guarantor is a subsidiary or affiliate of Borrowers, Guarantor's liability hereunder shall not exceed at any one time the largest amount during the period commencing with Guarantor's execution of this Guaranty and thereafter that would not render Guarantor's obligations hereunder subject to avoidance under Section 548 of the Bankruptcy Code (Title 11, United States Code) or any comparable provisions of any applicable state law.

2. Definitions.

(a)    "Borrowers" shall mean the entities named in Paragraph 1 of this Guaranty.

(b)    "Guarantor" shall mean the individual signing this Guaranty.

(c)    "Indebtedness" shall mean any and all debts, liabilities, and obligations of Borrowers to Bank including, without limitation, those arising pursuant to the Loan Documents, now or hereafter existing, whether voluntary or involuntary and however arising, whether direct or indirect or acquired by Bank by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by Bank for its own account or as agent for another or others, whether Borrowers may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable. Indebtedness includes, without limitation, any and all obligations of Borrowers to Bank for reasonable attorneys' fees and all other costs and expenses incurred by Bank in the collection or enforcement of the Loan Documents.    Indebtedness also includes, without limitation, all obligations of Borrowers arising under any interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, securities puts, calls, collars, options or forwards or any combination of, or option with respect to the Loan Documents whether now or hereafter entered into between Borrowers and Bank.



(d)  "Loan Documents" shall mean shall mean the Credit and Security Agreement between Borrowers and Lender, the Revolving Loan Note from Borrowers in favor of Lender, and all other written agreements, documents, and instruments evidencing any of the Indebtedness, and deeds of trust, mortgages, security agreements, and other written agreements, documents, and instruments executed by Borrowers in connection with such loan agreements, promissory notes, and other agreements, documents, and instruments evidencing any of the Indebtedness, all as now in effect and as hereafter amended, restated, renewed, or superseded.

3.  Obligations Independent.  The obligations hereunder are independent of the obligations of Borrowers or any other guarantor, and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrowers or any other guarantor or whether Borrowers or any other guarantor be joined in any such action or actions.  Anyone executing this Guaranty shall be bound by its terms without regard to execution by anyone else.

4.  Rights of Bank.  Guarantor authorizes Bank, without notice or demand and without affecting its liability hereunder, from time to time to:

(a)  renew, compromise, extend, accelerate, or otherwise change the time for payment, or otherwise change the terms, of the Indebtedness or any part thereof, including increase or decrease of the rate of interest thereon, or otherwise change the terms of any Loan Documents;

(b)  receive and hold security for the payment of this Guaranty or any Indebtedness and exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any such security;

(c)  apply such security and direct the order or manner of sale thereof as Bank in its discretion may determine;

(d)  release or substitute any Guarantor or any one or more of any endorsers or other guarantors of any of the Indebtedness; and

(e)  permit the Indebtedness to exceed Guarantor's liability under this Guaranty, and Guarantor agrees that any amounts received by Bank from any source other than Guarantor shall be deemed to be applied first to any portion of the Indebtedness not guaranteed by Guarantor.

5.  Guaranty to be Absolute.  Guarantor agrees that until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, Guarantor shall not be released by or because of the taking, or failure to take, any action that might in any manner or to any extent vary the risks of Guarantor under this Guaranty or that, but for this paragraph, might discharge or otherwise reduce, limit, or modify Guarantor's obligations under this Guaranty.  Guarantor waives and surrenders any defense to any liability under this Guaranty based upon any such action, including but not limited to any action of Bank described in the immediately preceding paragraph of this Guaranty.  It is the express intent of Guarantor that Guarantor's obligations under this Guaranty are and shall be absolute and unconditional.

6.  Guarantor's Waivers of Certain Rights and Certain Defenses.  Guarantor waives:

(a)  any right to require Bank to proceed against Borrowers, proceed against or exhaust any security for the Indebtedness, or pursue any other remedy in Bank's power whatsoever.

(b)  any defense arising by reason of any disability or other defense of Borrowers, or the cessation from any cause whatsoever of the liability of Borrowers; and

(c)  any defense based on any claim that Guarantor's obligations exceed or are more burdensome than those of Borrowers.

No provision or waiver in this Guaranty shall be construed as limiting the generality of any other waiver contained in this Guaranty.

7. <u>Waiver of Subrogation</u>. Until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, even though the Indebtedness may be in excess of Guarantor's liability hereunder, Guarantor waives to the extent permitted by applicable law any right of subrogation, reimbursement, indemnification, and contribution (contractual, statutory, or otherwise) including, without limitation, any claim or right of subrogation under the Bankruptcy Code (Title 11, United States Code) or any successor statute, arising from the existence or performance of this Guaranty, and Guarantor waives to the extent permitted by applicable law any right to enforce any remedy that Bank now has or may hereafter have against Borrowers, and waives any benefit of, and any right to participate in, any security now or hereafter held by Bank.

8. <u>Waiver of Notices</u>. Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of intent to accelerate, notices of acceleration, notices of any suit or any other action against Borrowers or any other person, any other notices to any party liable on any Loan Document (including Guarantor), notices of acceptance of this Guaranty, notices of the existence, creation, or incurring of new or additional Indebtedness to which this Guaranty applies or any other Indebtedness of Borrowers to Bank, and notices of any fact that might increase Guarantor's risk.

9. <u>Security</u>. To secure all of Guarantor's obligations hereunder, Guarantor assigns and grants to Bank a security interest in all moneys, securities, and other property of Guarantor now or hereafter in the possession of Bank, all deposit accounts of Guarantor maintained with Bank, and all proceeds thereof. Upon default or breach of any of Guarantor's obligations to Bank, Bank may apply any deposit account to reduce the Indebtedness, and may foreclose any collateral as provided in the Uniform Commercial Code and in any security agreements between Bank and Guarantor.

10. <u>Subordination</u>. Any obligations of Borrowers to Guarantor, now or hereafter existing, including but not limited to any obligations to Guarantor as subrogee of Bank or resulting from Guarantor's performance under this Guaranty, are hereby subordinated to the Indebtedness. In addition to Guarantor's waiver of any right of subrogation as set forth in this Guaranty with respect to any obligations of Borrowers to Guarantor as subrogee of Bank, Guarantor agrees that, if Bank so requests, Guarantor shall not demand, take, or receive from Borrowers, by setoff or in any other manner, payment of any other obligations of Borrowers to Guarantor until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated. If any payments are received by Guarantor in violation of such waiver or agreement, such payments shall be received by Guarantor as trustee for Bank and shall be paid over to Bank on account of the Indebtedness, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty. Any security interest, lien, or other encumbrance that Guarantor may now or hereafter have on any property of Borrowers is hereby subordinated to any security interest, lien, or other encumbrance that Bank may have on any such property.

11. <u>Revocation of Guaranty</u>.

(a)    This Guaranty may be revoked at any time by Guarantor in respect to future transactions, unless there is a continuing consideration as to such transactions that Guarantor does not renounce. Such revocation shall be effective upon actual receipt by Bank, at the address shown below or at such other address as may have been provided to Guarantor by Bank, of written notice of revocation. Revocation shall not affect any of Guarantor's obligations or Bank's rights with respect to transactions committed or entered into prior to Bank's receipt of such notice, regardless of whether or not the Indebtedness related to such transactions, before or after revocation, has been incurred, renewed, compromised, extended, accelerated, or otherwise changed as to any of its terms, including time for payment or increase or decrease of the rate of interest thereon, and regardless of any other act or omission of Bank authorized hereunder. Revocation by Guarantor shall not affect any obligations of any other guarantor.

(b)    In the event of the death of a Guarantor, the liability of the estate of the deceased Guarantor shall continue in full force and effect as to (i) the Indebtedness existing at the date of death, and any renewals or extensions thereof, and (ii) loans or advances made to or for the account of Borrowers after

the date of the death of the deceased Guarantor pursuant to a commitment made by Bank to Borrowers prior to the date of such death. As to all surviving Guarantors, this Guaranty shall continue in full force and effect after the death of a Guarantor, not only as to the Indebtedness existing at that time, but also as to the Indebtedness thereafter incurred by Borrowers to Bank.

(c) Guarantor acknowledges and agrees that this Guaranty may be revoked only in accordance with the foregoing provisions of this paragraph and shall not be revoked simply as a result of any change in name, location, or composition or structure of Borrowers, the dissolution of Borrowers, or the termination, increase, decrease, or other change of any personnel or owners of Borrowers.

12. <u>Reinstatement of Guaranty</u>. If this Guaranty is revoked, returned, or canceled, and subsequently any payment or transfer of any interest in property by Borrowers to Bank is rescinded or must be returned by Bank to Borrowers, this Guaranty shall be reinstated with respect to any such payment or transfer, regardless of any such prior revocation, return, or cancellation.

13. <u>Stay of Acceleration</u>. In the event that acceleration of the time for payment of any of the Indebtedness is stayed upon the insolvency, bankruptcy, or reorganization of Borrowers or otherwise, all such Indebtedness guaranteed by Guarantor shall nonetheless be payable by Guarantor immediately if requested by Bank.

14. <u>Information Relating to Borrowers</u>. Guarantor acknowledges and agrees that it has made such independent examination, review, and investigation of the Loan Documents as Guarantor deems necessary and appropriate, including, without limitation, any covenants pertaining to Guarantor contained therein, and shall have sole responsibility to obtain from Borrowers any information required by Guarantor about any modifications thereto. Guarantor further acknowledges and agrees that it shall have the sole responsibility for, and has adequate means of, obtaining from Borrowers such information concerning Borrowers' financial condition or business operations as Guarantor may require, and that Bank has no duty, and Guarantor is not relying on Bank, at any time to disclose to Guarantor any information relating to the business operations or financial condition of Borrowers.

15. <u>Borrowers' Authorization</u>. It is not necessary for Bank to inquire into the powers of Borrowers or of the officers, directors, partners, members, managers, or agents acting or purporting to act on their behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder, subject to any limitations on Guarantor's liability set forth herein.

16. <u>Information Relating to Guarantor</u>. Guarantor authorizes Bank to verify or check any information given by Guarantor to Bank, check Guarantor's credit references, verify employment, and obtain credit reports. Guarantor acknowledges and agrees that the authorizations provided in this paragraph apply to any individual general partner of Guarantor and to Guarantor's spouse and any such general partner's spouse if Guarantor or such general partner is married and lives in a community property state.

17. <u>Change of Status</u>. Any Guarantor that is a business entity shall not enter into any consolidation, merger, or other combination unless Guarantor is the surviving business entity. Further, Guarantor shall not change its legal structure unless (a) Guarantor obtains the prior written consent of Bank and (b) all Guarantor's obligations under this Guaranty are assumed by the new business entity.

18. <u>Remedies</u>. If Guarantor fails to fulfill its duty to pay all Indebtedness guaranteed hereunder, Bank shall have all of the remedies of a creditor and, to the extent applicable, of a secured party, under all applicable law. Without limiting the foregoing, Bank may, at its option and without notice or demand:

(a) declare any Indebtedness due and payable at once;

(b) take possession of any collateral pledged by Borrowers or Guarantor, wherever located, and sell, resell, assign, transfer, and deliver all or any part of the collateral at any public or private sale or otherwise dispose of any or all of the collateral in its then condition, for cash or on credit or for future delivery, and in connection therewith Bank may impose reasonable conditions upon any such sale. Further, Bank, unless prohibited by law the provisions of which cannot be waived, may purchase all or any part of the collateral to be sold, free from and discharged of all trusts, claims, rights of redemption and

equities of Borrowers or Guarantor whatsoever. Guarantor acknowledges and agrees that the sale of any collateral through any nationally recognized broker-dealer, investment banker, or any other method common in the securities industry shall be deemed a commercially reasonable sale under the Uniform Commercial Code or any other equivalent statute or federal law, and expressly waives notice thereof except as provided herein; and

(c) set off against any or all liabilities of Guarantor all money owed by Bank or any of its agents or affiliates in any capacity to Guarantor, whether or not due, and also set off against all other liabilities of Guarantor to Bank all money owed by Bank in any capacity to Guarantor. If exercised by Bank, Bank shall be deemed to have exercised such right of setoff and to have made a charge against any such money immediately upon the occurrence of such default although made or entered on the books subsequent thereto.

19. Notices. All notices required under this Guaranty shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Guaranty, or sent by facsimile to the fax numbers listed on the signature page (with a copy by one of the other methods of notice), or to such other addresses as Bank and Guarantor may specify from time to time in writing. Notices sent by (a) first class mail shall be deemed delivered on the earlier of actual receipt or on the fourth business day after deposit in the U.S. mail, postage prepaid, (b) overnight courier shall be deemed delivered on the next business day, and (c) telecopy shall be deemed delivered when transmitted.

20. Successors and Assigns. This Guaranty (a) binds Guarantor and Guarantor's executors, administrators, successors, and assigns, provided that Guarantor may not assign its rights or obligations under this Guaranty without the prior written consent of Bank, and (b) inures to the benefit of Bank and Bank's indorsees, successors, and assigns. Bank may, without notice to Guarantor and without affecting Guarantor's obligations hereunder, sell, assign, grant participations in, or otherwise transfer to any other person, firm, or corporation the Indebtedness and this Guaranty, in whole or in part. Guarantor agrees that Bank may disclose to any assignee or purchaser, or any prospective assignee or purchaser, of all or part of the Indebtedness any and all information in Bank's possession concerning Guarantor, this Guaranty, and any security for this Guaranty.

21. Amendments, Waivers, and Severability. No provision of this Guaranty may be amended or waived except in writing. No failure by Bank to exercise, and no delay in exercising, any of its rights, remedies, or powers shall operate as a waiver thereof, and no single or partial exercise of any such right, remedy, or power shall preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The unenforceability or invalidity of any provision of this Guaranty shall not affect the enforceability or validity of any other provision of this Guaranty.

22. Costs and Expenses. Guarantor agrees to pay all reasonable attorneys' fees, and all other costs and expenses that may be incurred by Bank (a) in the enforcement of this Guaranty or (b) in the preservation, protection, or enforcement of any rights of Bank in any case commenced by or against Guarantor or Borrowers under the Bankruptcy Code (Title 11, United States Code) or any similar or successor statute.

23. Annual Personal Financial Information. Guarantor hereby covenants and agrees, within one hundred twenty (120) days of each calendar year end during which this Guaranty is in effect, to prepare, sign and deliver to the Bank a personal financial statement in form and substance satisfactory to the Bank.

24. Governing Law and Jurisdiction. This Guaranty shall be governed by and construed and enforced in accordance with federal law and the law of the Commonwealth of Virginia. Jurisdiction and venue for any action or proceeding to enforce this Guaranty shall be the forum appropriate for such action or proceeding against Borrowers, to which jurisdiction Guarantor irrevocably submits and to which venue Guarantor waives to the fullest extent permitted by law any defense asserting an inconvenient forum in connection therewith. It is provided, however, that if Guarantor owns property in another state, notwithstanding that the forum for enforcement action is elsewhere, Bank may commence a collection proceeding in any state in which Guarantor owns property for the purpose of enforcing provisional remedies against such property. Service of process by Bank in connection with such action or proceeding shall be binding on Guarantor if sent to Guarantor by registered or certified mail at its address specified below.

25. <u>Dispute Resolution Provision</u>. This paragraph, including the subparagraphs below, is referred to as the "Dispute Resolution Provision." This Dispute Resolution Provision is a material inducement for the parties entering into this agreement.

(a) This Dispute Resolution Provision concerns the resolution of any controversies or claims between the parties, whether arising in contract, tort or by statute, including but not limited to controversies or claims that arise out of or relate to: (i) this agreement (including any renewals, extensions or modifications); or (ii) any document related to this agreement (collectively a "Claim"). For the purposes of this Dispute Resolution Provision only, the term "parties" shall include any parent corporation, subsidiary or affiliate of the Bank involved in the servicing, management or administration of any obligation described or evidenced by this agreement.

(b) At the request of any party to this agreement, any Claim shall be resolved by binding arbitration in accordance with the Federal Arbitration Act (Title 9, U.S. Code) (the "Act"). The Act will apply even though this agreement provides that it is governed by the law of a specified state.

(c) Arbitration proceedings will be determined in accordance with the Act, the then-current rules and procedures for the arbitration of financial services disputes of the American Arbitration Association or any successor thereof ("AAA"), and the terms of this Dispute Resolution Provision. In the event of any inconsistency, the terms of this Dispute Resolution Provision shall control. If AAA is unwilling or unable to (i) serve as the provider of arbitration or (ii) enforce any provision of this arbitration clause, the Bank may designate another arbitration organization with similar procedures to serve as the provider of arbitration.

(d) The arbitration shall be administered by AAA and conducted, unless otherwise required by law, in any U.S. state where real or tangible personal property collateral for this credit is located or if there is no such collateral, in the state specified in the governing law section of this agreement. All Claims shall be determined by one arbitrator; however, if Claims exceed Five Million Dollars ($5,000,000), upon the request of any party, the Claims shall be decided by three arbitrators. All arbitration hearings shall commence within ninety (90) days of the demand for arbitration and close within ninety (90) days of commencement and the award of the arbitrator(s) shall be issued within thirty (30) days of the close of the hearing. However, the arbitrator(s), upon a showing of good cause, may extend the commencement of the hearing for up to an additional sixty (60) days. The arbitrator(s) shall provide a concise written statement of reasons for the award. The arbitration award may be submitted to any court having jurisdiction to be confirmed and have judgment entered and enforced.

(e) The arbitrator(s) will give effect to statutes of limitation in determining any Claim and may dismiss the arbitration on the basis that the Claim is barred. For purposes of the application of any statutes of limitation, the service on AAA under applicable AAA rules of a notice of Claim is the equivalent of the filing of a lawsuit. Any dispute concerning this arbitration provision or whether a Claim is arbitrable shall be determined by the arbitrator(s), except as set forth at subparagraph (h) of this Dispute Resolution Provision. The arbitrator(s) shall have the power to award legal fees pursuant to the terms of this agreement.

(f) This paragraph does not limit the right of any party to: (i) exercise self-help remedies, such as but not limited to, setoff; (ii) initiate judicial or non-judicial foreclosure against any real or personal property collateral; (iii) exercise any judicial or power of sale rights, or (iv) act in a court of law to obtain an interim remedy, such as but not limited to, injunctive relief, writ of possession or appointment of a receiver, or additional or supplementary remedies.

(g) The filing of a court action is not intended to constitute a waiver of the right of any party, including the suing party, thereafter to require submittal of the Claim to arbitration.

(h) Any arbitration or trial by a judge of any Claim will take place on an individual basis without resort to any form of class or representative action (the "Class Action Waiver"). Regardless of

anything else in this Dispute Resolution Provision, the validity and effect of the Class Action Waiver may be determined only by a court and not by an arbitrator. The parties to this Agreement acknowledge that the Class Action Waiver is material and essential to the arbitration of any disputes between the parties and is non-severable from the agreement to arbitrate Claims. If the Class Action Waiver is limited, voided or found unenforceable, then the parties' agreement to arbitrate shall be null and void with respect to such proceeding, subject to the right to appeal the limitation or invalidation of the Class Action Waiver. **The Parties acknowledge and agree that under no circumstances will a class action be arbitrated.**

(i) By agreeing to binding arbitration, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of any Claim. Furthermore, without intending in any way to limit this agreement to arbitrate, to the extent any Claim is not arbitrated, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of such Claim. This waiver of jury trial shall remain in effect even if the Class Action Waiver is limited, voided or found unenforceable. **WHETHER THE CLAIM IS DECIDED BY ARBITRATION OR BY TRIAL BY A JUDGE, THE PARTIES AGREE AND UNDERSTAND THAT THE EFFECT OF THIS AGREEMENT IS THAT THEY ARE GIVING UP THE RIGHT TO TRIAL BY JURY TO THE EXTENT PERMITTED BY LAW.**

26. **FINAL AGREEMENT.** BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

Executed June 30, 2008.

Witness:

_____

Address for notices to Bank:

Jessica L. Tencza
Senior Vice President
Bank of America, N.A.
8300 Greensboro Drive, Mezzanine Level
McLean, Virginia 22102

_____ (Seal)
EARLE D. MUNNS, JR.

Address for notices to Guarantor:

EARLE D. MUNNS, JR.
11660 Great Falls Way
Great Falls, VA
22066

*Affiliate Sharing Notice. Notice to Guarantor (hereinafter, "Obligor"): From time to time Bank of America, N.A. (the "Bank") may share information about the Obligor's experience with Bank of America Corporation (or any successor company) and its subsidiaries and affiliated companies (the "Affiliates"). The Bank may also share with the Affiliates credit-related information contained in any applications, from credit reports and information it may obtain about the Obligor from outside sources. If the Obligor is an individual, the Obligor may instruct the Bank not to share this information with the Affiliates. The Obligor can make this election by (1) calling the Bank at 1.888.341.5000, (2) visiting the Bank online at www.bankofamerica.com, selecting "Privacy & Security," and then selecting "Set Your Privacy Preferences," or (3) contacting the Obligor's client manager or local banking center. To help the Bank complete the Obligor's request, the Obligor should include the Obligor's name, address, phone number, account number(s) and social security number. If the Obligor makes this election, certain products or services may not be made available to the Obligor. This request will apply to information from applications, consumer reports and other outside sources only, and may take six to eight weeks to be fully effective. Through the normal course of doing business, including servicing the Obligor's accounts and better serving the Obligor's financial needs, the Bank will continue to share transaction and account experience information, as well as other general information among the Affiliates. The Bank may change this policy from time to time. Visit our website, www.bankofamerica.com, for the latest policy.*

# Bank of America

| | |
|---|---|
| BORROWERS: | MB SECURITY CORPORATION |
| | AC TECHNOLOGY, INC. |
| GUARANTOR: | MICHAEL A. BYRD |

## CONTINUING AND UNCONDITIONAL GUARANTY

To:   Bank of America, N.A.

      1.   The Guaranty.   For valuable consideration, the undersigned ("Guarantor") hereby unconditionally guarantees and promises to pay promptly to Bank of America, N.A., its subsidiaries and affiliates (collectively, "Bank"), or order, in lawful money of the United States, any and all Indebtedness of MB SECURITY CORPORATION, a Delaware corporation and AC TECHNOLOGY, INC., a Virginia corporation (collectively, the "Borrowers") to Bank when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter. The liability of Guarantor under this Guaranty is not limited as to the principal amount of the Indebtedness guaranteed and includes, without limitation, liability for all interest, fees, indemnities, and other costs and expenses relating to or arising out of the Indebtedness and for all swap, option, or forward obligations relating to or arising out of the Indebtedness now or hereafter owing from Borrowers to Bank. The liability of Guarantor is continuing and relates to any Indebtedness, including that arising under successive transactions which shall either continue the Indebtedness or from time to time renew it after it has been satisfied. This Guaranty is cumulative and does not supersede any other outstanding guaranties, and the liability of Guarantor under this Guaranty is exclusive of Guarantor's liability under any other guaranties signed by Guarantor. If Guarantor is a subsidiary or affiliate of Borrowers, Guarantor's liability hereunder shall not exceed at any one time the largest amount during the period commencing with Guarantor's execution of this Guaranty and thereafter that would not render Guarantor's obligations hereunder subject to avoidance under Section 548 of the Bankruptcy Code (Title 11, United States Code) or any comparable provisions of any applicable state law.

      2. Definitions.

      (a)   "Borrowers" shall mean the entities named in Paragraph 1 of this Guaranty.

      (b)   "Guarantor" shall mean the individual signing this Guaranty.

      (c)   "Indebtedness" shall mean any and all debts, liabilities, and obligations of Borrowers to Bank including, without limitation, those arising pursuant to the Loan Documents, now or hereafter existing, whether voluntary or involuntary and however arising, whether direct or indirect or acquired by Bank by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by Bank for its own account or as agent for another or others, whether Borrowers may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable. Indebtedness includes, without limitation, any and all obligations of Borrowers to Bank for reasonable attorneys' fees and all other costs and expenses incurred by Bank in the collection or enforcement of the Loan Documents. Indebtedness also includes, without limitation, all obligations of Borrowers arising under any interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, securities puts, calls, collars, options or forwards or any combination of, or option with respect to the Loan Documents whether now or hereafter entered into between Borrowers and Bank.



(d) "Loan Documents" shall mean shall mean the Credit and Security Agreement between Borrowers and Lender, the Revolving Loan Note from Borrowers in favor of Lender, and all other written agreements, documents, and instruments evidencing any of the Indebtedness, and deeds of trust, mortgages, security agreements, and other written agreements, documents, and instruments executed by Borrowers in connection with such loan agreements, promissory notes, and other agreements, documents, and instruments evidencing any of the Indebtedness, all as now in effect and as hereafter amended, restated, renewed, or superseded.

3. Obligations Independent. The obligations hereunder are independent of the obligations of Borrowers or any other guarantor, and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrowers or any other guarantor or whether Borrowers or any other guarantor be joined in any such action or actions. Anyone executing this Guaranty shall be bound by its terms without regard to execution by anyone else.

4. Rights of Bank. Guarantor authorizes Bank, without notice or demand and without affecting its liability hereunder, from time to time to:

(a) renew, compromise, extend, accelerate, or otherwise change the time for payment, or otherwise change the terms, of the Indebtedness or any part thereof, including increase or decrease of the rate of interest thereon, or otherwise change the terms of any Loan Documents;

(b) receive and hold security for the payment of this Guaranty or any Indebtedness and exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any such security;

(c) apply such security and direct the order or manner of sale thereof as Bank in its discretion may determine;

(d) release or substitute any Guarantor or any one or more of any endorsers or other guarantors of any of the Indebtedness; and

(e) permit the Indebtedness to exceed Guarantor's liability under this Guaranty, and Guarantor agrees that any amounts received by Bank from any source other than Guarantor shall be deemed to be applied first to any portion of the Indebtedness not guaranteed by Guarantor.

5. Guaranty to be Absolute. Guarantor agrees that until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, Guarantor shall not be released by or because of the taking, or failure to take, any action that might in any manner or to any extent vary the risks of Guarantor under this Guaranty or that, but for this paragraph, might discharge or otherwise reduce, limit, or modify Guarantor's obligations under this Guaranty. Guarantor waives and surrenders any defense to any liability under this Guaranty based upon any such action, including but not limited to any action of Bank described in the immediately preceding paragraph of this Guaranty. It is the express intent of Guarantor that Guarantor's obligations under this Guaranty are and shall be absolute and unconditional.

6. Guarantor's Waivers of Certain Rights and Certain Defenses. Guarantor waives:

(a) any right to require Bank to proceed against Borrowers, proceed against or exhaust any security for the Indebtedness, or pursue any other remedy in Bank's power whatsoever.

(b) any defense arising by reason of any disability or other defense of Borrowers, or the cessation from any cause whatsoever of the liability of Borrowers; and

(c) any defense based on any claim that Guarantor's obligations exceed or are more burdensome than those of Borrowers.

No provision or waiver in this Guaranty shall be construed as limiting the generality of any other waiver contained in this Guaranty.

7. <u>Waiver of Subrogation</u>. Until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, even though the Indebtedness may be in excess of Guarantor's liability hereunder, Guarantor waives to the extent permitted by applicable law any right of subrogation, reimbursement, indemnification, and contribution (contractual, statutory, or otherwise) including, without limitation, any claim or right of subrogation under the Bankruptcy Code (Title 11, United States Code) or any successor statute, arising from the existence or performance of this Guaranty, and Guarantor waives to the extent permitted by applicable law any right to enforce any remedy that Bank now has or may hereafter have against Borrowers, and waives any benefit of, and any right to participate in, any security now or hereafter held by Bank.

8. <u>Waiver of Notices</u>. Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of intent to accelerate, notices of acceleration, notices of any suit or any other action against Borrowers or any other person, any other notices to any party liable on any Loan Document (including Guarantor), notices of acceptance of this Guaranty, notices of the existence, creation, or incurring of new or additional Indebtedness to which this Guaranty applies or any other Indebtedness of Borrowers to Bank, and notices of any fact that might increase Guarantor's risk.

9. <u>Security</u>. To secure all of Guarantor's obligations hereunder, Guarantor assigns and grants to Bank a security interest in all moneys, securities, and other property of Guarantor now or hereafter in the possession of Bank, all deposit accounts of Guarantor maintained with Bank, and all proceeds thereof. Upon default or breach of any of Guarantor's obligations to Bank, Bank may apply any deposit account to reduce the Indebtedness, and may foreclose any collateral as provided in the Uniform Commercial Code and in any security agreements between Bank and Guarantor.

10. <u>Subordination</u>. Any obligations of Borrowers to Guarantor, now or hereafter existing, including but not limited to any obligations to Guarantor as subrogee of Bank or resulting from Guarantor's performance under this Guaranty, are hereby subordinated to the Indebtedness. In addition to Guarantor's waiver of any right of subrogation as set forth in this Guaranty with respect to any obligations of Borrowers to Guarantor as subrogee of Bank, Guarantor agrees that, if Bank so requests, Guarantor shall not demand, take, or receive from Borrowers, by setoff or in any other manner, payment of any other obligations of Borrowers to Guarantor until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated. If any payments are received by Guarantor in violation of such waiver or agreement, such payments shall be received by Guarantor as trustee for Bank and shall be paid over to Bank on account of the Indebtedness, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty. Any security interest, lien, or other encumbrance that Guarantor may now or hereafter have on any property of Borrowers is hereby subordinated to any security interest, lien, or other encumbrance that Bank may have on any such property.

11. <u>Revocation of Guaranty</u>.

(a) This Guaranty may be revoked at any time by Guarantor in respect to future transactions, unless there is a continuing consideration as to such transactions that Guarantor does not renounce. Such revocation shall be effective upon actual receipt by Bank, at the address shown below or at such other address as may have been provided to Guarantor by Bank, of written notice of revocation. Revocation shall not affect any of Guarantor's obligations or Bank's rights with respect to transactions committed or entered into prior to Bank's receipt of such notice, regardless of whether or not the Indebtedness related to such transactions, before or after revocation, has been incurred, renewed, compromised, extended, accelerated, or otherwise changed as to any of its terms, including time for payment or increase or decrease of the rate of interest thereon, and regardless of any other act or omission of Bank authorized hereunder. Revocation by Guarantor shall not affect any obligations of any other guarantor.

(b) In the event of the death of a Guarantor, the liability of the estate of the deceased Guarantor shall continue in full force and effect as to (i) the Indebtedness existing at the date of death, and any renewals or extensions thereof, and (ii) loans or advances made to or for the account of Borrowers after

the date of the death of the deceased Guarantor pursuant to a commitment made by Bank to Borrowers prior to the date of such death. As to all surviving Guarantors, this Guaranty shall continue in full force and effect after the death of a Guarantor, not only as to the Indebtedness existing at that time, but also as to the Indebtedness thereafter incurred by Borrowers to Bank.

(c) Guarantor acknowledges and agrees that this Guaranty may be revoked only in accordance with the foregoing provisions of this paragraph and shall not be revoked simply as a result of any change in name, location, or composition or structure of Borrowers, the dissolution of Borrowers, or the termination, increase, decrease, or other change of any personnel or owners of Borrowers.

12. <u>Reinstatement of Guaranty</u>. If this Guaranty is revoked, returned, or canceled, and subsequently any payment or transfer of any interest in property by Borrowers to Bank is rescinded or must be returned by Bank to Borrowers, this Guaranty shall be reinstated with respect to any such payment or transfer, regardless of any such prior revocation, return, or cancellation.

13. <u>Stay of Acceleration</u>. In the event that acceleration of the time for payment of any of the Indebtedness is stayed upon the insolvency, bankruptcy, or reorganization of Borrowers or otherwise, all such Indebtedness guaranteed by Guarantor shall nonetheless be payable by Guarantor immediately if requested by Bank.

14. <u>Information Relating to Borrowers</u>. Guarantor acknowledges and agrees that it has made such independent examination, review, and investigation of the Loan Documents as Guarantor deems necessary and appropriate, including, without limitation, any covenants pertaining to Guarantor contained therein, and shall have sole responsibility to obtain from Borrowers any information required by Guarantor about any modifications thereto. Guarantor further acknowledges and agrees that it shall have the sole responsibility for, and has adequate means of, obtaining from Borrowers such information concerning Borrowers' financial condition or business operations as Guarantor may require, and that Bank has no duty, and Guarantor is not relying on Bank, at any time to disclose to Guarantor any information relating to the business operations or financial condition of Borrowers.

15. <u>Borrowers' Authorization</u>. It is not necessary for Bank to inquire into the powers of Borrowers or of the officers, directors, partners, members, managers, or agents acting or purporting to act on their behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder, subject to any limitations on Guarantor's liability set forth herein.

16. <u>Information Relating to Guarantor</u>. Guarantor authorizes Bank to verify or check any information given by Guarantor to Bank, check Guarantor's credit references, verify employment, and obtain credit reports. Guarantor acknowledges and agrees that the authorizations provided in this paragraph apply to any individual general partner of Guarantor and to Guarantor's spouse and any such general partner's spouse if Guarantor or such general partner is married and lives in a community property state.

17. <u>Change of Status</u>. Any Guarantor that is a business entity shall not enter into any consolidation, merger, or other combination unless Guarantor is the surviving business entity. Further, Guarantor shall not change its legal structure unless (a) Guarantor obtains the prior written consent of Bank and (b) all Guarantor's obligations under this Guaranty are assumed by the new business entity.

18. <u>Remedies</u>. If Guarantor fails to fulfill its duty to pay all Indebtedness guaranteed hereunder, Bank shall have all of the remedies of a creditor and, to the extent applicable, of a secured party, under all applicable law. Without limiting the foregoing, Bank may, at its option and without notice or demand:

(a) declare any Indebtedness due and payable at once;

(b) take possession of any collateral pledged by Borrowers or Guarantor, wherever located, and sell, resell, assign, transfer, and deliver all or any part of the collateral at any public or private sale or otherwise dispose of any or all of the collateral in its then condition, for cash or on credit or for future delivery, and in connection therewith Bank may impose reasonable conditions upon any such sale. Further, Bank, unless prohibited by law the provisions of which cannot be waived, may purchase all or any part of the collateral to be sold, free from and discharged of all trusts, claims, rights of redemption and

equities of Borrowers or Guarantor whatsoever. Guarantor acknowledges and agrees that the sale of any collateral through any nationally recognized broker-dealer, investment banker, or any other method common in the securities industry shall be deemed a commercially reasonable sale under the Uniform Commercial Code or any other equivalent statute or federal law, and expressly waives notice thereof except as provided herein; and

        (c) set off against any or all liabilities of Guarantor all money owed by Bank or any of its agents or affiliates in any capacity to Guarantor, whether or not due, and also set off against all other liabilities of Guarantor to Bank all money owed by Bank in any capacity to Guarantor. If exercised by Bank, Bank shall be deemed to have exercised such right of setoff and to have made a charge against any such money immediately upon the occurrence of such default although made or entered on the books subsequent thereto.

        19. <u>Notices</u>. All notices required under this Guaranty shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Guaranty, or sent by facsimile to the fax numbers listed on the signature page (with a copy by one of the other methods of notice), or to such other addresses as Bank and Guarantor may specify from time to time in writing. Notices sent by (a) first class mail shall be deemed delivered on the earlier of actual receipt or on the fourth business day after deposit in the U.S. mail, postage prepaid, (b) overnight courier shall be deemed delivered on the next business day, and (c) telecopy shall be deemed delivered when transmitted.

        20. <u>Successors and Assigns</u>. This Guaranty (a) binds Guarantor and Guarantor's executors, administrators, successors, and assigns, provided that Guarantor may not assign its rights or obligations under this Guaranty without the prior written consent of Bank, and (b) inures to the benefit of Bank and Bank's indorsees, successors, and assigns. Bank may, without notice to Guarantor and without affecting Guarantor's obligations hereunder, sell, assign, grant participations in, or otherwise transfer to any other person, firm, or corporation the Indebtedness and this Guaranty, in whole or in part. Guarantor agrees that Bank may disclose to any assignee or purchaser, or any prospective assignee or purchaser, of all or part of the Indebtedness any and all information in Bank's possession concerning Guarantor, this Guaranty, and any security for this Guaranty.

        21. <u>Amendments, Waivers, and Severability</u>. No provision of this Guaranty may be amended or waived except in writing. No failure by Bank to exercise, and no delay in exercising, any of its rights, remedies, or powers shall operate as a waiver thereof, and no single or partial exercise of any such right, remedy, or power shall preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The unenforceability or invalidity of any provision of this Guaranty shall not affect the enforceability or validity of any other provision of this Guaranty.

        22. <u>Costs and Expenses</u>. Guarantor agrees to pay all reasonable attorneys' fees, and all other costs and expenses that may be incurred by Bank (a) in the enforcement of this Guaranty or (b) in the preservation, protection, or enforcement of any rights of Bank in any case commenced by or against Guarantor or Borrowers under the Bankruptcy Code (Title 11, United States Code) or any similar or successor statute.

        23. <u>Annual Personal Financial Information</u>. Guarantor hereby covenants and agrees, within one hundred twenty (120) days of each calendar year end during which this Guaranty is in effect, to prepare, sign and deliver to the Bank a personal financial statement in form and substance satisfactory to the Bank.

        24. <u>Governing Law and Jurisdiction</u>. This Guaranty shall be governed by and construed and enforced in accordance with federal law and the law of the Commonwealth of Virginia. Jurisdiction and venue for any action or proceeding to enforce this Guaranty shall be the forum appropriate for such action or proceeding against Borrowers, to which jurisdiction Guarantor irrevocably submits and to which venue Guarantor waives to the fullest extent permitted by law any defense asserting an inconvenient forum in connection therewith. It is provided, however, that if Guarantor owns property in another state, notwithstanding that the forum for enforcement action is elsewhere, Bank may commence a collection proceeding in any state in which Guarantor owns property for the purpose of enforcing provisional remedies against such property. Service of process by Bank in connection with such action or proceeding shall be binding on Guarantor if sent to Guarantor by registered or certified mail at its address specified below.

25. Dispute Resolution Provision. This paragraph, including the subparagraphs below, is referred to as the "Dispute Resolution Provision." This Dispute Resolution Provision is a material inducement for the parties entering into this agreement.

(a) This Dispute Resolution Provision concerns the resolution of any controversies or claims between the parties, whether arising in contract, tort or by statute, including but not limited to controversies or claims that arise out of or relate to: (i) this agreement (including any renewals, extensions or modifications); or (ii) any document related to this agreement (collectively a "Claim"). For the purposes of this Dispute Resolution Provision only, the term "parties" shall include any parent corporation, subsidiary or affiliate of the Bank involved in the servicing, management or administration of any obligation described or evidenced by this agreement.

(b) At the request of any party to this agreement, any Claim shall be resolved by binding arbitration in accordance with the Federal Arbitration Act (Title 9, U.S. Code) (the "Act"). The Act will apply even though this agreement provides that it is governed by the law of a specified state.

(c) Arbitration proceedings will be determined in accordance with the Act, the then-current rules and procedures for the arbitration of financial services disputes of the American Arbitration Association or any successor thereof ("AAA"), and the terms of this Dispute Resolution Provision. In the event of any inconsistency, the terms of this Dispute Resolution Provision shall control. If AAA is unwilling or unable to (i) serve as the provider of arbitration or (ii) enforce any provision of this arbitration clause, the Bank may designate another arbitration organization with similar procedures to serve as the provider of arbitration.

(d) The arbitration shall be administered by AAA and conducted, unless otherwise required by law, in any U.S. state where real or tangible personal property collateral for this credit is located or if there is no such collateral, in the state specified in the governing law section of this agreement. All Claims shall be determined by one arbitrator; however, if Claims exceed Five Million Dollars ($5,000,000), upon the request of any party, the Claims shall be decided by three arbitrators. All arbitration hearings shall commence within ninety (90) days of the demand for arbitration and close within ninety (90) days of commencement and the award of the arbitrator(s) shall be issued within thirty (30) days of the close of the hearing. However, the arbitrator(s), upon a showing of good cause, may extend the commencement of the hearing for up to an additional sixty (60) days. The arbitrator(s) shall provide a concise written statement of reasons for the award. The arbitration award may be submitted to any court having jurisdiction to be confirmed and have judgment entered and enforced.

(e) The arbitrator(s) will give effect to statutes of limitation in determining any Claim and may dismiss the arbitration on the basis that the Claim is barred. For purposes of the application of any statutes of limitation, the service on AAA under applicable AAA rules of a notice of Claim is the equivalent of the filing of a lawsuit. Any dispute concerning this arbitration provision or whether a Claim is arbitrable shall be determined by the arbitrator(s), except as set forth at subparagraph (h) of this Dispute Resolution Provision. The arbitrator(s) shall have the power to award legal fees pursuant to the terms of this agreement.

(f) This paragraph does not limit the right of any party to: (i) exercise self-help remedies, such as but not limited to, setoff; (ii) initiate judicial or non-judicial foreclosure against any real or personal property collateral; (iii) exercise any judicial or power of sale rights, or (iv) act in a court of law to obtain an interim remedy, such as but not limited to, injunctive relief, writ of possession or appointment of a receiver, or additional or supplementary remedies.

(g) The filing of a court action is not intended to constitute a waiver of the right of any party, including the suing party, thereafter to require submittal of the Claim to arbitration.

(h) Any arbitration or trial by a judge of any Claim will take place on an individual basis without resort to any form of class or representative action (the "Class Action Waiver"). Regardless of

anything else in this Dispute Resolution Provision, the validity and effect of the Class Action Waiver may be determined only by a court and not by an arbitrator. The parties to this Agreement acknowledge that the Class Action Waiver is material and essential to the arbitration of any disputes between the parties and is non-severable from the agreement to arbitrate Claims. If the Class Action Waiver is limited, voided or found unenforceable, then the parties' agreement to arbitrate shall be null and void with respect to such proceeding, subject to the right to appeal the limitation or invalidation of the Class Action Waiver. **The Parties acknowledge and agree that under no circumstances will a class action be arbitrated.**

(i)  By agreeing to binding arbitration, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of any Claim. Furthermore, without intending in any way to limit this agreement to arbitrate, to the extent any Claim is not arbitrated, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of such Claim. This waiver of jury trial shall remain in effect even if the Class Action Waiver is limited, voided or found unenforceable. **WHETHER THE CLAIM IS DECIDED BY ARBITRATION OR BY TRIAL BY A JUDGE, THE PARTIES AGREE AND UNDERSTAND THAT THE EFFECT OF THIS AGREEMENT IS THAT THEY ARE GIVING UP THE RIGHT TO TRIAL BY JURY TO THE EXTENT PERMITTED BY LAW.**

26.  **FINAL AGREEMENT.**    BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT:    (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

Executed June 30, 2008.

Witness:

_____

Address for notices to Bank:

Jessica L. Tencza
Senior Vice President
Bank of America, N.A.
8300 Greensboro Drive, Mezzanine Level
McLean, Virginia 22102

_____ (Seal)
MICHAEL A. BYRD

Address for notices to Guarantor:

MICHAEL A. BYRD
2201 DARNELL CT
BOWIE, MD 20721

_____

*Affiliate Sharing Notice. Notice to Guarantor (hereinafter, "Obligor"): From time to time Bank of America, N.A. (the "Bank") may share information about the Obligor's experience with Bank of America Corporation (or any successor company) and its subsidiaries and affiliated companies (the "Affiliates"). The Bank may also share with the Affiliates credit-related information contained in any applications, from credit reports and information it may obtain about the Obligor from outside sources. If the Obligor is an individual, the Obligor may instruct the Bank not to share this information with the Affiliates. The Obligor can make this election by (1) calling the Bank at 1.888.341.5000, (2) visiting the Bank online at www.bankofamerica.com, selecting "Privacy & Security," and then selecting "Set Your Privacy Preferences," or (3) contacting the Obligor's client manager or local banking center. To help the Bank complete the Obligor's request, the Obligor should include the Obligor's name, address, phone number, account number(s) and social security number. If the Obligor makes this election, certain products or services may not be made available to the Obligor. This request will apply to information from applications, consumer reports and other outside sources only, and may take six to eight weeks to be fully effective. Through the normal course of doing business, including servicing the Obligor's accounts and better serving the Obligor's financial needs, the Bank will continue to share transaction and account experience information, as well as other general information among the Affiliates. The Bank may change this policy from time to time. Visit our website, www.bankofamerica.com, for the latest policy.*

O B E R | K A L E R
A Professional Corporation

**Ober, Kaler, Grimes & Shriver**
Attorneys at Law

1401 H. Street, NW, Suite 500
Washington, DC 20005-3324
202-408-8400  Fax 202-408-0640
www.ober.com

**Nikolaus F. Schandlbauer**
nfschandlbauer@ober.com
202-326-5016

**Offices In**
Maryland
Washington, D.C.
Virginia

December 17, 2008

## *Notice of Default and Reservation of Rights*

### VIA ELECTRONIC MAIL

J. Stephen Britt, Esquire
Leach Travell Britt plc
8270 Greensboro Drive
Suite 1050
McLean, Virginia 22102

**Re:    *Credit Facilities from Bank of America, N.A. (the "Bank") to
MB Security Corporation and AC Technology, Inc. (the "Borrowers")***

Dear Steve:

As you know, I represent the Bank in connection with the referenced commercial credit facilities as well as the various documents, instruments and written agreements executed by Borrowers and others in connection therewith (collectively, the "Loan Documents").  The credit facilities include a $10,000,000 revolving line of credit (the "Revolver") as well as an uncommitted $15,000,000 "guidance line" facility (the "Guidance Line Facility").

On December 4, 2008, the Bank received and has reviewed the Borrowers' compliance certificate in respect to the calendar quarter ended September 30, 2008 (the "Compliance Certificate").  The Compliance Certificate reports that the Borrowers' Funded Debt to EBITDA ratio was, as of the end of such quarter, 20.42:1, which greatly exceeds the covenant requirement of 2.75:1 established by the Loan Documents (the "Covenant Default").

The purpose of this letter is to notify you that the Borrowers have defaulted under the Loan Documents by, among other things, (i) suffering the Covenant Default and (ii) providing incorrect and materially misleading information to the Bank in regard to the Borrowers' financial condition as of the June 30, 2008 closing date (collectively with the Covenant Default, the "Existing Defaults").

As a result of the Covenant Default, the Bank has the immediate right to terminate any obligation or commitment of the Bank to make Advances or issue Letters of Credit for the account of Borrowers.  The Bank *specifically reserves all of its rights and remedies* in regard to the Existing Defaults.



EXHIBIT
tabbies®
**F**



J. Stephen Britt, Esquire
December 18, 2008
Page 2

As an immediate consequence thereof, however, please allow this letter to confirm (i) that the Lender will not make any Advances under the Revolver except as approved by the Lender in its discretion upon the specific written request of the Borrowers; (ii) that that the Lender will not henceforth make any Guidance Line Advances under the Guidance Line Facility, and (iii) that the Guidance Line Facility feature of the Loan Documents is hereby terminated. In addition, because an Event of Default under the Loan Documents has occurred, the Borrowers are no longer permitted to pay regularly scheduled interest payments (or any payments, for that matter) in connection with the Subordinated Debt to Arthur Sands and Christopher Sands.

As a further result of the foregoing, the Bank has transferred day-to-day responsibility for the credit relationship from Mark Zirkle to Joseph R. Linus at the Bank's Special Assets Group in Charlotte, North Carolina. All day-to-day business communications between Borrowers and the Bank should go through Mr. Linus, who may be reached at (980) 386-3800. I will continue to serve as the Bank's legal counsel in this matter.

The Bank is greatly concerned that Borrowers has found itself in these circumstances so soon after the conclusion of the recent closing. For this reason, the Bank believes that the Borrowers should seek immediately to refinance their obligations under the Loan Documents with another institution.

The Bank wishes to keep lines of communication open between it and Borrowers' principals, and I expect the high quality of our prior communications to continue. In the meantime, please call me with any questions or comments.

Sincerely,

Nikolaus F. Schandlbauer

ccs (via electronic mail):
    Joseph R. Linus, Senior Vice President
    Diane B. Zanetti, Senior Vice President
    Mark A. Zirkle, Vice President
    Gordon Hunter, Chief Executive Officer
    Richard Burtner, Chief Financial Officer
    Earle D. Munns
    Michael A. Byrd

## LOAN MODIFICATION AGREEMENT

THIS LOAN MODIFICATION AGREEMENT (this "Agreement") is dated as of February 19, 2009, and is by and between AC TECHNOLOGY, INC., a Virginia corporation that is the successor by merger to MB Security Corporation, a Delaware corporation (the "Borrower"), EARLE D. MUNNS, JR. and MICHAEL A. BYRD (collectively, the "Guarantors") and BANK OF AMERICA, N.A., a national banking association (the "Lender"). The Borrower and the Guarantors are hereinafter collectively referred to as the "Obligors."

### RECITALS

R.1    Pursuant to a Credit and Security Agreement dated as of June 30, 2008 by and between the Borrower, MB Security Corporation and the Lender (as the same may from time to time be further amended, restated, supplemented, or otherwise modified, the "Credit Agreement"), the Lender made available to the Borrower a revolving credit facility of up to $10,000,000 (the "Line of Credit"). On or about September 5, 2008, MB Security was merged into the Borrower.

R.2    The repayment of the Borrower's obligations in connection with the Line of Credit is evidenced by that certain Revolving Loan Note, dated as of June 30, 2008, in the original face amount of $25,000,000 (the "Note") and is collaterally secured by, among other things, the liens and security interests on all assets of the Borrower more particularly described in the Credit Agreement.  The Lender has perfected the liens and security interests granted to it pursuant to the Security Agreement by filing UCC-1 Financing Statements among the Financing Statement Records of the Secretary of State of Virginia.

R.3    The Guarantors have guaranteed the prompt, punctual and complete repayment of all of the amounts owed by the Borrower to the Lender under the Credit Agreement pursuant to those certain Continuing and Unconditional Guaranties, each dated as of June 30, 2008, from the Guarantors in favor of the Lender (collectively, the "Guaranties").

R.4    The Credit Agreement the Guaranties, and all other documents, instruments and written agreements executed in connection therewith are hereinafter referred to collectively the "Financing Documents."

R.5    The Borrower has defaulted under the Financing Documents for, among other things, (i) failing to comply with its Funded Debt to EBITDA ratio for the calendar quarter ended September 30, 2008 and (ii) failing to repay the existing "Borrowing Base Deficiency," as that term is defined in the Credit Agreement.

R.6    As result of the foregoing defaults and any other defaults which may exist under the Financing Documents (collectively, the "Existing Defaults"), the Lender has the immediate and unconditional right to exercise its rights and remedies under the Financing Documents against all of the Obligors, including, without limitation:  (i) the right to declare the Line of Credit and any obligation or commitment of the Lender to make advances or issue letters of



credit for the account of the Borrower terminated; (ii) the right to collect directly the collateral security for the Line of Credit and (iii) the right to enforce its rights and remedies against the Guarantors under the Guaranties.

R.7    The Obligors have requested that the Lender forbear from exercising its rights and remedies under the Financing Documents in order to allow them to seek refinancing of the Line of Credit and to restructure the operations of the Borrower. Without waiving any rights or remedies available to the Lender on account of the Existing Defaults, the Lender is willing to grant the Obligors' request, provided that all of the Obligors comply with each of the terms, conditions and understandings contained in this Agreement.

NOW, THEREFORE, in consideration of the premises and of the representations and mutual agreements made herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1.    Defined Terms.  Capitalized terms used herein and not otherwise defined shall have the meanings given to such terms in the Credit Agreement.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES

Section 2.1.    Acknowledgments of the Borrower. The Borrower hereby acknowledges that:

a.    the Recitals set forth above are true and complete in all respects and are incorporated herein by reference;

b.    as of the date hereof, the Borrower is currently in default under the Financing Documents by virtue of the Existing Defaults;

c.    as of February 11, 2009, the Borrower is duly indebted to the Lender in the following amounts:

| | |
|---|---|
| Principal: | $5,500,000.00 |
| Interest (As of 2/11/2009): | $4,052.81 |
| **TOTAL:** | **$5,504,052.81** |

d.    the Borrower does not have any defenses, affirmative or otherwise, rights of setoff, rights of recoupment, claims, counterclaims, actions or causes of action of any kind or nature whatsoever against the Lender or any past, present or future agent, attorney, legal representative, predecessor-in-interest, affiliate, successor, assign, employee, director or officer of the Lender (collectively, the "Bank Group"), directly or indirectly, arising out of, based upon, or in any manner connected with, any transaction, event, circumstance, action, failure to act, or

occurrence of any sort or type, whether known or unknown, which occurred, existed, was taken, permitted, or began prior to the execution of this Agreement and accrued, existed, was taken, permitted or begun in accordance with, pursuant to, or by virtue of the amounts owed under the Financing Documents or any of the terms or conditions of the Financing Documents, or which directly or indirectly relate to or arise out of or in any manner are connected with the amounts owed under the Financing Documents or any of the Financing Documents; TO THE EXTENT ANY SUCH DEFENSES, AFFIRMATIVE OR OTHERWISE, RIGHTS OF SETOFF, RIGHTS OF RECOUPMENT, CLAIMS, COUNTERCLAIMS, ACTIONS OR CAUSES OF ACTION EXIST OR EXTEND, SUCH DEFENSES, RIGHTS, CLAIMS, COUNTERCLAIMS, ACTIONS AND CAUSES OF ACTION ARE HEREBY FOREVER WAIVED, DISCHARGED AND RELEASED;

      e.     the Borrower has freely and voluntarily entered into this Agreement after an adequate opportunity and sufficient period of time to review, analyze and discuss all terms and conditions of this Agreement and all factual and legal matters relevant hereto with counsel freely and independently chosen by the Borrower. The Borrower further acknowledges that it has actively and with full understanding participated in the negotiation of this Agreement after consultation and review with its counsel and that this Agreement has been negotiated, prepared and executed without fraud, duress, undue influence or coercion of any kind or nature whatsoever having been exerted by or imposed upon any party to this Agreement;

      f.     as of the date hereof, with the exception of any actions threatened against it by the holders of its Subordinated Debt, there are no proceedings or investigations pending or, so far as the Borrower knows, threatened against them, before any court or arbitrator or any governmental, administrative or other judicial authority or agency;

      g.     there is no statute, rule, regulation, order or judgment, no charter, by-law or preference stock provision with respect to the Borrower, and no provision of any mortgage, indenture, contact or other agreement binding on the Borrower or any of its properties which would prohibit or cause a default under or in any way prevent the execution, delivery, performance, compliance or observance of any of the terms or conditions of this Agreement;

      h.     the Borrower has not, voluntarily or involuntarily, granted any liens or security interests to any creditor not previously disclosed to the Lender in writing on or before the date of this Agreement and has not otherwise taken any action or failed to take any action which could or would impair, change, jeopardize or otherwise adversely affect the priority, perfection, validity or enforceability of any liens or securing interests securing all or any portion of the amounts owed under the Financing Documents or the priority or validity of the Lender's claims with respect to the amounts owed under the Financing Documents relative to any other creditor of the Borrower;

      i.     the Borrower has the full legal right, power and authority to enter into and perform its obligations under this Agreement, and the execution and delivery of this Agreement and the Financing Documents by the Borrower and the consummation by the Borrower of the transactions contemplated hereby and thereby and performance of its obligations hereunder and

thereunder have been duly authorized by all appropriate action (corporate or otherwise) on the part of the Borrower; and

> j.    this Agreement and each of the Financing Documents to which it are a party constitutes the valid, binding and enforceable agreement of the Borrower, enforceable against the Borrower in accordance with the terms thereof.

Section 2.2.  Acknowledgments of the Guarantors.  Each of the Guarantors signing below hereby acknowledges that:

> a.    the Recitals set forth above are true and complete in all respects and incorporated by reference herein;

> b.    as of the date hereof, by virtue of the Existing Defaults, each of the Guarantors is now in default of his obligations under each Guaranty;

> c.    to their knowledge, the Guarantors have no defenses, affirmative or otherwise, rights of setoff, rights of recoupment, claims, counterclaims, actions or causes of action of any kind or nature whatsoever against the Lender or any of Bank Group, directly or indirectly, arising out of, based upon, or in any manner connected with, any transaction, event, circumstance, action, failure to act, or occurrence of any sort or type, whether known or unknown, which occurred, existed, was taken, permitted, or began prior to the execution of this Agreement and accrued, existed, was taken, permitted or begun in accordance with, pursuant to, or by virtue of the amounts owed under the Financing Documents or any of the terms or conditions of the Financing Documents, or which directly or indirectly relate to or arise out of or in any manner are connected with the amounts owed under the Financing Documents or any of the Financing Documents; TO THE EXTENT ANY SUCH DEFENSES, AFFIRMATIVE OR OTHERWISE, RIGHTS OF SETOFF, RIGHTS OF RECOUPMENT, CLAIMS, COUNTERCLAIMS, ACTIONS OR CAUSES OF ACTION EXIST OR EXTEND, SUCH DEFENSES, RIGHTS, CLAIMS, COUNTERCLAIMS, ACTIONS AND CAUSES OF ACTION ARE HEREBY FOREVER WAIVED, DISCHARGED AND RELEASED;

> d    the Guarantors have freely and voluntarily entered into this Agreement after an adequate opportunity and sufficient period of time to review, analyze and discuss all terms and conditions of this Agreement and all factual and legal matters relevant hereto with counsel freely and independently chosen by each Guarantor.  The Guarantors further acknowledge that they have actively and with full understanding participated in the negotiation of this Agreement after consultation and review with their counsel and that this Agreement has been negotiated, prepared and executed without fraud, duress, undue influence or coercion of any kind or nature whatsoever having been exerted by or imposed upon any party to this Agreement;

> e.    as of the date hereof, there are no proceedings or investigations pending or, so far as any Guarantor knows, threatened against any Guarantor, before any court or arbitrator or any governmental, administrative or other judicial authority or agency;

f.      there is no statute, rule, regulation, order or judgment and no provision of any mortgage, indenture, contract or other agreement binding on any of the Guarantors or any of their properties which would prohibit or cause a default under or in any way prevent the execution, delivery, performance, compliance or observance of any of the terms or conditions of this Agreement;

g.      No Guarantor has, voluntarily or involuntarily, taken any action or failed to take any action which could or would impair, change, jeopardize or otherwise adversely affect the priority, perfection, validity or enforceability of any liens or securing interests securing all or any portion of the amounts owed under the Financing Documents or the priority or validity of the Lender's claims with respect to the amounts owed under the Financing Documents relative to any other creditor of the Guarantors;

h.      the Guarantors have the full legal right, power and authority to enter into and perform their obligations under this Agreement and the Financing Documents; and

i.      this Agreement and the Guaranties constitute the valid, binding and enforceable agreements of the Guarantors, enforceable against the Guarantors in accordance with their terms.

2.3.    Acknowledgments of the Lender. The Lender hereby acknowledges that to its knowledge, the Recitals set forth above are true and complete in all respects and incorporated by reference herein.

## ARTICLE III
## PAYMENT OF OBLIGATIONS

Section 3.1.    Payments to Lender During Forbearance Period/Short-Term Principal Paydown. From and after the date hereof, until the amounts owed under the Financing Documents have been indefeasibly paid in full, the Borrower shall be required to make payments of principal (if any) and accrued interest at the rate, on the dates, and in the manner set forth in the Financing Documents, as amended hereby, as and when the same become payable thereunder. All sums due and owing under the Financing Documents, including principal, interest, late charges, costs, and attorneys' fees, costs and expenses shall be due and payable, in full, on the Termination Date (as defined below). **In addition to the foregoing, on or before March 20, 2009, the Borrower shall make a capital infusion of $1,250,000, from which the Borrower shall be obligated to make a principal payment of $250,000 on or before such date in order to pay down its outstanding Borrowing Base Deficiency, time being of the essence.**

Section 3.2.    Borrowing Base Deficiency/Additional Fee for failure to comply. On or before May 31, 2009, the Borrower shall reduce the Borrowing Base Deficiency to Zero Dollars ($0.00), time being of the essence. If for any reason the Borrower should fail to reduce the Borrowing Deficiency as aforesaid by the date aforesaid, the Borrower shall be obligated to pay an additional fee of $100,000, which shall be deemed fully earned upon the execution of this Agreement and shall be added to the Obligations.

AC TECHNOLOGY – loan modification agreement
Page 5 of 13

Section 3.3    Forbearance Fee.  In consideration of the Lender's agreement to enter into this Agreement, the Borrower shall, concurrently with the execution of this Agreement, pay to the Lender a forbearance fee in the amount of $25,000.00 (the "Forbearance Fee"), which Forbearance Fee shall be fully earned and non-refundable as of the date hereof.

Section 3.4.    Payment of Outstanding Attorneys's Fees, Costs and Expenses.  On the date of execution of this Agreement, and in consideration for the agreements of the Lender as set forth herein, the Borrower agree that the Lender may deduct from the Borrower's deposit accounts a payment equal to all of the attorneys' fees, costs and expenses incurred by the Lender in connection with this matter.

Section 3.5.    Interest.  During the term of the Forbearance Period, interest shall accrue on the unpaid principal balance of all amounts owed under the Financing Documents at the rate of the LIBOR Rate (as defined in the Credit Agreement) plus five hundred (500) basis points. From and after the Termination Date, interest shall accrue on the unpaid principal balance of all amounts owed under the Financing Documents at the Default Rate which, as per the Credit Agreement, shall be equal to the LIBOR Rate plus nine hundred (900) basis points.

## ARTICLE IV
## COVENANTS AND AGREEMENTS

Section 4.1.  Covenants of Borrower.

a.    Delivery of Weekly Borrowing Base Certificate/Semi-monthly Status Calls/ Other Reporting Requirements. This Agreement hereby amends Section 4.2(d) of the Credit Agreement as follows:  The Credit Agreement currently requires the Borrower to provide the Lender with a Borrowing Base Certificate twenty five (25) days after the last day of each month.   From and after the date of this Agreement, the Borrower hereby agrees that within five (5) business days after each Sunday of each calendar week through the Termination Date, the Borrower shall deliver to the Lender a duly certified Borrowing Base Certificate. On the 15th and 30th days of each month until the Termination Date (or the next Business Day if such date falls on a weekend or holiday), the Borrower shall make its Chief Financial Officer or Chief Executive Officer available for a telephone conference with the Lender to report on its performance to date. Except as specifically amended by this Agreement, the Borrower shall continue to provide all other information required by the terms of the Credit Agreement when and as due.

b.    Cash Budget/Weekly Compliance Report.  On or before the date of execution of this Agreement, the Borrower shall prepare and deliver to the Lender a thirteen (13) week cash budget of reasonable specificity, satisfactory to the Lender in all respects, detailing its cash needs for such period (the "Budget"). The Budget should include, among other line items, an allowance for all professional fees associated with this process, the contemplated refinance and the consummation of all related transactions.

Not later than 3:00 p.m. on each Wednesday until the Termination Date, the Borrower shall provide the Lender with a written compliance report in the same spreadsheet form as the

Budget, certified in writing as true and accurate by the Borrower under the penalty of perjury, that documents the Borrower's *actual* use of cash for the prior week and cumulative actual cash use since February 18, 2009 as to each line item and category of the Budget ("Budget Compliance Report").

    c.    Non-Budget Payments. The Borrower shall not pay for, or incur any indebtedness with respect to, any non-Budget costs or expenses other than business expenses incurred in the ordinary course of business and those specifically approved by the Lender in writing.

    d.    Advances; Variances to Budget. The Borrower acknowledges that the Lender is under no obligation to make any further advances under the Credit Agreement. The Borrower may not make and the Lender will not honor any request for advances. At all times, subject to a five percent (5%) monthly variance by category and ten percent (10%) percent variance in cumulative total, the Borrower must strictly comply with the Budget, unless such compliance is waived in writing by the Lender and no other Default shall have occurred and be continuing.

    e.    Refinancing. The Borrower shall proceed diligently to obtain refinancing and to take such other necessary and reasonable actions to repay the amounts owed under the Financing Documents.

    f.    Accounts with Other Institutions. The Borrower agrees immediately to close all deposit accounts currently open at other financial institutions and deposit the proceeds thereof into its operating account at the Lender not later than March 13, 2009.  The Borrower must provide the Lender with written proof of same on or before such date.

    g.    No Payments on Contractually Subordinated Debt. From the date hereof until all of the Obligations have been repaid in full or otherwise satisfied, the Borrower shall make neither principal nor interest payments, nor any payments of any kind, on any debt contractually subordinate to the Borrower's Obligations to the Lender, including without limitation Subordinated Debt to Arthur and Christopher Sands.

    h.    Dividends, Distributions, Loans, etc. to Shareholders, Officers and Directors. During the period from the date hereof until all of the amounts owed under the Financing Documents have been repaid in full or otherwise satisfied, the Borrower shall not make any distributions, dividends, loans or other payments of any kind to any of its shareholders, officers or directors, other than payment of current salaries of officers and reimbursement of reasonable, normal and ordinary business expenses and the payment of pass-through income taxes.

    i.    Field Exam. Within twenty one (21) days after this Agreement, the Borrower agrees to allow the Lender or its agents or representatives to conduct a Field Exam pursuant to section 4.9 of the Credit Agreement, at the Borrower's expense.

    Section 4.2.  Covenants of the Guarantors. The Guarantors shall abide by all of the terms and conditions of the Guaranties including, without limitation, all of their or their reporting obligations thereunder, as applicable.

Section 4.3.  Copy of Purchase Agreement, Settlement Statement from June 30, 2008 Transaction.  On or before the date of this Agreement, the Borrower shall deliver to the Lender a copy of the Purchase Agreement, all schedules thereto, all "flow of funds" memoranda executed in connection therewith, and a copy of the settlement statement associated with such transaction.

### ARTICLE V
### FORBEARANCE AND STANDSTILL PROVISIONS

Section 5.1.    No Exercise of Remedies/Standstill.  During the period (the "Forbearance Period") from the date hereof until the earlier of (i) payment in full of all of the amounts owed under the Financing Documents or (ii) the occurrence of a Default (as hereinafter defined) hereunder, or (iii) May 31, 2009 (the "Termination Date"), the Lender agrees that it will not take any further action against the Obligors or exercise or enforce any other or further rights or remedies provided for in the Financing Documents, or otherwise available to it, at law or in equity, by virtue of the occurrence and/or continuation of the Existing Defaults, or take any action against any property in which the Obligors have any interest, which action is available to the Lender as a result of the Existing Defaults.

Section 5.2.   No Waiver of Other Rights or Remedies/Service of Process.    The parties hereto acknowledge and agree that, except as expressly set forth above, the Lender (i) shall retain all rights and remedies it may have with respect to the amounts owed under the Financing Documents under the Financing Documents, and the Borrower's failure to honor or otherwise comply with the terms and conditions of the Financing Documents (such rights and remedies are hereinafter collectively referred to as "Default Rights") and (ii) shall have the right to exercise and enforce such Default Rights upon termination of the Forbearance Period.  The parties further agree that the exercise of any Default Rights by the Lender upon termination of the Forbearance Period shall not be affected by reason of this Agreement, and the parties hereto shall not assert as a defense thereto the passage of time, estoppel, laches or any statute of limitations to the extent that the exercise of any Default Rights was precluded by this Agreement.

Section 5.3.  Other Obligations.  All of the terms and conditions of Financing Documents, except to the extent modified or altered by the terms of this Agreement or waived in writing by the Lender, shall remain in full force and effect and unchanged.

### ARTICLE VI
### RELEASE AND WAIVER

Section 6.1.   Release and Waivers.  THE OBLIGORS SIGNING BELOW HEREBY KNOWINGLY AND VOLUNTARILY FOREVER RELEASE, ACQUIT AND DISCHARGE THE LENDER AND THE BANK GROUP FROM AND OF ANY AND ALL CLAIMS THAT THE LENDER OR ANY MEMBER OF BANK GROUP IS IN ANY WAY RESPONSIBLE FOR THE PAST, CURRENT OR FUTURE CONDITION OR DETERIORATION OF THE BUSINESS OPERATIONS AND/OR FINANCIAL CONDITION OF THE BORROWER, AND FROM AND OF ANY AND ALL CLAIMS THAT THE LENDER OR ANY MEMBER OF BANK GROUP BREACHED ANY AGREEMENT TO LOAN MONEY OR MAKE OTHER FINANCIAL ACCOMMODATIONS AVAILABLE TO THE BORROWER OR TO

FUND ANY OPERATIONS OF ANY OBLIGOR AT ANY TIME. THE OBLIGORS ALSO HEREBY KNOWINGLY AND VOLUNTARILY FOREVER RELEASE, ACQUIT AND DISCHARGE THE LENDER AND BANK GROUP, FROM AND OF ANY AND ALL OTHER CLAIMS, DAMAGES, LOSSES, ACTIONS, COUNTERCLAIMS, SUITS, JUDGMENTS, OBLIGATIONS, LIABILITIES, DEFENSES, AFFIRMATIVE DEFENSES, SETOFFS, AND DEMANDS OF ANY KIND OR NATURE WHATSOEVER, IN LAW OR IN EQUITY, WHETHER PRESENTLY KNOWN OR UNKNOWN, WHICH THE OBLIGORS MAY HAVE HAD, NOW HAVE, OR WHICH THEY CAN, SHALL OR MAY HAVE FOR, UPON, OR BY REASON OF ANY MATTER, COURSE OR THING WHATSOEVER RELATING TO, ARISING OUT OF, BASED UPON, OR IN ANY MANNER CONNECTED WITH, ANY TRANSACTION, EVENT, CIRCUMSTANCE, ACTION, FAILURE TO ACT, OR OCCURRENCE OF ANY SORT OR TYPE, WHETHER KNOWN OR UNKNOWN, WHICH OCCURRED, EXISTED, WAS TAKEN, PERMITTED, BEGUN, OR OTHERWISE RELATED OR CONNECTED TO OR WITH ANY OR ALL OF THE AMOUNTS OWED UNDER THE FINANCING DOCUMENTS, THIS AGREEMENT, ANY OR ALL OF THE FINANCING DOCUMENTS, AND/OR ANY DIRECT OR INDIRECT ACTION OR OMISSION OF THE LENDER AND/OR ANY OF THE BANK GROUP.

## ARTICLE VII
### TERMINATION

Section 7.1. <u>Default and Termination</u>. For purposes hereof, the Borrower shall be in default (each, a "<u>Default</u>") if:

(i)   Any Obligor fails to observe, perform, or comply with any of the terms, conditions or provisions of this Agreement, as and when required, specifically including the Borrower's failure to comply with the Budget (in excess of the variances allowed in connection therewith), unless waived in writing by the Lender;

(ii)   any default (other than the Existing Defaults) shall occur under any of the Financing Documents as amended hereby;

(iii)   any recital, representation or warranty made herein, in any document executed and delivered in connection herewith, or in any report, certificate, financial statement or other instrument or document previously, now or hereafter furnished by or on behalf of any Obligor in connection with this Agreement, shall prove to have been false, incomplete or misleading in any material respect on the date as of which it was made;

(iv)   the Borrower either (i) forms (or is learned to have formed) an affiliate or subsidiary or (ii) transfers or is found by the Lender to have transferred any asset of any value to such affiliate or subsidiary or subsidiary to be formed, or (iii) transfers or is found by the Lender to have transferred its rights under any Government Contract to any person, whether subsidiary, affiliate or otherwise;

(v)    (1) a court of competent jurisdiction shall enter an order for relief or take any similar action in respect of any of the Obligors in an involuntary case under any applicable bankruptcy, insolvency, reorganization, moratorium or similar law now or hereafter in effect or (2) a petition for relief under any applicable bankruptcy, insolvency, reorganization, moratorium or other similar law shall be filed against any of the Obligors, or (3) a decree or order of a court of competent jurisdiction for the appointment of a receiver, liquidator, sequestrator, trustee or custodian having similar powers over any of the Obligors, or over all or a substantial part of their property, shall have been entered and, in each case, such order, petition or decree is not vacated and such proceedings are not dismissed within sixty (60) days thereafter; or

(vi)    any of the Obligors shall (1) commence a voluntary case under any applicable bankruptcy, insolvency, reorganization, moratorium or other similar law now or hereafter in effect; (2) consent to the entry of an order for relief in any involuntary case, or to the conversion from an involuntary case to a voluntary case; or (3) consent to the appointment of or taking of possession by a receiver, liquidator, trustee or other custodian of all or a substantial part of their property; or (4) make an assignment for the benefit of creditors.

The occurrence of a Default hereunder shall be deemed to be an Event of Default under the Credit Agreement and the other Financing Documents. Upon the occurrence of a Default, should any of the Borrower's obligations not be satisfied, the Lender shall be entitled to pursue immediately its various rights and remedies, including the Default Rights, against the Obligors and against all collateral given to secure the amounts owed under the Financing Documents or any other person liable therefor.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.1.  Headings.  Descriptive headings are for convenience only and will not control or affect the meaning or construction of any provision of this Agreement.

Section 8.2.  Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and each of their respective heirs, personal representatives, successors and assigns.

Section 8.3.  Time of Essence.  Time is of the essence of this Agreement.

Section 8.4.  Counterparts.  This Agreement may be executed in any number of duplicate originals or counterparts, each of such duplicate originals or counterparts shall be deemed to be an original and all taken together shall constitute but one and the same instrument. The parties further agree that facsimile signatures shall be binding on all parties and have the same force and effect as original signatures.

Section 8.5.  Severability.  In case one or more provisions contained in this Agreement

shall be invalid, illegal, or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions contained herein shall remain effective and binding and shall not be affected or impaired thereby.

Section 8.6.  <u>Amendments</u>. This Agreement may be amended, modified or supplemented only by written agreement signed by all parties hereto. No provision of this Agreement may be waived except in writing signed by the party against whom such waiver is sought to be enforced.

Section 8.7.  <u>Entire Agreement</u>. This Agreement sets forth the entire agreement and understanding of the parties hereto with respect to payment and performance of the amounts owed under the Financing Documents, superseding all prior representations, understandings and agreements, whether written or oral. There are no unwritten agreements between the Lender and the Obligors in any such respect.

Section 8.8.  <u>Effective Date</u>. This Agreement shall be effective immediately upon the execution and delivery of this Agreement by all persons who are parties hereto.

Section 8.9.  <u>Fees and Expenses</u>. The Borrower agrees to pay to the Lender on demand all out-of-pocket costs, fees and expenses incurred by or on behalf of the Lender in connection with the preparation, negotiation, execution and delivery of this Agreement and any and all of the other documents related hereto and all other reasonable out-of-pocket costs, fees and expenses, incurred by, or on behalf of the Lender in connection with the enforcement, preservation, or collection of the amounts owed under the Financing Documents and/or this Agreement, including, without limitation, attorneys' fees and expenses, and recordation and filing fees and taxes (collectively, the "<u>Enforcement Costs</u>"). Such Enforcement Costs shall in all events be deemed to be part of the amounts owed under the Financing Documents and shall be payable upon demand.

Section 8.10.  <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HERETO HEREBY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH THEY MAY BE PARTIES, ARISING OUT OF OR IN ANY WAY PERTAINING TO (A) THIS AGREEMENT (B) ANY OF THE OTHER DOCUMENTS EXECUTED BY THEM IN CONNECTION HEREWITH, (C) ANY OF THE OBLIGATIONS, AND/OR (D) ANY OF THE FINANCING DOCUMENTS. IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS AGREEMENT.

Section 8.11.  <u>Further Assurances</u>. The Borrower hereby agrees to execute and deliver to the Lender from time to time such other documents and instruments and to take such other actions as the Lender may reasonably request in order to more effectively carry out the terms of this Agreement or any related documents.

Section 8.12.  <u>Waiver of Automatic Stay in Bankruptcy</u>. As a material inducement for the Lender to enter into this Agreement, the Borrower agrees that in the event that it files a petition under the *United States Bankruptcy Code*, it hereby unconditionally and

irrevocably consents to relief from the automatic stay of 11 U.S.C. § 362 so as to allow the Lender to exercise its rights and remedies under the Financing Documents with respect to any collateral which serves as security for the repayment of the Financing Documents. In such event, the Borrower agrees that it shall not, in any manner, oppose or otherwise delay any motion filed by the Lender for relief from the automatic stay. The Lender's enforcement of the right granted herein for the relief from the automatic stay is subject to the approval of the bankruptcy court in which the case is then pending.

[remainder of page left intentionally blank – signature lines follow]

IN WITNESS WHEREOF, the parties hereto have each caused this Agreement to be executed and sealed, the day and year first above written.

**BORROWER:**

AC TECHNOLOGY, INC.,
a Virginia corporation and the successor by merger
to MB Security Corporation

By: _____ (SEAL)
    Name:  Gordon T. Hunter
    Title:  President

**GUARANTORS:**

_____ (SEAL)
EARLE D. MUNNS, JR.

_____ (SEAL)
MICHAEL A. BYRD

**LENDER:**

BANK OF AMERICA, N.A.,

By: _____ (SEAL)
    Robert S. Cashion,
    Senior Vice President

IN WITNESS WHEREOF, the parties hereto have each caused this Agreement to be executed and sealed, the day and year first above written.

**BORROWER:**

AC TECHNOLOGY, INC.,
a Virginia corporation and the successor by merger
to MB Security Corporation

By: _____ (SEAL)
                Name: Gordon T. Hunter
                Title: President

**GUARANTORS:**

_____(SEAL)
EARLE D. MUNNS, JR.

_____(SEAL)
MICHAEL A. BYRD

**LENDER:**

BANK OF AMERICA, N.A.,

By: *Robert S. Cashion* _____ (SEAL)
                Robert S. Cashion,
                Senior Vice President

O B E R | K A L E R
A Professional Corporation

**Ober, Kaler, Grimes & Shriver**
Attorneys at Law

1401 H. Street, NW, Suite 500
Washington, DC 20005-3324
202-408-8400  Fax 202-408-0640
www.ober.com

**Nikolaus F. Schandlbauer**
nfschandlbauer@ober.com
202-326-5016

**Offices In**
Maryland
Washington, D.C.
Virginia

March 30, 2009

## *Notice of Enforcement of Rights and Remedies*

### <u>VIA ELECTRONIC MAIL</u>

J. Stephen Britt, Esquire
Leach Travell Britt plc
8270 Greensboro Drive
Suite 1050
McLean, Virginia 22102

> *Re:    Credit Facilities from Bank of America, N.A. (the "<u>Bank</u>") to*
> *MB Security Corporation and AC Technology, Inc. (the "<u>Borrowers</u>")*

Dear Steve:

As you know, I represent the Bank in connection with the referenced commercial credit facilities as well as the various documents, instruments and written agreements executed by Borrowers and others in connection therewith (collectively, the "<u>Loan Documents</u>").

By letter dated December 17, 2008, the Bank notified the Borrowers of their default under the Loan Documents and reserved all of its rights.  The Borrowers (by the surviving entity, AC Technology) as well as the guarantors of the repayment of the amounts owed pursuant to the Loan Documents, Messrs. Munns and Byrd (collectively with AC Technology, the "<u>Obligors</u>"), entered into that certain February 19, 2009 Loan Modification Agreement with the Bank, which required that the parties thereto perform certain acts and make certain payments as more particularly set forth therein.  The Obligors have defaulted under that agreement as well, and the Bank is immediately entitled to pursue its rights and remedies under the Loan Documents and applicable law with respect to the Obligors.

The purpose of this letter is to advise you that the Bank has commenced the enforcement of such rights and remedies, and expects your and the Obligors' undivided attention and cooperation with respect thereto.  Should Messrs. Munns and Byrd wish to address their obligations under their respective guaranties, they should feel free to speak directly with Mr. Bobby Cashion at the Bank or, if either or both have hired counsel, counsel should feel free to reach out to me.



EXHIBIT
H



J. Stephen Britt, Esquire
March 30, 2009
Page 2

In the meantime, please call me with any questions or comments.

Sincerely,

Nikolaus F. Schandlbauer

ccs (via electronic mail):
Robert S. Cashion, Senior Vice President
Gordon Hunter, Chief Executive Officer
Richard Burtner, Chief Financial Officer
Earle D. Munns
Michael A. Byrd

| | |
|---|---|
| **From:** | E M [emunns2325@msn.com] |
| **Sent:** | Sunday, June 29, 2008 11:19 AM |
| **To:** | Zanetti, Diane B; Tencza, Jessica; Yin, Yanlin |
| **Cc:** | mabyrd@sydiansys.com; Steve Britt |
| **Subject:** | Revised AC Tech BB Certificate-June (RESEND) |
| **Importance:** | High |
| **Attachments:** | BBTemp_270608.xls; AR_Aging_Jun08.pdf |

Diane, Jessica, and Yanlin,

We sent our revised and carefully reviewed BBC on Friday evening as per the email trail below ( see attachments). This was later than we planned, but another $2.1 mm was booked Friday and we almost have another $646,700 which we expect tomorrow.

I am resending the email and attachments now after I was apprised today you may not have received the email and attachments Friday. Our apologies for any confusion.

Our transaction with AC Technology is fully agreed and we are ready to proceed.

Thanks for all your assistance.

Please feel free to call me with any questions at (703)731-0452 or Mike at (301)523-4556.


>
> -----Original Message-----
> From: Michael Byrd [mailto:mabyrd@sydiansys.com]
> Sent: Friday, June 27, 2008 10:34 PM
> To: 'Tencza, Jessica'; 'Zanetti, Diane B'
> Cc: 'Yin, Yanlin'; 'sbritt@ltblaw.com'; 'E M'
> Subject: Revised AC Tech BB Certificate-June (RESEND)
>
>
>
> Jessica, Diane and Yanlin,
>
> We are pleased to provide a revised BBC for AC Tech. (My prior email had the
> incorrect attachment.)
>
> Thanks for your patience and for the explanation about "unbilled accounts"
> under the Credit Agreement. As you will see, we chose to delete the DHS
> "Unbilled" line item for $7.7mm. We expect this to be an eligible AR for
> the month of July.
>
> On the Borrowing Base spreadsheet, we are glad you were aware of the formula
> error.
>
> Beyond that...the news is all good, as the A/R figures are very strong and
> growing daily. I've attached the latest A/R Aging for your review.
>



EXHIBIT

tabbies

I

> Please let us know if you need any further information. You can contact me
> directly at 301-523-4556.
>
> We greatly value your support and assistance these past few weeks and look
> forward to a great relationship ahead.
>
> Have a good evening,
> MAB
>
>
>
>

---

The i'm Talkathon starts 6/24/08.  For now, give amongst yourselves. Learn More

# Bank of America

**Bank of America Asset Based Lending Services** - Monthly Borrowing Base Certificate

BORROWER: **MB Security Corporation**

|  |  |  | Certificate #: |  |  |  |
|---|---|---|---|---|---|---|
|  |  |  | Month Ending: |  |  | 6/30/2008 |

**ACCOUNTS RECEIVABLE**

| Line | Roll Forward Information | | Government | Commercial | | Combined |
|---|---|---|---|---|---|---|
| 1 | Trade Accounts Receivable-Last Month End | 31-May-08 | 5,625,758.61 | 1,929,623.58 | - | 7,555,382.19 |
| 2 | Plus: Credit Sales | | 5,073,539.22 | 1,117,370.45 | - | 6,190,909.67 |
| 3 | Plus: Debit Memos and Misc. Debit Adj. | | - | - | - | - |
| 4 | Less: Collections | | (2,460,798.38) | (1,497,194.29) | | (3,957,992.67) |
| 5 | Less: Credit Memos for the Month | | | | | |
| 6 | Other Debit or (Credit) Adj. (Attach Explanation) | | | | | |
| 7 | Trade Accounts Receivable-This Month End | 30-Jun-08 | 8,238,499.45 | 1,549,799.74 | | 9,788,299.19 |
| 8 | Less: Ineligible Receivables per attached (Schedule A) | | 310,607.21 | | | 310,607.21 |
| 9 | Eligible Receivables (Line 7 minus line 8) | | 7,927,892.24 | 1,549,799.74 | | 9,477,691.98 |
| 10 | Advance Rate | | 90% | 80% | | |
| 11 | GROSS ACCOUNTS RECEIVABLE AVAILABILITY | | 7,135,103.02 | 1,239,839.79 | | 8,374,942.81 |

UNBILLED ACCOUNTS RECEIVABLE

| 12 | Unbilled A/R from prior Month's BBC dated | | | |
|---|---|---|---|---|
|  | Plus: Estimated Unbilled A/R for the month (please exclude Billings in Excess of Costs) | | | |
|  | Less:  Billings Created for the Period | | | |
| 13 | Unbilled A/R this Month-End | | | |
| 14 | Advance Rate | | | 50% |
| 15 | Unbilled A/R Availability/Unbilled Cap | | | |
| 16 | APPROVED OVERADVANCE ($0) | | | |
| 17 | GROSS COMBINED AVAILABILITY | | | 8,374,942.81 |
| 18 | Less: Outstanding Letter of Credit | | | |
| 19 | NET AVAILABILITY | | | 8,374,942.81 |
| 20 | APPROVED LINE OF CREDIT | $  10,000,000 | | |
| 21 | The Lesser of Net Availability or Credit Line | | | 8,374,942.81 |

**LOANS OUTSTANDING**

| 21 | Loan Balance - Since last Certificate | 5,500,000 | |
|---|---|---|---|
| 22 | Advances Since last Certificate | | |
| 23 | Less: Collections Applied To Loan | | |
| 24 | Total Loan Balance this Certificate | 5,500,000 | 5,500,000.00 |
| 25 | Less:  Collateral Reserves | | |
| 26 | **REMAINING LOAN AVAILABILITY/(OVERADVANCE)** | | 2,874,943 |
|  | (Line 19 minus lines 25 & 26) | | |

I certify the above to be true and correct to the best of my knowledge and belief. We understand that you are relying upon
this Report and supporting documents in granting credit to us and we warrant that no Event of Default exists or is
imminent under any agreements between us. The undersigned further certifies that all inventory is owned by us free and
clear of any liens or encumbrances other than to Bank of America, that the same is under the control and in the possession of
the undersigned and otherwise complies with all provisions of agreements between us:

|  |  |
|---|---|
| Borrower: | **MB Security Corporation** |
| By: | Michael Byrd, EVP |
| Date: | 6/27/2008 |

| OBLIGOR | MB Security Corporation |
|---|---|
| SCHEDULE A - SCHEDULE OF INELIGIBLES | |

**INELIGIBLE ACCOUNTS RECEIVABLE**

| | |
|---|---:|
| Past due:    Over ____ 90 Days from **Invoice** Date | 309,161.61 |
| Datings/Futures | |
| Credit Balances in Past Dues | |
| ____ 50 % Cross Aging | |
| Intercompany/Affiliate | 1,445.60 |
| Contra Elimination | |
| Unapplied Cash | |
| Cash/COD's | |
| Credit Hold | |
| Finance/Service Charges | |
| Bankrupt Accounts | |
| Pre-Billings/Bill and Hold | |
| Retentions | |
| Bankrupt Accounts | |
| Consignments | |
| Debit Memos/Chargebacks | |
| Other as banks deems ineligible ____ | |
| Variance Between Aging & G/L (if G/L is lower) | |
| Excess ____ 50 % Concentration  [x] Net  [ ] Gross | |
| Commerical A/R only | |
| Excess Concentration limit (name specific) | |
| TOTAL INELIGIBLES | 310,607.21 |

CERTIFIED MAIL - RETURN RECEIPT REQUESTED

15 August 2008

Bank of America
8300 Greensboro Drive, Mezzanine Level
McLean, VA 22102

Re: Notice of Purchase Money Security Interest

Please be advised that under the provisions of the Uniform Commercial Code that the undersigned holds and acquired, or expects to hold or acquire a purchase money security interest in inventory collateral including but not limited to the proceeds thereof, which inventory will from time to time hereafter be delivered to Debtor's address(es) listed herein.

The purchase money security interest was created by and is pursuant to a security agreement entered into between:

SECURED PARTY:

Arrow Electronics Inc
7459 South Lima St., Bldg, 2
Englewood, CO 80112

and the DEBTOR:

AC Technology, Inc.
DBA:
22695 Commerce Center Court, Suite C
Dulles, VA 20166

This security interest is to be binding upon the above named Debtor and any and all of their DBAs at any and all present and future addresses.

The inventory collateral consists, or will consist of the following items or types of inventory as described in the financing statement. Said inventory is more particularly described as follows:

Any and all electronic merchandise and/or other products or merchandise sold to debtor by secured party as specifically identified in debtor's purchase order numbers 89064 (or any other purchase order accepted by secured party in an amendment to the security agreement) together with any improvements, replacements, accessions, and additions to it. In addition, accounts, deposit accounts, accounts receivable, chattel paper, instruments, documents, general intangibles, or other right to payment (collectively, "right to payment"), together with all renewals, and including all securities, guaranties, warranties, indemnity agreements, insurance policies, and other agreements pertaining to such rights to payment derived from the sale of any and all identified electronic merchandise and/or other products or merchandise.

By:     Arrow Electronics Inc
        7459 South Lima St., Bldg, 2
        Englewood, CO 80112



## Schandlbauer, Nikolaus

| | |
|---|---|
| **From:** | Schandlbauer, Nikolaus |
| **Sent:** | Tuesday, August 19, 2008 5:18 PM |
| **To:** | 'Steve Britt' |
| **Cc:** | 'Tencza, Jessica' |
| **Subject:** | MB SECURITY - contemplated indebtedness to arrow electronics |

**Attachments:**    C021F6B1.PDF

Dear Steve:

I hope this e-mail finds you well.

The Bank received the attached correspondence from Arrow Electronics (by certified mail!), and would like you to tell us a little bit more about what they are proposing to do.

The credit agreements permits the $735 existing debt to Arrow Electronics existing as of the date of closing, and if this is all that the attached refers to, please confirm for me and we will be done.

If the attached contemplates more or different indebtedness, or the imposition of a lien against the Bank's collateral (which the text of the letter seems to suggest), then the Borrowers are prohibited from incurring it without the prior written consent of the Lender, which would undoubtedly be conditioned upon Arrow's execution of a comprehensive subordination agreement. Please let me know one way or the other, and I look forward to hearing from you.

Nick



C021F6B1.PDF (20 KB)



| OBLIGOR | MB Security Corporation/AC Tech |
| --- | --- |
| SCHEDULE A - SCHEDULE OF INELIGIBLES | |

### INELIGIBLE ACCOUNTS RECEIVABLE

| | |
| --- | --- |
| Past due:        Over _____ 90 Days from Invoice Date | -2,767.39 |
| Datings/Futures | |
| Credit Balances in Past Dues | |
| _____ 50 % Cross Aging | |
| Intercompany/Affiliate | 1,445.60 |
| Contra Elimination | |
| Unapplied Cash | |
| Cash/COD's | |
| Credit Hold | |
| Finance/Service Charges | |
| Bankrupt Accounts | |
| Pre-Billings/Bill and Hold | |
| Retentions | |
| Bankrupt Accounts | |
| Consignments | |
| Debit Memos/Chargebacks | |
| Other as banks deems ineligible _____ | |
| Variance Between Aging & G/L (if G/L is lower) | |
| Excess        50 % Concentration   |x| Net   | Gross | |
| Commerical A/R only | |
| Excess Concentration limit (name specific) | |
| TOTAL INELIGIBLES | -1,321.79 |

### BORROWING BASE RESERVES

| | |
| --- | --- |
| Rent at Leased locations (subject to statutory or contractual landlord's liens) | 8,759.33 |
| Inventory shrinkage | |
| Dilution | |
| Custom's charges | |
| Warehousemen's or bailee's charges | |
| Act) or any similar State Law | |
| Derivatives (including interest rate SWAP risk) | |
| Other (Specify) _____ | |

## Schandlbauer, Nikolaus

**From:**    Steve Britt [sbritt@ltblaw.com]
**Sent:**    Friday, September 12, 2008 11:10 AM
**To:**      Schandlbauer, Nikolaus
**Cc:**      'Tencza, Jessica'; 'Earle Munns'; 'Gordon Hunter'; 'Michael Byrd'
**Subject:** RE: MB SECURITY CORP.

Nick:

Thanks for the discussion today.   It was very helpful and much appreciated.

As we discussed, the recent MOCA letter was the result of a mistaken execution of a document by AC Technology.  We expect to have the underlying purchase order paid off in the next couple of weeks and have taken steps to ensure it doesn't happen again.  It resulted from an over-zealous effort to capture some new A/R.

On that front, many good things are happening with many large bids in the works.   We do want to come see the Bank in the next few weeks to discuss our short-term financing needs but more will be clear on that by the end of the month.  Your thoughts about a carve out for purchase money security interests is especially interesting.

Also, Earle has successfully secured the services of Gordon Hunter, former President of I-Gov, who will be named COO or equivalent very soon.   He is already helping to ramp the business.

On another front, and I failed to mention this, we recently merged MB Security Corporation into AC Technology, with AC Technology the survivor.  Just completed this week.  We did this because the SDVOB regulations require that SDVOB ownership interests be held by individuals rather than other entities (in our case MB Security Corporation).   Since both Earle and Mike Byrd are Service Disabled Veterans, we wanted to protect that status for AC Tech.

Thanks again for your assistance.   Earle will be back in touch with Diane and Jessica soon to update them on his progress.

Let me know if you need anything in the meantime.

Best, Steve



**J. Stephen Britt**
sbritt@ltblaw.com

**Leach Travell Britt pc**
8270 Greensboro Drive
Suite 1050
McLean, Virginia 22102
Tel  703.584.8904
Fax  703.584.8901
www.ltblaw.com

This electronic mail transmission may contain confidential or privileged information. If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or d...

**EXHIBIT**

4/3/2009

MB SECURITY - contemplated indebtedness to arrow electronics

---

**From:** Schandlbauer, Nikolaus [mailto:nfschandlbauer@ober.com]
**Sent:** Tuesday, August 19, 2008 5:18 PM
**To:** Steve Britt
**Cc:** Tencza, Jessica
**Subject:** MB SECURITY - contemplated indebtedness to arrow electronics

Dear Steve:

I hope this e-mail finds you well.

The Bank received the attached correspondence from Arrow Electronics (by certified mail!), and would like you to tell us a little bit more about what they are proposing to do.

The credit agreements permits the $735 existing debt to Arrow Electronics existing as of the date of closing, and if this is all that the attached refers to, please confirm for me and we will be done.

If the attached contemplates more or different indebtedness, or the imposition of a lien against the Bank's collateral (which the text of the letter seems to suggest), then the Borrowers are prohibited from incurring it without the prior written consent of the Lender, which would undoubtedly be conditioned upon Arrow's execution of a comprehensive subordination agreement.  Please let me know one way or the other, and I look forward to hearing from you.

Nick


<<C021F6B1.PDF>>

4/3/2009



Enterprise Computing Solutions

## Security Agreement
### (Product and Payment Assignment as Collateral – **Without** Acknowledgment by End-User)

**Secured Party:**        Arrow Electronics, Inc. and subsidiaries
                                 7459 S. Lima
                                 Englewood, Co  80112

**Debtor:**                AC Technology, Inc.
                                 22695 Commerce Center Ct. Ste. C
                                 Dulles, VA 20166
                                 FEIN: 54-1600337

1.    **Definitions**

    As used in this security agreement,

    a.    *"Collateral"* means the products described in debtor's purchase order numbers **89064** (or any additional purchase orders issued to secured party by debtor and accepted by secured party under an amendment to this agreement) issued to secured party and the proceeds derived from the sale of said product to debtor's customer, **GSA** (end-user) (or any other end-user accepted by secured party in an amendment to this agreement),in accordance with end-user's purchase order numbers **GSAGS09A08DFM3534** issued to debtor (or any other purchase order issued to debtor and accepted by secured party in an amendment to this agreement). Copies of all purchase orders are attached to this security agreement and are incorporated herein by this reference.

    b.    *"Debtor"* means Arrow's customer, i.e. **AC Technology, Inc.**

    c.    *"Indebtedness"* means debtor's obligations to secured party resulting from debtor's purchase of products from secured party as set out in debtor's purchase orders identified above (or any additional purchase order issued to secured party by debtor and accepted by secured party in a written amendment to this security agreement).

    d.    *"Lien"* means any security interest, mortgage, pledge, attachment, claim, charge, encumbrance, and/or agreement retaining title as to the collateral.

    e.    *"Obligations"* means existing and future indebtedness and liability of debtor to secured party, including attorneys' fees incurred by secured party in enforcing this security agreement or collecting payment under it.

    f.    *"Account"* means a right to payment for goods sold or services rendered by debtor.

    g.    *"Product"* means all items purchased by debtor from secured party in accordance with debtor's purchase orders identified above (or in any amendment to this security agreement) in which debtor has or later acquires a right, and all documents of title covering all or part of the product.

    h.    *"Receivable"* means the account, instrument, document, chattel paper, or other general intangibles relating to the product purchased by debtor from secured party in accordance with its purchase orders identified above (or in any purchase order issued to secured party by debtor and accepted by secured party in a written amendment to this agreement).

    I.    Terms identified in the Uniform Commercial Code not otherwise defined in this security agreement are used in this security agreement as defined in that Code on the date of this agreement.

2.    **Grant of Security Interest**

    Debtor grants secured party a purchase money security interest in the property described below to secure debtor's obligations under this security agreement.  That property, called the collateral, consists of a continuing purchase money security interest in the following:

    a.    Any and all electronic merchandise and/or other products or merchandise sold to debtor by secured party as specifically identified in debtor's purchase order numbers **89064** (or any other purchase order accepted by secured party in an amendment ot this agreement), together with any improvements, replacements, accessions, and additions to it.

    b.    Accounts, deposit accounts, accounts receivable, chattel paper, instruments, documents, general intangibles, or other right to payment (collectively, "right to payment"), together with all renewals and including all securities, guaranties, warranties, indemnity agreements, insurance

EXHIBIT
tabbies
M

agreements pertaining to such rights to payment derived from the sale of that electronic merchandise and/or other products defined in paragraph 1(g) prior.

3. Debtor promises:
   a. To pay the obligations to secured party when they are due in the manner prescribed by paragraph 4(a) of this security agreement.
   b. To pay all expenses, including attorneys' fees, incurred by secured party in the perfection, preservation, realization, enforcement, and exercise of its rights under this agreement.
   c. To indemnify secured party against loss of any kind, including reasonable attorneys' fees, caused to secured party by reason of its interest in the collateral.
   d. To conduct debtor's business efficiently and without voluntary interruption.
   e. Not to sell, lease, transfer, or otherwise dispose of the product defined in paragraph 1(g), except, before the occurrence of a default, for cash proceeds of accounts collected from the sale of said products to the end-user acknowledging its obligations under this security agreement (or any other end-user acknowledging its obligations under an amendment to this security agreement).
   f. To notify secured party promptly in writing of any default, potential default, or any development that might have a material adverse effect on the collateral.
   g. To execute and deliver to secured party all financing statements and other documents that secured party requests, in order to maintain a first perfected purchase money security interest in the collateral. Said financing statements once executed, delivered, and filed are attached to this security agreement and by this reference made a part hereof.
   h. Not to make or agree to make any reduction in the original amount owing on a receivable, or to accept less than the original amount in satisfaction of a receivable as it relates to the product defined in paragraph 1(g) and in accordance with end-user's purchase order (including any purchase order issued by an end-user accepted by secured party in an amendment to this security agreement).
   I. To deliver to secured party (1) duplicate invoices for each account relating to debtor's sale of the product defined in paragraph 1(g), bearing the language of assignment as secured party specifies, (copies of said invoice(s) are attached to this security agreement and by this reference made a part hereof), and; (2) the originals of all receivables, endorsed and assigned as secured party requests.
   j. To keep the product defined in paragraph 1(g) in good repair and not to use the product for any unlawful purpose or in any way that would void any effective insurance.
   k. To maintain insurance coverage on the product defined in paragraph 1(g) above, in amounts and under policies sufficient to protect secured party's interest in the product.

4. Payment Terms and Collection of Proceeds:

   Debtor promises:
   a. To instruct end-user to make all payments as follows: **AC Technology, Inc., PO Box 18803, Newark, NJ 07191-8803** and to include the language specified by secured party on each invoice submitted to end-user.
   b. To receive and use reasonable diligence in obtaining payment from the end-user and to ensure that the proceeds are delivered promptly to the secured party.
   c. Not to commingle the proceeds with other property or proceeds. This includes debtor's promise not to deposit the proceeds to any bank account.
   d. To provide any service and perform any other acts necessary to keep the proceeds free and clear of defenses, rights of set-off, and counterclaims.
   e. To pay all expenses incurred by secured party in connection with the collection of the proceeds, including expenses of and incidental to accounting, correspondence, collection effort, filing, recording, and record keeping.

5. The assigned funds, which constitute payment pursuant to this agreement, are the property of secured party. **If checks are received by debtor, they will immediately forward to address in #4 above, or if funds are directly deposited into debtor's bank account, debtor will make payment to secured party within 24 hours.**

   _____ **(Initial Here)**

6. Power of Attorney
   a. Debtor hereby appoints Arrow Electronics, Inc. and subsidiaries, (see Limited Power of Attorney attached to this agreement and incorporated herein by reference) or any other person whom secured party may designate, as debtor's attorney in fact, with the following powers:
   b. To perform any of debtor's obligations under the agreement in debtor's name or otherwise.
   c. To give notice of debtor's right to payment, to enforce that right, and to make extension agreements with respect to it.

d. To prepare and file financing statements, continuation statements, statements of assignment, termination statements, and the like, as necessary to perfect, protect, preserve, or release secured party's interest in the collateral.

e. To endorse debtor's name on instruments, documents, or other forms of payment or security that come into secured party's possession.

f. To take cash in payment of obligations.

g. To verify information concerning rights to payment by inquiry in its own name or in a fictitious name.

h. To prepare, execute, and deliver insurance forms; to adjust insurance claims; to receive payment under insurance claims; and to apply such payment to reduce debtor's obligation.

7. Debtor's Warranties and Representations

Debtor covenants, warrants, and represents as follows:

a. Debtor is a **Corporation** duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, and has all necessary authority to conduct its business wherever it is conducted.

b. Debtor is authorized to execute and deliver this security agreement. The security agreement is a valid and binding obligation of debtor. This security agreement together with all attachments and any amendments hereto, creates a perfected, first priority purchase money security interest enforceable against the collateral in which debtor now has rights, and will create a perfected, first priority purchase money security interest enforceable against the collateral in which debtor later acquires rights, when debtor acquires those rights.

c. Neither the execution and delivery of this security agreement, nor the taking of any action in compliance with it, will (1) violate or breach any law, regulation, rule, order, or judicial action binding on debtor, any agreement to which debtor is a party, debtor's articles of incorporation or bylaws; or (2) result in the creation of a lien against the collateral except that created by this security agreement.

d. A schedule attached to and made a part of this security agreement states, without exceptions:

(1) The location of debtor's chief executive office and the name of its chief executive officer.

(2) All names under which debtor has conducted its business.

(3) The names and addresses of all secured creditors maintaining a valid and binding security interest in inventory, equipment, and/or receivables. In addition, this list will also identify the state and/or other jurisdiction in which any such financing statement is filed along with the file number and filing date.

(4) The General Terms & Conditions of Sale which govern the transactions contemplated by this security agreement and any and all amendments hereto unless specifically modified by this security agreement.

8. Termination

This security agreement will continue in effect even though from time to time there may be no outstanding obligations or commitments under this agreement or any amendment to it. The agreement will terminate when (a) debtor completes performance of all obligations to secured party, including without limitation the repayment of all indebtedness by debtor to secured party, including any indebtedness derived from an amendment to this security agreement; (b) secured party has no commitment that could give rise to an obligation; and © debtor has notified secured party in writing of its desire to terminate this Security Agreement.

9. Default

Debtor will be in default under this agreement if:

a. Debtor fails to pay the indebtedness owed to secured party when due, or otherwise.

b. Debtor fails to properly instruct end-user as to properly directing assigned accounts as provided in this agreement under paragraph 4(a).

c. Debtor commits any breach of this agreement, or any present or future amendment to this agreement, or any other agreement between debtor and secured party evidencing the obligation or securing it.

d. Any warranty, representation, or statement, made by or on behalf of debtor in or with respect to the agreement, is false.

e. The collateral is lost, stolen, or damaged.

f. There is a seizure or attachment of, or a levy on, the collateral.

g. Debtor ceases operations, is dissolved, terminates its existence, does or fails to do anything that allows obligations to become due before their stated maturity, or becomes insolvent or unable to meet its debts as they mature.

10. Remedies

When an event of default occurs secured creditor may:

a.  Declare the obligations immediately due and payable without demand, presentment, protest, or notice to debtor, all of which debtor expressly waives.

b.  Terminate any obligation to make future product shipments to debtor under this security agreement or any amendment hereto.

c.  Exercise all rights and remedies available to a secured creditor after default, including but not limited to the rights and remedies of secured creditors under the Uniform Commercial Code.

d.  Perform any of debtor's obligations under this agreement for debtor's account. Any money expended or obligations incurred in doing so, including reasonable attorneys' fees and interest at the highest rate permitted by law, will be charged to debtor and added to the obligation secured by this agreement.

e.  Notify end-user about the existence of this security agreement, provide end-user with a copy of this agreement, attachments and amendments, and require end-user to make payments of any amounts owed to debtor *for any reason* directly to secured party at the place and in the manner specified in paragraph 4(a) until the amount owed to secured party under this agreement and attachments or any amendments to it has been paid in full.

10A.  Costs and Attorneys' Fees

Debtor will pay all costs and expenses of collection, including reasonable attorneys' fees.

11.  Waiver by Secured Party

No waiver by secured party of any breach or default will be a waiver of any breach or default occurring later. A waiver will be valid only if it is in writing and signed by secured party.

12.  Survival of Representations and Warranties

Debtor's representations and warranties made in this security agreement will survive its execution, delivery and termination.

13.  Assignment

This security agreement will bind and benefit the successors and assignees of the parties, but debtor may not assign its rights under the agreement without secured party's prior written consent.

14.  Governing Law

This security agreement will be governed by the laws of the State of Colorado.

15.  Entire Agreement

This security agreement together with all attachments incorporated by reference and any written amendments to this agreement is the entire agreement, and supersedes any prior agreement or understandings, between secured party and debtor relating to the collateral.

16.  Notices

Notices under this security agreement and any written amendment to this agreement are considered to be served three days after they are deposited in the United States mail, with prepaid first-class postage, addressed to the other party at the address listed and to the attention of the chief executive officer identified in paragraph 6(d)(1) of this agreement. Either party may change its address for service of notice, by notice to the other.

FACSIMILE SIGNATURES TO THIS AGREEMENT ARE LEGALLY VALID AND BINDING. ADDITIONALLY, A PHOTOSTATIC COPY OF THIS SECURITY AGREEMENT IS AS LEGALLY BINDING AS THE ORIGINAL.

Dated: 07/30/2008

**Arrow Electronics, Inc and subsidiaries.**

By: _____

Name: _____

Title: Manager, Financial Services

**AC Technology, Inc.**

By: *M A Byrd*

Name: *Michael A. Byrd*

Title: *Executive Vice President*

**SCHEDULE PURSUANT TO PARAGRAPH 1(a)**
**(Attachment to Security Agreement or Amendment to Security Agreement)**

*Attach all Debtor's Purchase orders issued to Secured Party: GSA-89064, AFRL-89065,*
*MPO-89069,*
*MPO-89070,*
*DISA-89073*
*ONI-89074,*
*AFRL-89076,*
*DoL-89077,*
*AFRL-89082,*
*√TKC-89083,*
*√ManTech-89086,*
*AFRL-89087,*
*√US Army-89088,*
*√Air Force-89089,*
*√Nat. Archives & Records Administration-89091,*
*Owl-89092,*
*Space Telescope Science-89094,*
*NOAA-89096,*
*OFHEO-89097,*
*Space Telescope Science Inst-89103,*
*AFRL-89107*

## SCHEDULE PURSUANT TO PARAGRAPH 1(a)
### (Attachment to Security Agreement or Amendment to Security Agreement)

*Attach all End-User's purchase orders issued to Debtor:*
*GS09Q08DFM3534*
*FA8751-08-P-0115,*
*H98230-08-P-3456,*
*H98230-08-C-1285,*
*HC1028-08-F-23430,*
*GS-35F-0459K,*
*FA8751-08-C-0007,*
*DOL082J12575,*
*FA8751-08-P-0117,*
*JM20000051,*
*MBI007171,*
*FA8751-08-P-0136,*
*AM2008-052,*
*FA3300-08-P-0168,*
*NAMA-08-F-0077,*
*239,*
*45008,*
*NEEF4100-8-44655,*
*OFHEO08F6758,*
*45023,*
*W91247-08-P-0454*

## SCHEDULE PURSUANT TO PARAGRAPH 3(g)
### (Attachment to Security Agreement or Amendment to Security Agreement)

Attach UCC Financing Statement

*The UCC Financing Statement must include the following collateral description:*

Any and all electronic merchandise and/or other products or merchandise sold to debtor by secured party as specifically identified in debtor's purchase order numbers **89064** (or any other purchase order accepted by secured party in an amendment to the security agreement entered into between debtor and secured party in **July, 2008**) together with any improvements, replacements, accessions, and additions to it.   In addition, accounts, deposit accounts, accounts receivable, chattel paper, instruments, documents, general intangibles, or other right to payment (collectively, "right to payment"), together with all renewals, and including all securities, guaranties, warranties, indemnity agreements, insurance policies, and other agreements pertaining to such rights to payment derived from the sale of any and all identified electronic merchandise and/or other products or merchandise.

## SCHEDULE PURSUANT TO PARAGRAPH 3(1)
### (Attachment to Security Agreement or Amendment to Security Agreement)

Debtor's Invoice(s) to End-User: INVOICE #

**Debtor's invoice must clearly indicate the following:**

**Please note: Your payment must be sent to:**

> **AC Technology, Inc.**
> **P.O. Box 18803**
> **Newark, NJ 07191-8803**

## LIMITED POWER OF ATTORNEY PURSUANT TO PARAGRAPH 5(a)
### (Attachment to Security Agreement)

I, Michael A. Bryd, a duly authorized officer of **AC Technology, Inc.**, debtor, hereby provide Arrow Electronics, Inc. and subsidiaries, this Limited Power of Attorney and authority to execute negotiable instruments on behalf of debtor, with respect to this Security Agreement or any Amendment to this Security Agreement, and to deposit same to an appropriate Client Trust Account in accordance with the laws of the State of Colorado and the Business and Professions Code, Section 7211(a). This Limited Power of Attorney is also provided to allow Arrow Electronics, Inc and subsidiaries the authority to (a) perform any of debtor's obligations under the agreement in debtor's name or otherwise; (b) give notice of debtor's right to payment, to enforce that right, and to make extension agreements with respect to it; (c) sign debtor's name on and to prepare, file, and record original financing statements, continuation statements, statements of assignment, termination statements, and the like, as necessary to perfect, protect preserve, or release secured party's interest in the collateral; (d) To verify information concerning rights to payment by inquiry in its own name or in a fictitious name; and (e) To prepare, execute, and deliver insurance forms' to adjust insurance forms; to adjust insurance claims; to receive payment under insurance claims; and to apply such payment to reduce debtor's obligation. These rights are granted in conjunction with paragraph 6 of the Security Agreement and any Amendment to the Security Agreement.

FACSIMILE SIGNATURE TO THIS AGREEMENT IS LEGALLY VALID AND BINDING. ADDITIONALLY, A PHOTOCOPY OF THIS LIMITED POWER OF ATTORNEY IS AS LEGALLY BINDING AS THE ORIGINAL.

Executed this 30 day of July, 2008, at Dulles, VA.

*Note: This document must be...*

BY: _____

Name: MICHAEL A. BYRD

**Notarized:**

State of VIRGINIA

County of LOUDOUN

The foregoing instrument was acknowledged before me this 30th day of July, 2008, by _____ MICHAEL A. BYRD.

_____    Notary Seal:

Notary Public

My Commission Expires: NOV. 30, 2011

> DAVID A. SITEK
> Notary Public
> Commonwealth of Virginia
> 328884
> My Commission Expires Nov 30, 2011

**OR**

**Witnessed:**

The above and foregoing limited power of attorney, consisting of one page, was on the above date signed by Michael A. Bryd on behalf of **AC Technology, Inc.**, debtor, in our presence. In the presence of each other, we have signed our names as attesting witnesses and acknowledge that we are each of legal age and not a party to the underlying agreement between debtor and Arrow. We declare under penalty of perjury that the foregoing is true and correct.

By: _____    By: _____

Name: Stacie R Potter    Name: _____

## SCHEDULE PURSUANT TO PARAGRAPH (A)
## (Attachment to Security Agreement)

(1)    The location of debtor's chief executive office and the name of its chief executive officer are:

22695 Commerce Center Ct, Suite C, Dulles, VA 20166
Address of Debtor's Chief Executive Office

Earle Munns
Name of Chief Executive Officer

(2)    All legal names under which debtor has conducted its business and State of Origin:

AC Technology
Current Business Name


Alternate Business Name (Fictitious, Previous, Etc.)


Alternate Business Name (Fictitious, Previous, Etc.)

| VA | 0382020-6 | Corporation |
|---|---|---|
| State of Organization | State Organization ID# | Legal Form of Organization |

(3)    The names and addresses of all secured creditors maintaining a valid and binding security interest in inventory, equipment, and/or receivables. In addition, identification as to the state and/or other jurisdiction in which any such financing statement is filed along with the file number and filing date (attach additional pages if necessary).


Bank of America, N.A.
Secured Creditor Name

8300 Greensboro Drive, McLean, VA 22102
Secured Creditor Address

| VA | 02 July 2008 | 080702-7557-0 |
|---|---|---|
| State Where UCC is Filed | Date UCC Filed | UCC File Number |


Secured Creditor Name


Secured Creditor Address


| State Where UCC is Filed | Date UCC Filed | UCC File Number |
|---|---|---|

(4)    The General Terms & Conditions of Sale, which govern the transactions contemplated by this security agreement and any and all amendments hereto, are listed on the next page, unless specifically modified by this security agreement. The debtor has initialed the General Terms & Conditions of Sale as required.

(5)    www.actechnology.com
Debtor's Website Address if applicable

mbyrd@actechnology.com
Email Address of Debtor Contact for Administering this Security Agreement

0808211470

'S OFFICE

2008 AUG -5 AM II: 08

**UCC FINANCING STATEMENT**

Celine    802-878-0011

O'Curran & Middlebrook, Inc.
400 Blair Park Rd., Suite 205
Williston, VT 05495

"Best Available Copy"

080805 7019

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

AC Technology, Inc.

| | | | |
|---|---|---|---|
| 22695 Commerce Center Court, Suite C | Dulles | VA    20166 | USA |
| | Domestic Corp. | Virginia | 0382020-6 | |

**SECURED PARTY'S NAME**

Arrow Electronics, Inc.

| | | | |
|---|---|---|---|
| 7459 South Lima Street, Bldg. 2 | Englewood | CO    80112 | USA |

Any and all electronic merchandise and/or other products or merchandise sold to debtor by secured party as specifically identified in debtor's purchase order numbers 89064 (or any other purchase order accepted by secured party in an amendment to the security agreement entered into between debtor and secured party in July, 2008) together with any improvements, replacements, accessions, and additions to it. In addition, accounts, deposit accounts, accounts receivable, chattel paper, instruments, documents, general intangibles, or other right to payment (collectively, "right to payment"), together with all renewals, and including all securities, guaranties, warranties, indemnity agreements, insurance policies, and other agreements pertaining to such rights to payment derived from the sale of any and all identified electronic merchandise and/or other products or merchandise.

See attached extension sheets for additional Debtor Purchase Orders included in this collateral description:

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

### SCHEDULE PURSUANT TO PARAGRAPH I
(Attachment to Amendment to Security Agreement)

Debtor's Purchase Order(s) issued to Secured Party: GSA-89064.
AFRL-89065.
MFO-89069.
MFO-89070.
DISA-89073.
ONI-89074.
AFRL-89076.
DoD-89077.
AFRL-89078.
TRO-89083.
Modi- Chg-89086.
AFRL-89087.
US Army-89088.
Air Force-89089.
Natl Archives & Records Administration-89091.
ONI-89092.
Space Telescope Science-89094.
NOAA-89096.
OFHEO-89097.
Space Telescope Science Inst-89103.
AFRL-89107.

SCHEDULE PURSUANT TO PARAGRAPH 3
(Attachment to Amendment to Security Agreement)

End User's Purchase Order(s) issued to Debtor: GS09Q08DFM3534
FA8751-08-P-0115,
H95230-08-P-2456,
H98230-08-C-1285,
HC1028-08-P-23430,
GS-35F-0459K,
FA8751-08-C-0007,
DOL0823Y2575,
FA8751-08-P-0117,
SM20000051,
MBI087171,
FA8751-08-P-0138,
H98006-052,
FA3300-08-P-0168,
NAMA-08-F-0077,
216,
N5008,
NEPA1108-B-14855,
DFHEQ08F9756,
45028,
W91247-08-P-0454

## Bank of America

**Bank of America Asset Based Lending Services** - Monthly Borrowing Base Certificate

**BORROWER:    MB Security Corporation/AC Tech**

Certificate #: **2**
Month Ending: **8/31/2008**

**ACCOUNTS RECEIVABLE**

| Line | Roll Forward Information | | Government | Commercial | | Combined |
|---|---|---|---|---|---|---|
| 1 | Trade Accounts Receivable-Last Month End | 31-Jul-08 | 6,464,157.22 | 189,858.24 | - | 6,654,015.46 |
| 2 | Plus: Credit Sales | | 1,026,846.70 | 20,208.40 | - | 1,047,055.10 |
| 3 | Plus: Debit Memos and Misc. Debit Adj. | | - | - | - | - |
| 4 | Less: Collections | | (1,537,487.34) | (189,858.24) | | (1,727,345.58) |
| 5 | Less: Credit Memos for the Month | | | | 0.00 | 0.00 |
| 6 | Other Debit or (Credit) Adj. (Attach Explanation) | | | | 0.00 | |
| 7 | Trade Accounts Receivable-This Month End | 31-Aug-08 | 5,953,516.58 # | 20,208.40 # | 0.00 | 5,973,724.98 |
| 8 | Less: Ineligible Receivables per attached (Schedule A) | | (1,321.79) | 0.00 | | (1,321.79) |
| 9 | Eligible Receivables (Line 7 minus line 8) | | 5,954,838.37 | 20,208.40 | 0.00 | 5,975,046.77 |
| 10 | Advance Rate | | 90% | 80% | | |
| 11 | GROSS ACCOUNTS RECEIVABLE AVAILABILITY | | 5,359,354.53 | 16,166.72 | 0.00 | 5,375,521.25 |
| | UNBILLED ACCOUNTS RECEIVABLE | | | | | $0.00 |
| 12 | Unbilled A/R from prior Month's BBC dated | | | | | $0.00 |
| | Plus: Estimated Unbilled A/R for the month (please exclude Billings in Excess of Costs) | | | | | |
| | Less: Billings Created for the Period | | | | | |
| 13 | Unbilled A/R this Month-End | | MPO sales orders to invoice in Sept 08 | | | $631,023.31 |
| 14 | Advance Rate | | | | | 50% |
| 15 | Unbilled A/R Availability/Unbilled Cap | | | | | 315,511.66 |
| 16 | APPROVED OVERADVANCE ($0) | | | | | 0.00 |
| 17 | GROSS COMBINED AVAILABILITY | | | | | 5,691,032.91 |
| 18 | Less: Outstanding Letter of Credit | | | | | 0.00 |
| 19 | NET AVAILABILITY | | | | | 5,691,032.91 |
| 20 | APPROVED LINE OF CREDIT | | $  10,000,000 | | | |
| 21 | The Lesser of Net Availability or Credit Line | | | | | 5,691,032.91 |

**LOANS OUTSTANDING**

| Line | | | | |
|---|---|---|---|---|
| 21 | Loan Balance - Since last Certificate | 5,500,000 | | |
| 22 | Advances Since last Certificate | 0 | | |
| 23 | Less: Collections Applied To Loan | 0 | | |
| 24 | Total Loan Balance this Certificate | 5,500,000 | | 5,500,000.00 |
| 25 | Less: Collateral Reserves | | | 0 |
| 26 | REMAINING LOAN AVAILABILITY/(OVERADVANCE) | | | 191,033 |
| | (Line 19 minus lines 25 & 26) | | | |

I certify the above to be true and correct to the best of my knowledge and belief. We understand that you are relying upon this Report and supporting documents in granting credit to us and we warrant that no Event of Default exists or is imminent under any agreements between us. The undersigned further certifies that all inventory is owned by us free and clear of any liens or encumbrances other than to Bank of America, that the same is under the control and in the possession of the undersigned and otherwise complies with all provisions of agreements between us:

Borrower:      **MB Security Corporation/AC Tech**
By:            Earle Munns, CEO
Date:          7/31/2008

**EXHIBIT N**

tabbies®